# PETITION FOR WRIT OF HABEAS CORPUS

## UNDER 28 U.S.C. § 2254

**Prisoner's Name:**                        **Billy Daniel Raulerson, Jr.**

**Prisoner's Number:**                      **UNO-462992**

**Place of Confinement:**                   **Georgia Diagnostic Prison**
                                            **Jackson, Georgia 30233**


## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## WAYCROSS DIVISION

|  |  |
|---|---|
| **BILLY DANIEL RAULERSON, JR.,** ) | |
| ) | |
| *Petitioner,* ) | |
| ) | Case No. **CV505-057** |
| **v.** ) | |
| ) | |
| **WILLIAM M. TERRY, Warden,** ) | |
| **Georgia Diagnostic Prison,** ) | |
| ) | |
| *Respondent.* ) | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

Comes now the Petitioner, BILLY DANIEL RAULERSON, JR., by and through undersigned counsel, and invokes this Court's jurisdiction pursuant to 28 U.S.C. § 2254. Petitioner is an indigent person currently under sentence of death and is incarcerated at the Georgia Diagnostic Prison in Jackson, Georgia. This is the first time Petitioner has sought a writ of habeas corpus in federal court.

## NATURE OF RELIEF SOUGHT AND ALLEGATIONS OF ERROR

This petition follows the form established by the Model Form for Use in Applications for Habeas Corpus under 28 U.S.C. § 2254, prescribed by the Rules Governing § 2254 Cases in United States District Courts. It pleads Petitioner's claims for relief and alleges the constitutional errors raised. In conformity with the form and practice, the petition does not make detailed legal argument or address procedural issues or affirmative defenses that the Respondent may choose to raise. Petitioner shall respond in memoranda of law to any procedural issues the Respondent may raise as affirmative defenses and shall submit briefing on the merits of the claims properly before the court.

This petition states claims that have been raised in state courts in exhaustion of state remedies. It is being filed on this date in order to comply with the limitations period of the Anti-Terrorism and Effective Death Penalty Act. However, the investigation and research of Petitioner's case continues, and Petitioner may seek permission of the Court to amend, correct or modify the claims based upon the result of this continued investigation and research.

Petitioner is indigent and was so found by the Georgia state courts during trial, direct appeal and state post-conviction proceedings. Petitioner requests leave to proceed in forma pauperis in this proceeding via motion filed herewith.

Petitioner seeks relief in the form of an order granting the writ of habeas corpus as to his conviction and death sentence, and granting all other relief which the Court may deem just, proper and equitable. Petitioner submits that the state court convictions, death sentence, and affirmances on direct appeal and in state habeas corpus proceedings resulted from violations of his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

Constitution. Petitioner contends that the state courts' findings are contrary to and/or an unreasonable application of clearly established federal law as determined by the United States Supreme Court; involved an unreasonable determination of the facts in light of the evidence; and/or involved the unreasonable and arbitrary denial of relief. See 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362 (2000).

## PROCEDURAL HISTORY

Petitioner was indicted by a Ware County, Georgia grand jury in February 1994, but, pursuant to a change of venue, the convictions and sentences challenged by this Petition were returned by the Superior Court of Chatham County, Georgia. On March 5, 1996, Mr. Raulerson was convicted of two counts of malice murder and one count of felony murder. He was also convicted of one count of burglary, kidnaping, necrophilia, possession of a firearm by a convicted felon, and two counts of possession of a firearm during the commission of a felony. At his trial, Petitioner pled not guilty, and he did not testify at either the guilt-innocence or sentencing phase of his trial. The trial on the issue of guilt or innocence and on the issue of sentencing was determined by a jury. The jury returned a death sentence on March 7, 1996. The trial court entered judgments of conviction and sentence on March 15, 1996, and sentenced Petitioner to death and to various terms of imprisonment.

Mr. Raulerson filed a motion for a new trial on April 1, 1996. The trial court denied the motion on March 12, 1997. Petitioner appealed his conviction and his sentences to the Supreme Court of Georgia. The Supreme Court of Georgia affirmed Petitioner's convictions and sentences on October 10, 1997. Raulerson v. State, 268 Ga. 623, 491 S.E.2d 791 (1997). A

3

timely filed motion for reconsideration was denied on November 5, 1997. On March 20, 1998,

Petitioner filed a Petition for Writ of Certiorari in the United States Supreme Court. That Court

denied the petition on May 18, 1998. Raulerson v. Georgia, 523 U.S. 1127 (1998). The

Supreme Court also denied a timely filed petition for reconsideration of the denial of certiorari.

Raulerson v. Georgia, 524 U.S. 969 (1998).

Thereafter, Mr. Raulerson filed a Petition for Writ of Habeas Corpus in the Superior

Court of Butts County, Georgia on November 23, 1998, and amended that Petition on July 31,

2000. An evidentiary hearing was held on February 20-21, 2001. On July 22, 2003, Petitioner

filed a Notice of Supplemental Authority to bring to the habeas court's attention the decision in

Wiggins v. Smith, 539 U.S. 510 (2003). Respondent filed a Supplemental Brief in response on

August 18, 2003. On March 22, 2004, the Court denied the Petition. On April 2, 2004,

Petitioner filed his Notice of Appeal with the Supreme Court of Georgia and on June 22, 2004

filed his Application for Certificate of Probable Cause to Appeal the denial of his Petition, which

the Court denied on January 11, 2005.

