[Petitioner] does suffer from psychological impairments as a result of the traumatic conditions of his upbringing." Id. at H. Tr. 522.

Also presented in the state habeas proceedings — and undiscovered or ignored by trial counsel — was evidence that, on the day of the killings at the lake, Mr. Raulerson had consumed at least one and a half cases of beer, a half bag of marijuana, and various pain pills including Vistaril, Vicodin, Percodan, and Valium. See, e.g., P. Ex. 4 at H. Tr. 490. Based on this and other evidence presented in the state habeas court, Dr. John Holbrook, an expert pharmacologist, opined "that, at the time of the homicides of the teenage couple, Mr. Raulerson was experiencing a drug-induced dissociative episode which significantly impaired his judgement, behavior, capacity to recognize reality and his ability to conform his conduct to the requirements of the law." Id. at H. Tr. 493; see also P. Ex. 1 at H. Tr. 466-68. These conclusions were corroborated by the state habeas testimony of Robert Tressel, a crime scene investigator and former homicide detective, who testified that the crime scenes in this case revealed no evidence of premeditation and deliberation, but that the crimes appeared to have been confused, impulsive and unplanned. See P. Ex. 5 at H. Tr. 503-10.

In sum, it was objectively unreasonable for trial counsel to fail to investigate and present critical evidence concerning Petitioner's mental illness and mental impairments at the time of the crimes. Other than Dr. Grant's guilt-innocence phase testimony concerning Petitioner's mental retardation, trial counsel presented no expert testimony to demonstrate Mr. Raulerson's severe mental illness or impaired mental state. Plainly, both of these factors would have been critical to the jury's assessment of Mr. Raulerson's culpability. But trial counsel simply ignored or failed to develop the factual basis to support the compelling mental health expert opinion presented in the

state habeas proceedings. Accordingly, the jury never heard these critical expert opinions, which belied the State's claim that Petitioner was a deliberative and cold-blooded killer.

As is clear from the evidence submitted in the state habeas proceedings, including expert reports and school records, Petitioner suffered from mental illness throughout his life, beginning in early childhood. These afflictions affected his day-to-day functioning, often causing him to experience dissociative states. Although trial counsel conceded in state habeas proceedings that a "guilty but mentally ill" defense "certainly had merit," they claimed not to have pursued that strategy based on the mistaken belief that evidence of mental illness would not have saved Petitioner's life. See H. Tr. 160, 241. Such a "strategy" was objectively unreasonable, and plainly prejudicial to Mr. Raulerson. Regardless whether a "guilty but mentally ill" defense, standing alone, would have exempted Petitioner from the death penalty under Georgia law or the federal Constitution, at the very least, the voluminous evidence related to Petitioner's mental illness would have been highly relevant to Mr. Raulerson's mitigation case at sentencing. Indeed, such evidence could have made the difference between life and death, had the jury simply been informed by trial counsel of its existence.

### F. Trial Counsel Failed to Rebut the State's Case in Aggravation.

In the penalty phase, the State presented aggravating evidence of alleged prior instances of Petitioner's violent conduct through two witnesses, Wayne Reeves and Christopher Raulerson — Petitioner's brother. These were the only State witnesses to testify to Petitioner's alleged violent nature, and thus their testimony was critical to the State's aggravation case. Trial counsel's failure to investigate these witnesses, to cross-examine them, or to present rebuttal evidence concerning their testimony constituted ineffective assistance of counsel.

Reeves testified that Petitioner shot at three unarmed individuals for no reason whatsoever in the month before the killings in this case. However, trial counsel failed to investigate Reeves' background, which included an extensive criminal record. Had trial counsel performed a basic investigation, they would have been able to impeach Reeves' credibility through the use of these prior convictions, which included crimes of moral turpitude such as theft, burglary, and attempting to elude a police officer. In addition, had trial counsel investigated, they would have discovered that Reeves' testimony on the stand — that Petitioner had indiscriminately fired at three unarmed individuals at the river — was flatly inconsistent with earlier statements he had given authorities in which he claimed that he had <u>prevented</u> Petitioner from firing the gun. See P. Ex. 141 at H. Tr. 4042-43. Trial counsel's failure to investigate and impeach Wayne Reeves' critical aggravating testimony was objectively unreasonable.