## INTRODUCTION

Billy Daniel Raulerson, Jr. is a mentally retarded and mentally ill man sentenced to death

for the murders of three people in Waycross, Georgia, on May 30-31, 1993. Mr. Raulerson's

death sentence was obtained in violation of the federal Constitution, and is therefore invalid. The

bizarre circumstances of Petitioner's crimes — never explained by trial counsel to the jury —

show that Mr. Raulerson was a deeply troubled and impaired man, and not a cold-blooded killer.

Upon learning that his ex-wife's new husband was planning to adopt Mr. Raulerson's young

4

daughter as his own, and in a severe state of intoxication, Mr. Raulerson shot and killed a teenage couple who were parked in a car near a lake where Mr. Raulerson had gone to be alone. In his altered state, Mr. Raulerson believed that the female teenager was his ex-wife Stacey, in the romantic company of another man. Even after the female victim was dead, Mr. Raulerson picked her up, carried her from the scene, and continued to call her "Stacey." The following day, Petitioner entered what he thought was an unoccupied house to find some food. When he entered the house, he found a woman wielding a knife; in the ensuing struggle, Petitioner shot and killed that victim. Petitioner had no prior history of violent crime.

Mr. Raulerson's trial counsel rendered unconstitutionally ineffective assistance of counsel, among other things, by failing to investigate and present a mitigation case on Petitioner's behalf. Despite that Mr. Raulerson's confessions and the Government's overwhelming evidence of guilt made this a case entirely about sentencing, Mr. Raulerson's counsel presented <u>no mitigation case whatsoever</u> during the sentencing phase of the trial — in large part because counsel failed to conduct an investigation into Mr. Raulerson's life that would have revealed a wealth of mitigating evidence explaining the circumstances of the crimes and describing the horrific upbringing that Mr. Raulerson endured. In this regard, Mr. Raulerson's case is extraordinarily similar to <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), in which the United States Supreme Court (by a 7 to 2 vote) reversed a death sentence based on trial counsel's failure to investigate, and thus present to the jury, critical mitigating evidence concerning the defendant's terrible childhood. Yet the state habeas court entirely ignored <u>Wiggins</u> — among other fundamental precepts of federal law — in denying Mr. Raulerson's petition.

As in <u>Wiggins</u>, Mr. Raulerson's counsel conducted next to no investigation of his childhood and past, and, as a result of this lack of investigation (as well as sheer unpreparedness to litigate a capital case) Mr. Raulerson's counsel <u>failed to present a single witness or present a shred of evidence in mitigation during the sentencing phase</u>.  Not one family member, relative, neighbor, or friend was called to present evidence that Mr. Raulerson was brutally abused as a young child.  No expert witness was presented to the sentencing jury to describe Mr. Raulerson's mental illness, or to give the jury some context that would help understand the highly bizarre facts of the crimes.  Not a single record was introduced, such as an available school record indicating that Mr. Raulerson believed the best thing that could happen to him at age 11 was "to die," or a report of a community health center urging that Mr. Raulerson receive in-patient psychiatric treatment when he was eight but his father refused, or medical records documenting Mr. Raulerson's suicide attempt (a gun shot to the chest) when he was 18.  Moreover, trial counsel made no effort to rebut the State's aggravation case at sentencing, which included testimony from Mr. Raulerson's <u>own brother</u>.  Trial counsel also failed to ensure that the jury knew they could consider evidence of Mr. Raulerson's retardation — which had presented and discussed only during the guilt-innocence phase — at sentencing as well.  Indeed, defense counsel's entire mitigation case consisted of a brief closing argument (spanning only 10 pages of transcript), in which his principal point about Mr. Raulerson was that his own client had a "sick mind."  Given that trial counsel acknowledged that the only realistic hope at trial was for Mr. Raulerson to avoid the death penalty, trial counsel's failure to offer a defense at sentencing was patently inadequate.

A vast amount of new evidence concerning Mr. Raulerson's case was presented at the state habeas hearing, including twenty-five affidavits from relatives, friends, and community members who were never contacted by Mr. Raulerson's trial counsel; extensive expert testimony relating to Mr. Raulerson's mental state; and statements by the State's experts at trial declaring that, based on the evidence undiscovered by trial counsel, they would change their testimony as to Mr. Raulerson's competency and mental retardation. Furthermore, after the hearing, but before the state habeas court issued its order, the Supreme Court decided Wiggins. Because of the strong similarities in the cases, habeas counsel filed a Notice of Supplementary Authority bringing that decision to the state habeas court's attention. But when the state habeas court eventually denied the petition, its order neither distinguished nor even mentioned Wiggins. Rather, the court adopted virtually verbatim a proposed order prepared by the State — an order submitted to the habeas court before Wiggins was decided. The court's failure to address or consider binding precedent from the United States Supreme Court was objectively unreasonable, as was the court's resulting conclusion that counsel's patently deficient performance satisfied federal constitutional standards.

In any event, Mr. Raulerson is ineligible for the death penalty because he is mentally retarded, and his execution therefore would be a miscarriage of justice. See Atkins v. Virginia, 536 U.S. 304 (2002). Yet due to Georgia's unique statutory framework predating Atkins — which requires a defendant to prove mental retardation under an extraordinarily stringent "beyond a reasonable doubt" standard — Mr. Raulerson was unable to get a fair hearing on his mental retardation claim in state court. Indeed, despite the clear and convincing evidence of Mr. Raulerson's mental retardation reaffirmed in the state habeas proceedings, the state habeas court

denied Mr. Raulerson's <u>Atkins</u> claim, relying on Georgia's unconstitutional procedure for determining whether a defendant is mentally retarded. Notably, in the state habeas proceeding, Petitioner's trial expert reiterated his conclusion that Petitioner is mentally retarded, bolstered by the compelling evidence of Petitioner's family and medical history obtained by state habeas counsel. What is more, in light of the readily available evidence adduced by state habeas counsel that trial counsel had failed to uncover, the <u>State</u> expert who had opined at trial that Mr. Raulerson was <u>not</u> mentally retarded disavowed that conclusion in the state habeas proceedings and refused to dispute Mr. Raulerson's retardation claim.