Chris Raulerson testified about a family dispute in 1993, during which Petitioner allegedly turned violent and threatened to kill Chris Raulerson with a gun. Chris Raulerson's testimony painted himself and his family as victims. This testimony was particularly detrimental to Petitioner because it came from his own brother, and because, although other family members were sitting in the courtroom, it went unrebutted. Had trial counsel performed even a basic investigation of the facts of this incident, they would have known that other witnesses would have contradicted Chris Raulerson's testimony, and would have recalled Chris Raulerson — not Petitioner — as the aggressor. Moreover, had trial counsel performed an adequate mitigation investigation, they could have used this incident to demonstrate to the jury that violence — particularly against the children — was commonplace in Petitioner's family. The failure to

discover and present testimony of witnesses who would have discredited Chris Raulerson's version of events constituted deficient performance.

Petitioner plainly was prejudiced by counsel's failure to submit the State's aggravation case to meaningful adversarial testing. Because of counsel's failure, the jury was presented with an unrebutted view of Petitioner as a wanton predator who attempted to kill without reason individuals who crossed his path. Had counsel simply investigated these witnesses and performed some degree of cross-examination, the State's aggravation case would have been considerably tempered. Because there is a reasonable probability that "the result of the proceeding would have been different," Strickland, 466 U.S. at 694, absent counsel's failings concerning the State's aggravation case, Petitioner's constitutional rights were violated.

### G. Trial Counsel Failed to Rebut the State's Devastating Closing Argument Concerning Petitioner's Intent.

The prosecution's closing argument painted Petitioner as a "cold-blooded killer" who was "not just one person going out and happening to kill." T. Tr. Vol. 13 at 107, 113. These statements could easily have been contradicted, had trial counsel properly investigated the issue of Petitioner's intent and presented available evidence rebutting the argument that Petitioner acted in a premeditated and deliberate matter. Because "the issue of whether a killing was impulsive or premeditated can be 'an important factor when the jurors consider whether to recommend the death penalty,'" Fugate v. Head, 261 F.3d 1206, 1218 (11th Cir. 2001) (quoting Magill v. Dugger, 824 F.2d 879, 889 (11th Cir. 1987)), trial counsel's complete failure to counteract the State's closing argument amounted to constitutionally deficient performance that prejudiced Petitioner.

31

Trial counsel were aware of the circumstances of the crimes, which were extensively described in Petitioner's statements to law enforcement officials, discovery from the prosecution, and notes from the public defender. Moreover, trial counsel was well aware that Petitioner had extensively used drugs and alcohol prior to the crimes. And it was obviously critical to show at trial that Mr. Raulerson's crimes were impulsive rather than premeditated, to demonstrate Petitioner's reduced culpability. But rather than presenting their own evidence or witnesses to show the lack of premeditation, trial counsel testified in the state habeas proceedings that Petitioner's mental state and the circumstances of the crime were adequately "touched on, or described, in Dr. Grant's testimony." H. Tr. 158. However, Dr. Grant did not testify at trial regarding Petitioner's state of mind at the time of the crimes. Indeed, because Dr. Grant had received no materials concerning the crime scene from trial counsel, he could not have done so. And, although Dr. Grant did touch on Petitioner's general experience of difficulty in "discriminating what may be real or unreal," T. Tr. Vol.10 at 62, trial counsel made no effort to connect such problems to Petitioner's intent at the time of the crimes.

Trial counsel fell short of constitutional standards by failing to secure the testimony of an appropriate expert witness to rebut the State's claim of premeditation and intent. For example, and as described above, a crime scene expert testified at the state habeas proceedings that the characteristics of the crimes at issue in this case were not consistent with premeditation and deliberation. P. Ex. 5 at H. Tr. 503-10. Because this sort of evidence concerning Petitioner's lack of intent, and concomitant decreased culpability, was reasonably available to trial counsel and provided a legitimate and compelling explanation of the crimes, the failure to investigate and present such evidence or argument at closing constituted deficient performance.

32

Petitioner was prejudiced from counsel's failure to rebut the State's arguments concerning Petitioner's premeditation and deliberation. Evidence concerning Petitioner's intent is indisputably relevant to whether a jury chooses to impose the death penalty. See, e.g., Williams, 529 U.S. at 398 (holding that "[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case," such as whether a defendant's "behavior was a compulsive reaction rather than the product of cold-blooded premeditation"). Because the jury did not receive available and highly relevant evidence that Petitioner's crimes were unplanned, Petitioner was prejudiced by his counsel's deficient performance in rebutting the State's theory of intent.