Georgia is the <u>only</u> state to place the burden on mentally retarded defendants to prove their mental retardation beyond a reasonable doubt — which they must do during the guilt-innocence phase of the trial. This procedure, which indisputably allows Georgia to execute people who are more likely than not mentally retarded or who can prove their mental retardation by clear and convincing evidence, violates the Constitution. Whatever the validity of Georgia's mental retardation procedure prior to <u>Atkins</u>, that procedure is now an unconstitutional vestige — one that made the difference between life and death in Mr. Raulerson's case. Both because the evidence of Mr. Raulerson's mental retardation is compelling, and because Georgia's unconstitutional procedures failed to permit Mr. Raulerson to prove his mental retardation in the state proceedings, his death sentence must be reversed.

For these and manifold additional reasons detailed below, the imposition of the death penalty in this case simply cannot be squared with current constitutional standards governing the imposition of the death penalty and the right to effective assistance of counsel. Accordingly, this

8

Court should vacate Mr. Raulerson's death sentence, remand his case for a new sentencing, and grant any other relief that is just and appropriate.

## CLAIMS FOR RELIEF[1]

Each claim for relief set forth below is predicated on the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, as well as the other law set forth in the Petition.  All allegations in this Petition are incorporated into each individual Claim below.

## CLAIM I

**PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT TRIAL AND ON APPEAL IN VIOLATION OF THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

As detailed below in several sub-claims, Mr. Raulerson was denied his right to effective assistance of counsel at trial and on appeal in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and the mandates of the United States Supreme Court in, among other cases, Rompilla v. Beard, 125 S. Ct. 2456 (2005), Wiggins v. Smith, 539 U.S. 510 (2003), Williams v. Taylor, 529 U.S. 362 (2000), and Strickland v. Washington, 466 U.S. 668 (1984).  As the Supreme Court recently reiterated in Wiggins, a claim of ineffective assistance of counsel "has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense." 539 U.S. at 521.  "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an

---

[1] While the grounds in support of this Petition are asserted as separate Claims, Petitioner submits that each paragraph subsumed under the various claim headings, viewed independently or cumulatively, states a basis for relief with respect to his conviction and/or sentence.

objective standard of reasonableness,'" measured by "'prevailing professional norms.'" Id.

(quoting Strickland, 466 U.S. at 688).  Prejudice is established by showing a "reasonable

probability that at least one juror would have struck a different balance" based on the uncovered

mitigation evidence.  Id. at 537.  As the Supreme Court has repeatedly made clear in recent

decisions, because mitigating evidence is an essential component of a capital case, investigating

and presenting mitigating evidence to the jury is constitutionally required.  See, e.g., Rompilla,

125 S. Ct. at 2465-66 & n.7; Wiggins, 539 U.S. at 521-23; Williams, 529 U.S. at 391-98.  And

the Supreme Court has also held that governing professional norms include the obligation of trial

counsel to "'conduct a thorough investigation of the defendant's background,'" Wiggins, 539

U.S. at 522 (quoting Williams, 529 U.S. at 396), and "'to discover all reasonably available

mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by

the prosecutor,'" id. at 524 (quoting American Bar Association's Standards and Guidelines,

emphasis added by Supreme Court).

     The Supreme Court's decision in Wiggins provides a vivid example of what constitutes

constitutionally deficient performance and prejudice.  Because Mr. Raulerson's case is nearly

identical to Wiggins, the Supreme Court's decision strongly supports — if not mandates — a

new sentencing proceeding in this case.  Like the petitioner in Wiggins, Mr. Raulerson suffered

many horrible years of privation and abuse, from a young age, at the hands of his alcoholic and

abusive parents.  Also as in Wiggins, no such mitigation evidence was presented to Mr.

Raulerson's sentencing jury because trial counsel did not perform a proper mitigation

investigation and uncover such evidence, even though counsel had several leads indicating that

such evidence existed.  Absent such investigation, counsel in both cases could not make a

reasoned decision about whether to present mitigation evidence to the jury. In both cases, a proper investigation by trial counsel would have led to such evidence, which was readily obtained by counsel at the state habeas stage of proceedings. Finally, in both cases, had the vast amount of compelling mitigation evidence been presented to the sentencing jury by trial counsel, there is a reasonable probability the jury would have chosen a sentence other than death. But the trial court denied Mr. Raulerson's petition for habeas corpus without even a passing reference to Wiggins, instead adopting a proposed order submitted by the State before Wiggins was decided.