### H. Trial Counsel Rendered Constitutionally Ineffective Assistance Based on Myriad Other Failures.

In addition to the constitutionally deficient and prejudicial performance of trial counsel as described above, Mr. Raulerson's right to effective assistance of counsel was violated by numerous additional failings of trial counsel, including:

- Trial counsel failed to raise proper objections to improper jury charges given by the trial court at the conclusion of the guilt phase of trial;

- Trial counsel failed to raise proper objections to items of improper evidence offered by the State in aggravation at both the guilt-innocence and penalty phases of trial;

- Trial counsel failed to employ a mental health expert for the penalty phase of Petitioner's trial;

- Trial counsel failed to employ a mitigation specialist;

- Trial counsel failed to object to the State's witnesses testifying about matters outside their personal knowledge, see T. Tr. Vol. 13, at 61-62;

33

- Trial counsel failed to challenge the constitutionality of Petitioner's prior convictions;

- Trial counsel failed to object to inappropriate arguments made by the State in its sentencing phase closing, including references to Petitioner as a cold-blooded killer and an enemy of the state, see T. Tr. Vol. 13, at 113, improper Biblical references, see id. at 108, improperly injecting victim-impact testimony not in evidence, see id. at 109, focusing on all the "rights" and due process Petitioner had received, see id. at 110-11, and stating that Petitioner had asked to receive the death penalty, see id. at 114;

- Trial counsel closed the sentencing phase by effectively expressing agreement with the State's argument that Mr. Raulerson should be put to death. For example, trial counsel's ten-page included statements designed to distance counsel from Petitioner, see T. Tr. Vol. 13, at 116, 122, statements failing to explain and give effect to Petitioner's life and background, and in effect transforming those potential mitigating factors into aggravating factors, see id. at 117-18, statements instructing the jury not to consider all options resulting in a sentence of less than death, see id. at 118-19, 121, and statements designed to induce the jury to believe that the responsibility to sentence Petitioner did not rest with the jury, see id. at 121;

- Trial counsel failed to object to those portions of the trial court's charge which failed to adequately define mitigating circumstances and misled the jury in other ways;

- Trial counsel failed to present all issues raised and described in this Petition for a Writ of Habeas Corpus in Petitioner's Motion for a New Trial and on Petitioner's appeal to the Georgia Supreme Court.

34

- Trial counsel failed to raise numerous additional issues in Petitioner's Motion for a New Trial and on Petitioner's direct appeal, including, but not limited to: the prejudice caused by the bomb threat called into the courthouse during trial, where counsel moved for a mistrial; the admission of hearsay testimony on the part of the State's witnesses in the guilt phase; and the trial court's denial of the Plea to Abatement to the indictment on the grounds that the grand jurors were taxpayers of Ware County, the same county that approved $2,500.00 to the reward fund for the arrest and conviction of the perpetrators of the murders.

### CLAIM II

### PETITIONER IS MENTALLY RETARDED AND THEREFORE INELIGIBLE FOR THE DEATH PENALTY UNDER THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

Mr. Raulerson is mentally retarded and therefore ineligible for the death penalty under the United States Constitution. See Atkins v. Virginia, 536 U.S. 304 (2002) (holding that the execution of mentally retarded individuals violates the Eighth Amendment's prohibition against "cruel and unusual punishment"). Although there was compelling evidence of Mr. Raulerson's retardation at trial, which became stronger still as developed further in state habeas proceedings, the state habeas court rejected Mr. Raulerson's retardation claim outright, relying on the unconstitutional Georgia procedures used to determine whether a defendant is mentally retarded. See 3/24/04 Order at 5. But the Constitution requires this Court to reverse Mr. Raulerson's death sentence based on his clear — indeed, nearly unrebutted — evidence of mental retardation. Put simply, it would be a miscarriage of justice to allow unconstitutional and unreasonable state

35

procedures to dictate the execution of a mentally retarded individual such as Mr. Raulerson. See, e.g., Sawyer v. Whitley, 505 U.S. 333 (1992). Mr. Raulerson's death sentence must be reversed.