During the state habeas proceedings, extensive and compelling new mitigating evidence concerning Petitioner's personal and medical history was discovered and presented at an evidentiary hearing, as was evidence regarding trial counsels' lack of preparation for Petitioner's case. This evidence showed that trial counsel failed to obtain or present to the jury even a glimpse, much less a complete picture, of the abusive and destructive family environment Petitioner faced growing up. Moreover, as the evidence developed in the state habeas proceeding demonstrated, trial counsel's ineffectiveness was not limited to a failure to investigate and present a mitigation case concerning Petitioner's background. Rather, as detailed below, trial counsel were also constitutionally ineffective by, among other things: failing to investigate and present mitigation evidence concerning Petitioner's mental state at the time of the crimes; failing to adequately investigate and present a defense of "guilty but mentally retarded"; failing to seek proper jury instructions about the penalty phase that would have informed the jury of the relevance of mental retardation to sentencing; failing to investigate or present evidence of mental illness, through a "guilty but mentally ill" defense and/or as mitigating evidence at sentencing; failing to rebut the aggravation evidence submitted by the prosecution in the penalty phase; and

11

failing to present evidence to counter the prosecutor's penalty phase closing argument concerning Petitioner's intent.  Taken separately, and certainly when viewed as a whole, these ineffectiveness claims compel reversal of Petitioner's death sentence.

### A.     Trial Counsel Failed to Investigate or Present Readily Available Mitigation Evidence Relating to Petitioner's Background.

Just as in <u>Wiggins</u>, Mr. Raulerson's trial counsel failed to investigate, develop, or present extremely powerful mitigating evidence concerning the abuse and deprivation that Mr. Raulerson had suffered throughout his life, from the earliest days of his childhood.  After the Ware County Public Defender briefly represented Petitioner, attorney Leon Wilson, assisted by attorney Mark Hatfield, was appointed to Petitioner's case.  Responsibility for developing the mitigation case at sentencing rested with lead counsel Mr. Wilson.  However, Mr. Wilson was an elderly man of poor health leading up to and during Petitioner's trial, P. Ex. 11 at H. Tr. 563,[2] and he performed virtually no investigation of Mr. Raulerson's upbringing.  Mr. Hatfield, a recent law school graduate, was much less experienced and thus was charged with assisting in the implementation, not creation, of the defense strategy.  Despite knowing that evidence concerning mitigation and Petitioner's mental state was vital to any chance of a jury sparing Mr. Raulerson's life, having a variety of leads, and having basic information about Petitioner's troubled family and mental problems, trial counsel did not perform an investigation beyond contacting Petitioner's parents and uncle, and securing an expert to testify about Petitioner's mental retardation.  The only documents that trial counsel obtained concerning Petitioner's case were those turned over to him

---

[2] Citations to the transcript of Mr. Raulerson's underlying criminal trial are cited as "T. Tr. ___." Citations to the transcript of the hearing before the state habeas court are cited "H. Tr. ___." Citations to Petitioner's exhibits at the state habeas hearing are cited "P. Ex. ___, at H. Tr. ___." Citations to a page within an exhibit are cited to the transcript page, not the internal exhibit page. Similarly, citations to Respondent's exhibits are cited "R. Ex. ___, at H. Tr. ___."

by the prosecutor and the public defender. Moreover, trial counsel failed to obtain additional information about Petitioner's background and mental health, despite that Dr. Grant, who testified at trial that Petitioner was mentally retarded, asked for more information to make a full and proper diagnosis. See P. Ex. 7 at H. Tr. 534-36.

According to the testimony of many witnesses who submitted testimony in the state habeas proceeding, Petitioner, while growing up, suffered brutal abuse at the hands of his father, who was a severe alcoholic. One neighbor recounted that when Petitioner was approximately four years old, Petitioner's father hit him all over with a leather strap: "I heard the smack of the strap against Bill's bare skin and could see the welts all over Bill's body . . . . Bill didn't cry at all — he'd just kept pleading, 'No, No, No, No!' But it was no use." P. Ex. 40 at H. Tr. 732. This particular neighbor personally witnessed fifteen such beatings while Petitioner was four through ten years old. See id. Another witness explained that Petitioner's father regularly beat Petitioner with poles and yard tools; for example, when Petitioner was five: "Billy [Petitioner's father] started whacking his son in the head with the pole and went down from there. As I saw it, there wasn't a part of Bill's body that Billy didn't hit. . . . Bill was crumbling under the beating and fell to his knees." P. Ex. 27 at H. Tr. 647-48. According to this witness, "[e]ven to this day, I have never seen a parent treat his child as badly as Billy did Bill [Petitioner]." Id.

Witnesses testified that Petitioner also faced brutal abuse from his mother. As Petitioner's sister testified in these proceedings, "[a]s soon as my mother caught Bill she would lay into him something fierce with whatever she could get her hands on — a belt, a switch, a big spoon, or anything else that might be laying nearby. . . . She didn't just whip the butt either, her blows struck wherever she could land them — in the head, the back." P. Ex. 28 at H. Tr. 703.

13

Petitioner withstood beatings with "a hairbrush, various kitchen utensils, belts, and switches," and received "the worst of [his] parents' aggression." P. Ex. 37 at H. Tr. 701. Furthermore, these beatings often took place in public; as one witness stated, "Bill must have been 9 or so when I first saw him get beat by his daddy. It was rough what went on in their front yard. . . . This fight was not just a father spanking his son, [but was] a knock down drag out beating that Bill took from his daddy." P. Ex. 35 at H. Tr. 685. Petitioner suffered horrible verbal abuse as well; one witness explained that "[t]here was not a time I was in the Raulerson house when I did not hear [Petitioner's mom] call [Petitioner] a bastard, a motherfucker, or other sorts of mean and hateful things. This happened all the time." P. Ex. 39 at H. Tr. 724. The record is replete with similar examples of the brutality suffered by Petitioner, as viewed by numerous witnesses.