Substantial evidence submitted at trial and in the state habeas proceedings demonstrate that Mr. Raulerson is mentally retarded. As discussed above, Petitioner's expert, Dr. Grant, testified at trial that Mr. Raulerson was mentally retarded, as part of Petitioner's "guilty but mentally retarded" defense. This testimony was opposed at trial by the State's expert, Dr. Lower, whose own test results indicated that Mr. Raulerson had a qualifying I.Q. score of 69, but who reached a conclusion of non-retardation. Critically, and as explained above, Dr. Lower changed his conclusion about Mr. Raulerson's retardation based upon the evidence developed in the state habeas proceedings — evidence that trial counsel failed to reasonably discover. Based on the habeas proceedings, Dr. Lower retracted his conclusion that Mr. Raulerson is not mentally retarded, and, indeed, agreed with Dr. Grant that the evidence supported a conclusion of mental retardation. Thus, as a result of the state habeas proceedings, there is no longer any expert testimony rebutting Dr. Grant's expert opinion that Mr. Raulerson is mentally retarded. Rather, Mr. Raulerson's retardation is clear.

The extensive evidence presented at the state habeas hearing painted a vivid and credible picture of Petitioner's retardation and its early onset. For example, Petitioner sustained severe injuries and trauma both before birth and as a young child. See, e.g., P. Ex. 30 at H. Tr. 662-63 (testimony of Petitioner's mother describing that, for the first several months of her pregnancy with Petitioner, she was using nerve pills and drinking about a pint of whiskey each day); id. at H. Tr. 663 (mother's testimony that, "One time, during the sixth month of pregnancy [with Petitioner], my husband hit me hard with his fist in my stomach. . . . It hurt a lot, and I was

scared that I would lose the baby. The same thing happened again during the seventh month . . ."). In addition to these pre-natal incidents, Petitioner suffered severe and repeated beatings as a young child, including frequent blows to the head. See, e.g., P. Ex. 27 at H. Tr. 647 ("First, Billy [Raulerson Sr.] started whacking his son in the head with the pole and went down from there." (testimony of Robert Pittman, cousin, describing an incident when Petitioner was "five or so")); id. at H. Tr. 648 ("Other times, I saw Billy [Raulerson Sr.] grab tools that were sitting in the yard, like rakes or brooms, and beat his son down to the ground with them."); P. Ex. 40 at H. Tr. 731-32 ("With his free hand, Billy Sr. was beating Bill with a leather strap wherever he could — his head, his back, his legs, his face. I heard the smack of the strap against Bill's bare skin and could see the welts all over Bill's body." (testimony of a neighbor, describing an incident when Petitioner was about four years old)); P. Ex. 37 at H. Tr. 703-04 ("She [Petitioner's mother] didn't just whip the butt, her blows [with a belt, a switch, a big spoon, or anything else that might be laying nearby] struck wherever she could land them — in the head, the back, where ever she could land them." (testimony of Petitioner's sister)).

The state habeas proceedings also included extensive testimony that Petitioner had severe and unusual cognitive deficits that were readily apparent from an early age. He failed first grade. See P. Ex. 18. He had extreme difficulty completing simple tasks. See, e.g., P. Ex. 26 at H. Tr. 638 ("I had to repeatedly explain to Bill and show him over and over how to rake the leaves into piles and then put them into bags" (testimony of Petitioner's cousin)); P. Ex. 37 at H. Tr. 705 ("[Bill] had the hardest time completing a chore. It was like his mind would go blank on what he was supposed to be doing. It isn't like he would sneak off to go play or was trying to avoid having to do his part. He never left the task." (testimony of Petitioner's sister)). And he

appeared and acted differently from others as a child. P. Ex. 26 at H. Tr. 638 ("Bill was always just slower than the others." (testimony of Petitioner's cousin)); P. Ex. 33 at H. Tr. 678 ("Bill just wasn't like other people. It's like he wasn't all there mentally." (testimony of neighborhood friend)); P. Ex. 27 at H. Tr. 644-45 ("[Bill] mainly got teased because people thought he was stupid" (testimony of Petitioner's cousin)); P. Ex. 42 at H. Tr. 740 ("Bill always did seem kind of slow" (testimony of Petitioner's schoolmate and friend)); P. Ex. 45 at H. Tr. 758-60 (testimony of a local storekeeper).