Considerable evidence exists that Petitioner's reaction to this violent and degrading treatment at home was one of withdrawal, as he grew into a depressed loner. Witnesses testified that, even as a very young child, Petitioner went to great lengths to escape his family's violence; for example, at age five, Petitioner crawled under a house next door to his grandmother's, where he hid for hours. P. Ex. 37 at H. Tr. 705. At age eleven, Petitioner answered a questionnaire at school, which asked him to describe the best thing that could happen to him; he wrote, "TO DIE." P. Ex. 74 at H. Tr. 1089. And at age 18, Petitioner attempted suicide by shooting himself in the chest.

Furthermore, the evidence shows that a history of mental illness and retardation existed in Petitioner's father's family, and Petitioner's father also had deep intellectual impairments. For example, Petitioner's father cannot read, write, count money or tell time, and a mental health evaluation conducted in 1979 concluded that his father was mentally retarded. Petitioner's

14

mother drank and took pills throughout her pregnancy with Petitioner, was assaulted twice by Petitioner's father during that pregnancy, and has also been diagnosed as being mentally retarded.

From a young age, Petitioner also showed severe mental limitations. These were described by many of the witnesses, who explained that he did not refuse to work, but that he simply could not accomplish basic tasks and would become frustrated. These problems at school and work led to embarrassment and teasing by his peers. Petitioner's impairments were physical, as well as mental; occasionally Petitioner would seem to fall into a trance-like state and appear to lose consciousness. Nearly all of the witnesses who testified to Petitioner's childhood commented that Petitioner was isolated and withdrawn as a child, both at home and at school. In addition, by the time he was ten years old, Petitioner began to drink significant amounts of beer and other alcoholic beverages, and use drugs. Petitioner continued to abuse these substances throughout his childhood and as an adult.

The evidence also showed that mental health professionals throughout Petitioner's life recognized that Petitioner was in need of help, but that his parents prevented him from receiving the proper medical treatment. For example, at age eight, Petitioner was examined by a doctor in his hometown of Waycross, and the doctor encouraged Petitioner's mother to seek inpatient psychiatric help for her son in Savannah. However, he never received further treatment, because his father refused to let Petitioner be treated. A similar series of events happened after Petitioner's attempted suicide at age 18: his mother agreed with the doctors at the hospital that Petitioner should be transferred to Savannah for psychiatric treatment, and two days later, Petitioner's father removed him from the facility. The consistent reaction of teachers, social

15

workers, and others who knew Petitioner as a child was that he failed to receive appropriate attention and treatment when he needed it most.

Even though all of this evidence was readily available to trial counsel had it been sought out, trial counsel discovered none of this information, nor presented it to the jury. None of the over 30 lay witnesses who submitted mitigation and mental health testimony in the state habeas hearing had ever been contacted by trial counsel, with the exception of Petitioner's parents and one uncle. Nearly all of these potential witnesses — family, friends, neighbors, teachers, and medical professionals — lived in or near Waycross, where trial counsel practiced; Petitioner knew many of them well. Even with respect to Petitioner's parents and uncle, trial counsel never informed them about a mitigation case or asked them to testify, and trial counsel spent no more than several hours talking to them in the three-year period from trial counsel's appointment to Petitioner's case to the trial. Finally, nearly all of the witnesses testified at the evidentiary hearing that they would willingly have given their information about Petitioner's upbringing and mental health to trial counsel and would have testified at trial as mitigation witnesses, had they been asked to.

From the beginning of their representation of Petitioner, trial counsel knew that because the State had a strong guilt case, their strategy would be disputing Petitioner's mental state and offering mitigating evidence at the penalty phase in hopes that the judge would spare their client's life. Evidence also shows that trial counsel — at least Mr. Wilson — understood that a mitigation case was vital to successfully representing a client facing the death penalty. See, e.g., P. Ex. 104 at H. Tr. 3127. Trial counsel also had knowledge of numerous mitigation leads, mostly from information provided by Petitioner, but they did not follow up, even though trial

counsel knew Petitioner's family background was difficult.  See, e.g., P. Ex. 127 at H. Tr. 3917.

In addition, the public defender — who had initially represented Petitioner — passed along to

trial counsel notes from initial interviews with Petitioner that included potential mitigation

witnesses and Petitioner's description of his problematic upbringing.  These notes also

demonstrated Petitioner's disturbed mental state at the time of the crime.  Finally, documents

turned over to trial counsel by the prosecution, including Petitioner's statements to police,

contained several leads and information about Petitioner's mental state at the time of the crime.

Had trial counsel made reasonable efforts to uncover some or all of this evidence, it would have

changed the entire landscape of Petitioner's case at sentencing.

    In state habeas court, trial counsel Mark Hatfield suggested two "tactical" reasons that

trial counsel did not further investigate Petitioner's mitigation case:  the cost of an investigation

and trial counsel's focus on the retardation defense.  See H. Tr. at 152, 162-65, 223.  Trial

counsel's "cost" explanation fails because trial counsel never requested funds from the trial court

for a mitigation investigation, and, indeed, even refused the services of a mitigation expert who

offered to conduct an investigation without charge.  See P. Ex. 9 at H. Tr. 545-46.  And trial

counsel's "focus on retardation" explanation makes no sense, because further investigation into

mitigating evidence would only have helped the retardation case, in addition to providing other

reasons for the jury not to impose a death sentence.  In short, trial counsel's failure to investigate

cannot be justified as a "tactical" decision where, as here, counsel did not have enough

information about Petitioner's background to conclude that further investigation would not be

fruitful.  See, e.g., Wiggins, 539 U.S. at 521-23; Jackson v. Herring, 42 F.3d 1350, 1367-68 (11th

Cir. 1995).