Several witnesses in the state habeas proceedings described Mr. Raulerson's physical as well as intellectual impairments. A cousin who tried to employ Petitioner described incidents in which Petitioner would lapse into a blank state and appear almost to lose consciousness. The witness described that he would help Petitioner "snap out of it" and that "I asked him what happened to him and he asked me what I was talking about. That has stood out in my mind to this day. There was something that wasn't right in Bill's head." P. Ex. 27 at H. Tr. 644-45 (Robert Pittman); see, e.g., id. at H. Tr. 627; P. Ex. 47 at H. Tr. 772 (Angela Taylor); P. Ex. 44 at H. Tr. 751 (Alvin Rowland).

Finally, the state habeas proceedings demonstrated that Petitioner came from a family with a history of mental retardation — a critical fact that trial counsel failed to develop. See, e.g., P. Ex. 29 at H. Ex. 652-54. In particular, Petitioner's father cannot read, write, count money, or tell time, see, e.g., id.; P. Ex. 37 at H. Tr. 708, and a mental health evaluation in 1979 found his father to be mentally retarded. P. Ex. 83 at 2227, 2473; see also id. at 2173.

It is against this rich factual background that the compelling expert testimony concerning Petitioner's mental retardation must be considered. For example, Dr. Grant, Petitioner's expert

38

at trial, did not have access to most of the factual information just described, but he still was able to conclude from his testing, and the minimal other information available to him, that Petitioner was mentally retarded. See P. Ex. 7 at H. Tr. 533. Dr. Grant sought additional information from Petitioner's counsel at the time of trial, but counsel did not obtain it. Id. at H. Tr. 533-38. In connection with the state habeas proceedings, Dr. Grant now has been provided much of that information, which has only strengthened his conclusion. In particular, he has obtained psychological evaluations of Petitioner's parents, which "provide evidence of the sociocultural factors such as abuse and deprivation of nurturance and social stimulation which are consistent with Bill Raulerson, Jr.'s, mental retardation. Id. at H. Tr. 537. In addition, Dr. Grant has reviewed additional statements of family members, friends, teachers, and co-workers, which "are precisely the type of evidence that I requested from Mr. Wilson prior to trial and provide the evidence of deficits in adaptive functioning which are consistent with a diagnosis of mental retardation." Id.

Even more critical is the about-face of the State's expert based on the factual development in the state habeas proceedings. Dr. Lower testified for the State at trial that Mr. Raulerson's I.Q. of 69 indicated that he was either mentally retarded or functioning in the borderline range of intelligence. Dr. Lower had concluded that he needed further information about Petitioner's "level of adaptive behavior," see P. Ex. 10 at H. Tr. 556, 557, and when he failed to receive this information from trial counsel, he settled on a "borderline" diagnosis. Now, based on the additional materials concerning Petitioner's family and medical history that have been provided to him by habeas counsel, Dr. Lower has concluded that "these materials provide clear evidence of deficits in Petitioner's adaptive skill functioning, particularly in the areas of

communication, social skills, self-direction, functional academics, self-care, work, health, leisure and safety. These deficits were apparent prior to the age of 18." Id. at H. Tr. 552. Had Dr. Lower been provided with these readily available materials at the time of trial, he would not have disputed Dr. Grant's opinion that Petitioner is mentally retarded: "Had I been provided with this information, I would have testified that Mr. Raulerson's I.Q. (including the scores obtained by Dr. Grant) and his deficits in adaptive functioning apparent prior to age 18 supports a diagnosis of Mental Retardation." Id.; see, e.g., H. Tr. 365, 376, 380 (Dr. Lower's state habeas hearing testimony that he could not make a conclusive diagnosis of retardation, but that the factual record supported a diagnosis of mental retardation). Thus, there is no expert testimony in the record to contradict Dr. Grant's conclusion that Petitioner is mentally retarded. Indeed, there is strong corroboration of that diagnosis from Dr. Lower, the State's own trial expert.

It is now firmly established that a person who is mentally retarded may not be executed as a matter of federal law. See Atkins v. Virginia, 536 U.S. 304 (2002). Despite this controlling precedent, the state habeas court rejected Mr. Raulerson's retardation claim without analysis, based on the jury's rejection of Mr. Raulerson's "guilty but mentally retarded" defense at trial. That reasoning is unreasonable and contrary to federal law, for at least two reasons. First, all that the jury determined in this case was that Petitioner had failed to prove that he is mentally retarded "beyond a reasonable doubt." But as explained below in Claim III, this standard of proof — unlike that used by any other state in the nation — is inadequate to ensure that mentally retarded persons are not executed. Thus, the jury's verdict does not dispose of Petitioner's Atkins claim and the demands of federal law. Second, even assuming that the standard used at trial was constitutionally permissible, it would be a miscarriage of justice to execute Mr.