Trial counsel also testified at the state habeas hearing that no mitigation case was presented because trial counsel believed that Dr. Grant's testimony at the guilt phase introduced all relevant evidence and that mitigation witnesses such as Petitioner's mother and sister would have opened the door to negative evidence about Petitioner's alleged acts of violence toward them. See H. Tr. 159, 164-65, 204. But trial counsel must assert more than a general fear of negative evidence to justify a failure to put on mitigation witnesses, see, e.g., Dobbs v. Turpin, 142 F.3d 1383, 1388 (11th Cir. 1998), and may not rely on a fear that has not been substantiated by a full investigation, see, e.g., Wiggins, 539 U.S. at 521-23; Jackson, 42 F.3d at 1367-68. According to several potential witnesses never contacted by trial counsel, they would have painted a much less violent picture of Petitioner than had been painted by his brother, Chris Raulerson, and would have put into some context the violence that the State presented. See, e.g., P. Ex. 31 at H. Tr. 668. Moreover, the risk of some negative testimony concerning Petitioner's violence did not justify trial counsel's complete failure to put on a mitigation case, because absent any rebuttal testimony from the defense, the State's aggravation case went uncontradicted and Petitioner's death sentence was assured. Failing to confront the state's aggravation evidence with mitigation evidence was simply not an reasonable or informed "strategy" by trial counsel, on the facts of this case.

**B.    Trial Counsel Failed to Investigate or Present Readily Available Mitigation Evidence Concerning Petitioner's Mental State at the Time of the Crimes.**

In addition to revealing a wealth of readily available information about Petitioner's upbringing, the state habeas proceedings demonstrated that there was considerable information available about the circumstances surrounding the crimes, including Petitioner's relationship with his wife and child. This information was not disclosed to the jury, largely because most of it

18

went undiscovered by trial counsel. Not only would the evidence about Petitioner's wife and child have enabled trial counsel to portray Petitioner more positively to the jury, but it also would have provided a context for the jury to better understand Petitioner's mental state at the time of his crimes.

That evidence showed that Petitioner married a woman named Stacey Kirkland in 1987 when he was 17 and she was 16. Petitioner was desperate to make this relationship work. The couple had a child, Mandy, with whom Petitioner had a very close relationship. Several witnesses testified that Mandy was the only part of Petitioner's life that made him happy and that they had a loving relationship. See, e.g., P. Ex. 32 at H. Tr. 673; P. Ex. 41 at H. Tr. 737.

Other evidence reveals that in 1990, Petitioner's wife filed for divorce, which devastated him, in large part because Stacey had primary custody of Mandy and he began to see Mandy much less. Rather than moving on, Petitioner continued to hope that the couple would reconcile. He engaged in heavy substance abuse after the divorce, and began committing burglaries to fund his drug habit. He was convicted of several burglaries committed in 1990 and 1991; each involved taking not only money, but food. In May 1993, shortly before the crimes in this case took place, Petitioner learned that Stacey was remarried, and that her new husband was planning to adopt Mandy. Petitioner's drug and alcohol binging worsened. In the week before the crimes were committed, Stacey refused to let Petitioner see his daughter on her birthday and asked him to relinquish his parental rights.

As noted above, the crimes that formed the basis of Mr. Raulerson's death sentence began soon after he consumed a substantial amount of beer, marijuana, and pain pills, and went to a nearby lake to get away. While at the lake, he saw a man and woman kissing in a truck. In his

altered state, Mr. Raulerson thought Ms. Dixon was his ex-wife Stacey, and he began yelling and shooting at the couple. Petitioner then picked up Ms. Dixon's dead body, continuing to call her Stacey, and became angry when she did not respond. Because trial counsel failed to discover or present this critical information that shed light on the bizarre circumstances of the crimes and Mr. Raulerson's mental state in the weeks and days leading up to the crimes, the jurors were not able to take this evidence into account in determining the proper sentence. Counsel's failure to investigate and present this critical evidence was objectively unreasonable, and caused Petitioner clear prejudice.

### C.   Trial Counsel Failed To Adequately Investigate and Present a Defense of "Guilty But Mentally Retarded."

As discussed in more detail below with respect to Claims II and III, under Georgia law a defendant can pursue a "guilty but mentally retarded" defense, under which the defendant bears the unconstitutional burden of proving his retardation beyond a reasonable doubt in order to be spared a death sentence. Given the overwhelming evidence linking Petitioner to the crimes in this case, Petitioner's trial counsel pursued this "guilty but mentally retarded" defense at trial. Yet trial counsel presented only one witness in support of Petitioner's "guilty but mentally retarded" defense — Dr. Grant, a psychologist who testified that Petitioner was mentally retarded. Had trial counsel adequately investigated Petitioner's family and medical history, and responded to Dr. Grant's requests for additional information to support the "guilty but mentally retarded" defense, Petitioner's mental retardation would have been plain to the jury. However, trial counsel failed to effectively investigate and present Petitioner's "guilty but mentally retarded" defense. This failure was the difference between life and death, as even one of the State's experts conceded in the state habeas proceedings: had trial counsel provided the State's

20

expert with the materials uncovered by state habeas counsel, the State's expert would not have disputed Mr. Raulerson's retardation claim.