40

Raulerson based on the overwhelming evidence adduced in the state habeas proceedings demonstrating that he is mentally retarded. See Sawyer v. Whitley, 505 U.S. 333 (1992). Although the evidence at trial demonstrated Mr. Raulerson's retardation, that diagnosis is now clear based on the state habeas proceedings, and, indeed, is no longer rebutted by the State's own trial expert. This evidence must be considered to avoid a miscarriage of justice, and it precludes Petitioner's death sentence.

## CLAIM III

### THE GEORGIA STATUTE REQUIRING CAPITAL DEFENDANTS TO PROVE THEIR MENTAL RETARDATION BEYOND A REASONABLE DOUBT VIOLATES THE UNITED STATES CONSTITUTION.

The Georgia procedure for determining whether a defendant is mentally retarded — under which a defendant bears the burden of proving his retardation <u>beyond a reasonable doubt</u> — violated Mr. Raulerson's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Indeed, this procedure permitted the jury to conclude that Mr. Raulerson was not mentally retarded, despite clear evidence that his IQ is 69, that he has deficits in adaptive functioning, and that this condition onset before age 18. In Atkins, the Supreme Court recognized that it was generally the states' "task of developing <u>appropriate</u> ways to enforce the constitutional restriction." 536 U.S. at 317 (emphasis added). But Atkins was not a blanket sanction of state procedures without regard to whether such procedures are inconsistent with "evolving standards of decency," id. at 321, or unreasonably burden the right of mentally retarded persons not to be executed. Rather, such procedures are plainly subject to due process scrutiny. See, e.g., Cooper v. Oklahoma, 517 U.S. 348, 354-55 (1996). Georgia is the <u>only</u> State to require "beyond a

reasonable doubt" proof of retardation; no other State requires such exacting proof, and the great majority require only a "preponderance of the evidence" showing. Georgia's unique procedure is a pre-Atkins vestige, and is not a constitutionally acceptable implementation of Atkins. Thus, Mr. Raulerson's death sentence — which is premised on the jury's application of Georgia's unconstitutional standard — must be reversed.

Georgia's statutory procedure for determining whether a defendant is mentally retarded predates Atkins. It requires defendants raising a defense of "guilty but mentally retarded" to prove mental retardation beyond a reasonable doubt. See O.C.G.A. § 17-7-131. Thus, Mr. Raulerson's jury was instructed to find him guilty, not guilty, or guilty but mentally retarded, and was told to apply a "beyond a reasonable doubt" standard of proof to the retardation claim. And, six years before Atkins was decided, the jury found Mr. Raulerson guilty, apparently concluding that he had not proved mental retardation beyond a reasonable doubt. The state habeas court relied on the jury's rejection of Mr. Raulerson's "guilty but mentally retarded" defense" to conclude that his Atkins claim was barred by *res judicata*. 3/24/04 Order at 5.

Because the right of mentally retarded individuals not to be executed is now a federal constitutional right, state procedures that affect this constitutional right are subject to scrutiny under federal due process standards, and will violate the Fourteenth Amendment if they offend a "recognized principle of fundamental fairness." Cooper, 517 U.S. at 355. Georgia's uniquely stringent procedure violates the Fourteenth Amendment as it applies to Petitioner's rights under the United States Constitution, because it allows Georgia to execute Petitioner and others like him who are mentally retarded, even if a jury does not so find beyond a reasonable doubt. See, e.g., Cooper, 517 U.S. at 355-56, 363-64 (holding unanimously that a state statute requiring

42

capital defendants to prove their incompetence to stand trial by "clear and convincing evidence" was unconstitutional, and ruling that the burden of proof could be no higher than "preponderance of the evidence"). Indeed, by requiring defendants to prove their mental retardation beyond a reasonable doubt, O.C.G.A. § 17-7-131 creates a significant risk that mentally retarded individuals like Mr. Raulerson will not be able to, or for various reasons will fail to, satisfy that burden, and thus will be wrongly executed.