Although Dr. Grant did not have access before or during trial to the vast majority of the above-described factual information concerning Petitioner's family and medical history, Dr. Grant still was able to conclude from his testing, and the minimal other information available to him, that Petitioner was mentally retarded. See P. Ex. 7 at H. Tr. 533. In the course of trial preparation, Dr. Grant sought additional information from Petitioner's trial counsel, but counsel failed to obtain or provide such information. See id. at 533-38. During the state habeas case, however, Dr. Grant was provided with the great amount of additional evidence adduced by habeas counsel, which has strengthened his diagnosis of Mr. Raulerson's retardation. For example, in the course of state habeas proceedings, Dr. Grant was able to obtain psychological evaluations of Petitioner's parents, which "provide evidence of the sociocultural factors such as abuse and deprivation of nurturance and social stimulation which are consistent with Bill Raulerson, Jr.'s, mental retardation." Id. at 537. Dr. Grant also reviewed statements of family members, friends, teachers, and co-workers, which "are precisely the type of evidence that I requested from Mr. Wilson prior to trial and provide the evidence of deficits in adaptive functioning which are consistent with a diagnosis of mental retardation." Id.

To rebut Mr. Raulerson's mental retardation defense at trial, the State presented guilt-phase testimony from psychologist Jerold Lower. Dr. Lower had tested Petitioner to have an I.Q. of 69, and he had concluded that Petitioner was either mentally retarded or functioning in the borderline range of intelligence. In order to make that distinction, Dr. Lower had concluded that he needed further information about Petitioner's "level of adaptive behavior." See P. Ex. 10 at

21

H. Tr. 556, 557. Such information was never discovered or provided by trial counsel. However, based on the additional materials concerning Petitioner's background and upbringing that were provided to Dr. Lower during the state habeas proceedings, Dr. Lower <u>changed</u> his diagnosis of Mr. Raulerson, concluding that "these materials provide clear evidence of deficits in Petitioner's adaptive skill functioning, particularly in the areas of communication, social skills, self-direction, functional academics, self-care, work, health, leisure and safety. These deficits were apparent prior to the age of 18." <u>Id.</u> at 552. Remarkably, Dr. Lower concluded during the state habeas proceedings that the additional evidence provided by habeas counsel "<u>supports a diagnosis of Mental Retardation</u>." <u>Id.</u> (emphasis added); <u>see id.</u> ("As I indicated at trial, crucial information regarding adaptive functioning and age of onset was missing from my evaluation of Mr. Raulerson in 1995. Had I been provided with this information, I would have testified that Mr. Raulerson's I.Q. (including the scores obtained by Dr. Grant) and his deficits in adaptive functioning apparent prior to age 18 supports a diagnosis of Mental Retardation."). Although Dr. Lower was unable to conclude definitively that Petitioner was mentally retarded, he reiterated his conclusion that the additional information provided to him supports a diagnosis of mental retardation, and he was unequivocal that he could not say — as he had at trial — that Petitioner was not mentally retarded. H. Tr. 365, 376, 380.

Thus, had trial counsel performed an adequate investigation into Mr. Raulerson's family background and medical history, and had counsel adequately supplied such information to Dr. Grant and Dr. Lower, the expert opinion at trial would have roundly supported his "guilty but mentally retarded" defense. But trial counsel failed to perform these basic and critical functions — which were all the more important in this case because trial counsel's entire defense focused

on demonstrating Mr. Raulerson's mental retardation during the guilt phase. Because trial counsel's constitutionally deficient performance plainly prejudiced Mr. Raulerson — indeed, made the difference between Mr. Raulerson's life and death — his death sentence must be reversed.

### D.       Trial Counsel Failed to Seek Proper Jury Instructions At the Penalty Phase Concerning the Relevance of Petitioner's Mental Retardation to Mitigation.

As just explained, trial counsel failed to meet constitutional standards in investigating and presenting Petitioner's "guilty but mentally retarded" defense during the guilt phase. But that is only half the story. Trial counsel also profoundly misunderstood the role of Petitioner's mental retardation as a mitigating factor in the penalty phase of the trial. Indeed, once the jury had determined, in the guilt phase, that Petitioner had failed to prove his retardation beyond a reasonable doubt, trial counsel gave up on Petitioner's retardation claim outright. Competent counsel would have recognized that Petitioner's mental retardation remained critical during the sentencing phase as a mitigating factor (where it would not have to be shown "beyond a reasonable doubt" to be relevant), and would have ensured that the jury was specifically instructed that it could consider retardation as mitigating evidence in determining whether a death sentence was appropriate. Absent guidance or argument from trial counsel on this point, however, the trial court's instructions failed to explain to the jury that retardation remained relevant at sentencing. Trial counsel's performance was constitutionally deficient for failure to object to the trial court's erroneous instruction, thus preventing the jury from considering compelling, relevant evidence.

Trial counsel presented the testimony of Dr. Grant in support of Petitioner's "guilty but mentally retarded" defense during the guilt phase of trial, and the State presented competing

23

expert testimony from Dr. Lower. The jury then determined that Petitioner did not prove mental retardation beyond a reasonable doubt. The case proceeded to sentencing, during which, as explained above, counsel put on no witnesses or mitigating evidence. Nor did counsel reintroduce evidence of Petitioner's mental retardation or other psychological problems, or reiterate the strong evidence of Petitioner's retardation. Nor did counsel explain in his closing argument that although the jury had rejected the guilty but mentally retarded defense in the guilt phase, they were still obliged to consider the evidence and conclusions of Dr. Grant as mitigating factors in the penalty phase, in which the beyond a reasonable doubt standard no longer applied to the retardation issue. What is more, without objection from defense counsel, the trial court gave a penalty phase jury instruction that only briefly referenced mitigation, but did that not clearly inform the jury that it could reconsider all the evidence presented in the guilt phase without regard to burden of proof, and conclude that Mr. Raulerson was at least sufficiently mentally retarded or impaired to mitigate his guilt.