The Georgia procedures contravene due process and the protections recognized in <u>Atkins</u> for several specific and tangible reasons. <u>First</u>, because of the nature of the evidence involved in "proving" retardation — test scores that require interpretation and are subject to various measurement errors, and qualitative information about adaptive deficiencies that does not lend itself to clear-cut measurement — the issue of mental retardation is particularly ill-suited to the "reasonable doubt" standard as a matter of science. As the Supreme Court recognized in the analogous context of mental illness, "[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." <u>Addington v. Texas</u>, 441 U.S. 418, 429-30 (1979) (distinguishing the "reasonable doubt" standard, which "is addressed to specific, knowable facts"). <u>Second</u>, aside from scientific uncertainty, common public misconceptions about how mentally retarded persons appear and behave contribute to the unfairness of the "reasonable doubt" standard. Defendants, like Mr. Raulerson, who do not display physical characteristics like those associated with Down Syndrome may not be perceived by jurors to be mentally retarded, and thus may never be able to satisfy the jurors that they are retarded under a "reasonable doubt" standard, despite clear testimony and evidence to that effect. <u>Third</u>, mentally retarded individuals are often unable to assist their lawyers fully in preparing their defense,

making it all the more difficult to satisfy a "reasonable doubt" standard. As the Supreme Court recognized in <u>Atkins</u>, their "impairments can jeopardize the reliability and fairness of capital proceedings," 536 U.S. at 306-07 — including the very determination of whether or not they are mentally retarded, <u>id.</u> at 320-21.

As noted, Georgia is the <u>only</u> State to impose upon capital defendants the exacting — indeed, nearly impossible — burden of proving mental retardation beyond a reasonable doubt. Most states require defendants to prove mental retardation only by a preponderance of the evidence.[3] A few states require "clear and convincing proof" of mental retardation,[4] and in three States and the federal government, the requisite burden is unclear.[5] In four states, reliable I.Q. scores in the mentally retarded range create a rebuttable presumption that the defendant <u>is</u> mentally retarded, thus placing the ultimate burden of proof on the prosecution.[6] As is clear, Georgia's unique and burdensome procedure is out-of-step with evolving standards of decency

---

[3] <u>See</u> Ark. Code Ann. 5-4-618(c) (Michie 2003); Cal. Penal Code 1376(b)(3) (West 2004); Idaho Code 19-2515A(3) (Michie 2004); 725 Ill. Comp. Stat. 5/114-15(b) (2004); La. Rev. Stat. Ann. 905.5.1(C)(1) (West 2004); Md. Code Ann., Crim. Law 2-202(b)(2)(ii) (2004); Mo. Ann. Stat. 565.030(4)(1) (West 2004); Neb. Rev. Stat. Ann. 28-105.01(4)(b)(ii) (Michie 2004); Nev. Rev. Stat. 174.098(5)(b) (2004); N.M. Stat. Ann. 31-20A-2.1(C) (Michie 2004); N.Y. Crim. Proc. Law 400.27(12)(e) (McKinney 2004), S.D. Codified Laws 23A-27A-26.3 (Michie 2004); Tenn. Code Ann. 39-13-203(c) (2003); Utah Code Ann. 77-15a-104(12)(a) (2004); Va. Code Ann. 19.2-264.3:1.1(C) (Michie 2004); Wash. Rev. Code Ann. 10.95.030(2) (West 2004).

[4] <u>See</u> Ariz. Rev. Stat. Ann. 13-703.02(G) (West 2004); Colo. Rev. Stat. Ann. 18-1.3-1102(2) (West 2004); Del. Code Ann. tit. 11, 11-4209(D)(3)(b) (2003), Fla. Stat. Ann. 921.137(4) (West 2004); Ind. Code Ann. 35-36-9-4(b) (West 2004); N.C. Gen. Stat. 15A-2005(c) (2004).

[5] <u>See</u> 18 U.S.C. § 3596(c); Conn. Gen. Stat. Ann. 53a-46a(h)(2) (West 2004); Kan. Stat. Ann. 21-4623 (2003); Ky. Rev. Stat. Ann. 532.135 (Michie 2004); Okla. Stat. Ann. tit. 22, 1175.5(3) (West 2004); S.C. Code Ann. 16-3-20(C)(b)(10) (Law. Co-op. 2003). In Kentucky, it appears that anyone who demonstrates an IQ below 70 is ineligible for the death penalty. See <u>Woodall v. Commonwealth</u>, 63 S.W.3d 104, 116 (Ky. 2002).