A reasonably competent attorney would have requested the court to explain to the jury that they could consider the issue of Petitioner's mental retardation again at the penalty stage, despite the fact that they had already decided that he had not carried his burden in the guilt phase. And, absent such an instruction from the Court, a reasonably competent attorney would have himself explained to the jury the continuing relevance of the mental retardation evidence. This is particularly true where, as here, trial counsel's entire mitigation case supposedly rested on the testimony of one guilt-phase expert. On these facts, trial counsel's failure to object to the penalty phase instructions was constitutionally deficient because those jury instructions simply did not permit the jury to "give effect" to the mental retardation evidence at sentencing — as the federal

24

Constitution requires. Penry v. Lynaugh, 492 U.S. 302, 328 (1989) (explaining that a trial judge is constitutionally required to give "instructions informing the jury that it could consider and give effect to the mitigating evidence of [defendant's] retardation and abused background by declining to impose the death penalty"). It is well-established, and "quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations," Gregg v. Georgia, 428 US. 153, 192-93 (1976), and thus "the judge must clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death; in order to do so, the judge will normally tell the jury what a mitigating circumstance is . . . and what its function is in the jury's sentencing deliberations." Spivey v. Zant, 661 F.2d 464, 471 (5th Cir. 1981).

Mr. Raulerson was plainly prejudiced by counsel's failure to seek a proper jury instruction or to properly inform the jury concerning its consideration of mental retardation evidence as mitigation. Given the strong evidence of Petitioner's mental retardation, a reasonable juror could well have believed that it was more likely than not true that Petitioner was mentally retarded, and decided that Petitioner's life should be spared due to his significant intellectual deficits. But under the instructions given, such a juror could not have understood that for sentencing purposes, he could consider Petitioner mentally retarded and spare his life for that reason. Had Petitioner's counsel sought a proper mitigation instruction, objected to the court's instruction, or told the jury about the relevance of retardation, it would have reasonably likely resulted in a different sentence. Thus, Petitioner is entitled to relief from his death sentence based on counsel's deficient performance.

E.     **Trial Counsel Failed to Investigate or Present Evidence Demonstrating Mr. Raulerson's Mental Illness Through a "Guilty But Mentally Ill" Defense in the Guilt Phase and/or as Mitigating Evidence at Sentencing.**

Early on, trial counsel determined that the defense would hinge in large part on Petitioner's mental state, because the State's evidence linking him to the crimes was quite strong. To this end, trial counsel secured the services and testimony of Dr. Grant, who tested Petitioner and testified that he was mentally retarded. Trial counsel did not, however, pursue a defense of guilty but mentally ill or present expert testimony to the jury demonstrating Petitioner's mental illness. Trial counsel also failed to investigate or present other evidence concerning Petitioner's mental illness as mitigating evidence. These failures were objectively unreasonable, and prejudiced Petitioner. As the state habeas proceedings revealed, abundant evidence demonstrating Petitioner's mental illness would have been readily available to trial counsel upon further investigation, and this compelling evidence should have been presented to the jury through a "guilty but mentally ill" defense and/or as mitigation evidence at sentencing.

In the state habeas proceedings, a clinical psychologist, Dr. Kimberley Ackerson reviewed the evidence developed by habeas counsel, examined Petitioner, and concluded that, "to a reasonable degree of psychological certainty," Mr. Raulerson "was 'mentally ill' at the time of these crimes as defined by O.C.G.A. section 17-7-131(a)(2). . . ." P. Ex. 1 at H. Tr. 468. Dr. Ackerson also opined that several mitigating factors applied to Petitioner, including that he was "under the influence of an extreme mental or emotional disturbance at the time of the crimes," and that his capacity "to conform his conduct to the requirements of law was impaired" by his mental illness and substance abuse. Id.

26

Even more significantly, the evidence obtained by habeas counsel would have affected the judgment of experts who were consulted in Petitioner's trial, according to these experts' own testimony in the state habeas proceedings. For example, Dr. Donald Gibson, who evaluated Petitioner's competency for the State prior to trial, determined at that point that Petitioner did "not have a mental disorder that would preclude his understanding the wrongfulness of his alleged acts." P. Ex. 6 at H. Tr. 561. After evaluating the evidence brought to light in these proceedings, Dr. Gibson's credible sworn testimony was as follows: "Had I been privy to [Petitioner's] statements in 1995, my report to Judge Cheatham would have been quite different. As a result of that review, I now conclude that Mr. Raulerson was mentally ill at the time of the crime consistent with the definition of that term as provided for by O.C.G.A. §§ 17-7-31 et al. I also would have testified to such findings had the court held a hearing on Mr. Raulerson's mental condition, or at the trial itself had I been called upon to do so." P. Ex. 6 at H. Tr. 521-22.

Similarly, Dr. Lower, the psychologist who testified for the State at trial that Petitioner was not mentally retarded, testified in the state habeas proceedings that the materials uncovered by habeas counsel's investigation would have had a dramatic impact on his analysis. With respect to retardation, Dr. Lower explained that the new "materials provide clear evidence of deficits in Mr. Raulerson's adaptive skill functioning"; that "crucial information regarding adaptive functioning and age of onset was missing from my evaluation of Mr. Raulerson in 1995"; and that "[h]ad I been provided with this information, I would have testified that Mr. Raulerson's I.Q. (including the scores obtained by Dr. Grant) and his deficits in adaptive functioning apparent prior to age 18 support a diagnosis of Mental Retardation." P. Ex. 10 at H. Tr. 551-52. Dr. Lower also testified in state habeas that the new materials "strongly indicate that

27