[6] <u>See</u> Ariz. Rev. Stat. § 13-703.02; Ark. Code Ann. § 5-4-618; Neb. Rev. Stat. Ann. § 28-105.01; N.M. Stat. Ann. § 31-20A-2.1.

44

and is inconsistent with the demands of due process. Because Mr. Raulerson's death sentence was obtained as a result of this unconstitutional procedure, that sentence cannot stand.

### CLAIM IV

**THE SENTENCING PHASE JURY INSTRUCTIONS, WHICH FAILED TO PERMIT THE JURY TO CONSIDER PETITIONER'S MENTAL RETARDATION IN MITIGATION, VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

The sentencing phase jury instructions, both individually and collectively, were ambiguous, insufficient, vague, confusing, contrary to law, and resulted in an unreliable jury verdict, in violation of Mr. Raulerson's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments. Most prominently, the trial court failed to instruct the jury at sentencing that mental retardation evidence remained relevant as a mitigating factor, and that such evidence was no longer governed by the "beyond a reasonable doubt" standard of proof that had applied to Petitioner's "guilty but mentally retarded" defense in the guilt-innocence phase that had concluded just the day before. Thus, Mr. Raulerson's jury rendered its death sentence while under the misimpression that evidence of his mental retardation was either irrelevant or not to be considered unless proven beyond a reasonable doubt. These erroneous jury instructions prevented the jury from giving effect to mitigating evidence that may have spared Petitioner's life, and he is therefore entitled to a new sentencing proceeding.

At the end of the guilt-innocence phase, the court instructed the jury that under Georgia law, Petitioner had to prove mental retardation "beyond a reasonable doubt" to warrant a verdict

of "guilty but mentally retarded." T. Tr. Vol. 12 at 181-82. The jury evidently concluded that Petitioner had not proved retardation beyond a reasonable doubt, because they rejected the "guilty but mentally retarded" verdict. At sentencing — one day after the jury had determined that Petitioner was not mentally retarded beyond a reasonable doubt — the trial court instructed the jury as follows:

> In arriving at this determination [as to punishment], you are authorized to consider all of the evidence received here in court in both stages of this proceeding, presented by the State and the defendant throughout the trial before you, unless the Court has previously instructed you to consider certain evidence introduced by the State for a limited purpose . . . .
>
> Now you shall also consider the facts and circumstances, if any, in extenuation, mitigation, and aggravation of punishment. Mitigating or extenuating facts or circumstances are those which you the jury find do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame.

Id. at 126. This was the extent of the trial court's instruction on mitigation evidence.

The Eighth Amendment requires that a jury be permitted to consider all constitutionally relevant mitigating evidence. Penry, 492 U.S. at 319; Eddings v. Oklahoma, 455 U.S. 104, 113-15 (1982); Lockett v. Ohio, 438 U.S. 586, 602-06 (1978). As the Supreme Court explained in Penry: "[I]n the absence of instructions informing the jury that it could consider and give effect to the mitigating evidence of Penry's mental retardation and abused background by declining to impose the death penalty, we conclude that the jury was not provided with a vehicle for expressing its 'reasoned moral response' to that evidence in rendering its sentencing decision." 492 U.S. at 328. The Supreme Court so held, because there must be no "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." Id. (internal citation and quotation marks omitted). Thus, a defendant's death sentence is invalid under the

Eighth Amendment if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. . . . [A] defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction." Boyde v. California, 494 U.S. 370, 380 (1990).

The jury instructions at Mr. Raulerson's sentencing did not inform the jury that the "beyond a reasonable doubt" standard that the jury had applied only the day before no longer applied to the issue of mental retardation. Further, the instructions failed to inform the jury that at sentencing, they could reconsider the issue of mental retardation — since mental retardation is quite clearly a mitigating factor — despite that they had already decided that issue at the guilt-innocence phase. Although the jury instruction did state that the jurors could consider "all of the evidence" in their sentencing deliberations, that brief, general statement was insufficient to inform the jurors not only that they could reconsider the mental retardation issue they had decided at guilt-innocence, but also that they could apply a different, less-exacting standard of proof to mental retardation evidence at sentencing. Absent clear instruction, a jury of laypersons would be highly unlikely to infer that they could reconsider the mental retardation issue under a far less stringent standard. Because it is highly unlikely that the jury properly considered the evidence of Mr. Raulerson's mental retardation as a mitigating factor, he is entitled to relief from his death sentence, and to a new sentencing proceeding.