# ORIGINAL

**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
WAYCROSS DIVISION**

| | | |
|---|---|---|
| BILLY DANIEL RAULERSON, JR., | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | CV 505-057 |
| | * | |
| CARL HUMPHREY, Warden, | * | |
| Georgia Diagnostic Prison, | * | |
| | * | |
| Respondent. | * | |

## O R D E R

Before the Court in the above captioned case is Georgia death row inmate Billy Daniel Raulerson, Jr.'s petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. no. 1.)

## I. Background

### A. Factual Background

Over the course of two days in 1993, Billy Daniel Raulerson, Jr. ("Raulerson") killed three people in and around Waycross, Georgia. On May 30, 1993, Raulerson shot and killed two teenagers parked near a lakeside "lovers' lane," Jason Hampton and Charlye Dixon. The next day, Raulerson shot and stabbed Gail Taylor to death. Each victim had been shot multiple times with a .22 rifle, and Raulerson's semen was found in Dixon's rectum. Raulerson v. State, 268 Ga. 623, 623 (1997).

On May 31, 1993, the victims' bodies were discovered, all at separate locations. The crime went unsolved for seven months. In January 1994, Raulerson was arrested on unrelated assault and weapons charges, and he gave the police a blood sample. DNA analysis linked Raulerson to Dixon's murder, and upon questioning by law enforcement, Raulerson confessed to the three murders. Id. at 623-24.

In his confession, Raulerson admitted that he parked his car near Hampton's pickup truck, and that he shot Hampton several times from the bed of the truck. Raulerson also confessed that he shot Dixon as she attempted to flee from the truck. Raulerson dragged Hampton from the truck and shot him several more times, and then put Dixon, and two of Hampton's fishing rods, in his vehicle. Raulerson drove to a wooded area several miles away, where he shot Dixon again and sodomized her. Id. at 624-25.

Raulerson attempted to return to Dixon's body the next day, but did not approach the site because people were nearby. Instead, he drove to a rural area of the County and looked for a house to burglarize. Raulerson stopped at a house with no cars in the carport. When no one responded to his knock at the door, he broke into a utility shed and stole meat from a freezer. Id. at 624.

Raulerson heard someone in the house as he was loading the meat into his car. Upon entering the home, he encountered Gail

2

Taylor, who was armed with a kitchen knife. After struggling with Taylor and stabbing her in the wrist, perhaps fatally, Raulerson shot Taylor multiple times before stealing her purse and fleeing. Raulerson told investigators that he had stolen the .22 rifle from a Pierce County residence that he had burglarized in early May 1993. Id.

Officers executed a search warrant on Raulerson's residence and found a fishing rod that was identified as having been taken from Hampton's pickup truck the night he was killed. Parts of a .22 caliber rifle were also found at Raulerson's home. A ballistics expert later testified that the shell casings found near Hampton and Taylor were probably fired from the rifle found in Raulerson's possession. Id.

## B. Procedural Background

### 1. State Prosecution and Direct Appeal

On February 2, 1994, Raulerson was indicted on two counts of malice murder, burglary, felony murder, kidnapping, aggravated sodomy, necrophilia, two counts of possession of a firearm during the commission of a felony, and possession of a firearm by a convicted felon. The state sought the death penalty against Raulerson, and the venue of the trial was changed to Chatham County, Georgia. The trial was held February 20 to March 7, 1996. Id. at 623 n.1.

At trial, Raulerson offered expert testimony indicating that tests administered after the crime showed that Raulerson

3

was mentally retarded, with an IQ of 69.[1] The state submitted other IQ test evidence that was taken nine years earlier, when Raulerson was fifteen, indicating that his IQ was 83. The state's psychologist opined that there was no indication that Raulerson was severely mentally ill. Id. at 624.

The state abandoned prosecution of the felon in possession of a gun charge, and the jury found Raulerson not guilty of aggravated sodomy. The jury convicted Raulerson of the remaining counts, and imposed three death sentences for the murders. Id. at 623 n.1.

The jury found several aggravating factors justifying the sentence. It found that the murder of Dixon was committed while Raulerson was engaged in the commission of murdering Hampton, and that the murder of Hampton occurred while Raulerson was kidnapping Dixon. The jury found that the murders of Hampton, Dixon, and Taylor were all outrageously or wantonly vile, horrible, or inhuman in that the acts involved torture, depravity of mind, or aggravated battery. The jury also found that the murder of Taylor was committed while Raulerson was in the commission of a burglary, and that Raulerson committed murder to obtain money or other things of value. Raulerson was sentenced to death on March 15, 1996. Id. at 633.

In 1997, the Georgia Supreme Court affirmed Raulerson's conviction. It held that the evidence was sufficient to

---

[1] It is estimated that between 1 and 3 percent of the population has an IQ of 70-75 or lower. Atkins v. Virginia, 536 U.S. 304, 309 n.5 (2002).

authorize a rational trier of fact to find Raulerson guilty beyond a reasonable doubt of two malice murders, felony murder, burglary, necrophilia, and possession of a firearm during the commission of a felony. Id. at 624. The Court further noted that the jury was authorized to find that [Raulerson's] expert's testimony [of his mental retardation] at trial was effectively rebutted by the State." Id. at 627. The Court also rejected Raulerson's constitutional challenge to Georgia's law that requires the defense of mental retardation be proven beyond a reasonable doubt in order for a jury to return a "guilty but mentally retarded verdict." Id. at 632 (citing Burgess v. State, 264 Ga. 777, 789-92 (1994)).

### 2. State Habeas Corpus Application

Raulerson is incarcerated on death row at the Georgia Diagnostic Prison in Jackson, Georgia. In 1998, Raulerson filed a petition for a writ of habeas corpus in the Superior Court of Butts County, Georgia, and amended his petition in 2000. Resp't Ex. 94 at 2. An evidentiary hearing was held on February 20 and 21, 2001. Id. On March 22, 2004, the court denied the petition. Id. at 64. On January 11, 2005, the Supreme Court of Georgia denied Raulerson's application to appeal from that determination. See doc. no. 1 at 4.

### 3. Federal Habeas Corpus Application

On July 18, 2005, Raulerson filed his petition for a writ of habeas corpus in federal court. On June 9, 2008, the

Honorable Anthony Alaimo entered an Order allowing discovery on the issue of whether Georgia's burden of proof on the mental retardation standard was unconstitutional. (Doc. no. 33.) Specifically, in this Order, Judge Alaimo found that the state habeas court "determined that the state supreme court's decision on direct appeal on the constitutionality of the burden of proof was res judicata, and that it had no jurisdiction to reconsider that ruling." Id. at 8. Thus, Judge Alaimo granted Raulerson's request for authorization of funds to retain Professor Ruth Luckasson, but denied funds for a clinical psychologist. Furthermore, Respondent was directed to answer Raulerson's interrogatories.

Thereafter, Raulerson filed a motion for an evidentiary hearing on Claim III regarding the constitutionality of Georgia's burden of proof for mental retardation. (Doc. no. 41.) On December 15, 2008, Judge Alaimo granted this request, finding that Raulerson was diligent in presenting his claims to the state courts and that his allegations, if true, would entitle him to relief. (Doc. no. 44.) Judge Alaimo again based this ruling on his finding that "the state habeas court did not reach the merits of Raulerson's claim, or interpret the import of the intervening precedent in Atkins, but simply explained that it was bound by the state supreme court's interpretation." (Id. at 44.)

On February 23, 2009, an evidentiary hearing was conducted on Georgia's burden of proof regarding mental retardation. Raulerson called Ruth Luckasson as an expert witness over the objection of Respondent. (Doc. no. 49.) After this hearing, the parties briefed Claim III, including the evidence presented at the February 23, 2009 hearing.

On July 24, 2009, Judge Alaimo entered an Order determining that Raulerson's Brady claim and Batson claim were barred from federal review due to procedural default, while reserving ruling on Raulerson's remaining claims regarding ineffective assistance of counsel. (Doc. no. 63.) Thereafter, the parties filed briefs on the remaining claims on the merits.

On March 31, 2010, the case was transferred to the undersigned judge for plenary disposition. Oral Argument was set for July 30, 2010, but this hearing was postponed in light of the Eleventh Circuit's continued consideration of Hill v. Schofield, --- F.3d ---, No. 08-15444 2010 WL#2427092 (11th Cir. June 18, 2010), a case regarding the constitutionality of Georgia's burden of proof for mental retardation. On November 22, 2011, on rehearing en banc, the Eleventh Circuit held that the Georgia Supreme Court decision upholding Georgia's statutory reasonable doubt standard for capital defendants' mental retardation claims was not contrary to clearly established law. Hill v. Humphrey, 662 F.3d 1335 (11th Cir. 2011). On June 4, 2012, the United States Supreme Court denied certiorari, Hill v.

Humphrey, 132 S. Ct. 2727 (2012), and on August 31, 2012, the United States Supreme Court denied the petition for rehearing, Hill v. Humphrey, 133 S. Ct. 94 (2012).

On March 26, 2013, the Court set supplementary briefing deadlines for the parties to identify the remaining ripe issues as well as the impact of the Eleventh Circuit's opinion in Hill. (Doc. no. 83.) Further, the Court ordered oral argument for July 15, 2013.  The week prior to oral argument, the Court canceled the hearing and set final briefing deadlines with respect to Raulerson's claim that he is mentally retarded. (Doc. no. 89.)

## II. Section 2254 Standard

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), signed into law on April 24, 1996, amended § 2254(d) to provide:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The United States Supreme Court addressed Section 2254(d) in Brown v. Payton, 544 U.S. 133 (2005). The

Supreme Court explained the difference between the "contrary to" and "unreasonable application" clauses in § 2254(d)(1) as follows:

> AEDPA provides that, when a habeas petitioner's claim has been adjudicated on the merits in state-court proceedings, a federal court may not grant relief unless the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." A state-court decision is contrary to this Court's clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases, or if it confronts a set of facts that is materially indistinguishable from a decision of this Court but reaches a different result. A state-court decision involves an unreasonable application of this Court's clearly established precedents if the state court applies this Court's precedents to the facts in an objectively unreasonable manner.

Brown, 544 U.S. at 141 (internal citations omitted). Thus, under § 2254(d)(1), it is not enough to demonstrate that a state court's decision is "incorrect or erroneous"; only a showing that the decision was "objectively unreasonable" will entitle a petitioner to relief. Wiggins v. Smith, 539 U.S. 510, 520-21 (2003). In sum, a habeas petition may be granted if "the state court's decision was contrary to, or involved an objectively unreasonable application of, the governing Federal law set forth by Supreme Court cases." McIntyre v. Williams, 216 F.3d 1254, 1257 (11th Cir. 2000). Elaborating on this standard, the Supreme Court recently stated that a habeas court may only "issue the writ in cases where there is no possibility

9

fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." Harrington v. Richter, 131 S. Ct. 770, 786 (2011) ("[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.").

Moreover, AEDPA sets a highly deferential standard of review for state court factual determinations. AEDPA "requires federal habeas courts to presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" Schriro v. Landrigan, 550 U.S. 465, 473-74 (2007) (quoting 28 U.S.C. § 2254(e)(1)); see also Crawford v. Head, 311 F.3d 1288, 1317 (11th Cir. 2002) (affirming state court factual determination "because there is support for it in the record and [the petitioner] has not rebutted the finding by clear and convincing evidence"). Thus, "some evidence suggesting the possibility" that a petitioner's version of the pertinent facts is correct is not sufficient to carry the burden of showing that a state court made an unreasonable determination of fact as contemplated by § 2254(d)(2). Bottoson v. Moore, 234 F.3d 526, 540 (11th Cir. 2000). If the record provides any support for a state court's factual findings, this Court may not set aside those findings unless and until they are rebutted by clear and convincing evidence. Crawford, 311 F.3d at 1317.

## III. DISCUSSION

Raulerson raises a number of claims in his petition that merit discussion. The Court will first address his claim that trial counsel were ineffective in violation of Strickland (Claim I). Next, the Court will analyze his contention that Georgia's statutory burden of proof is unconstitutional (Claim III). Then, the Court will discuss his claim that he is mentally retarded and therefore ineligible for the death penalty under Atkins (Claim II). Finally, the Court will address his claims that the sentencing phase instructions were unconstitutional (Claim IV); that he is ineligible for the death penalty because he is severely mentally ill (Claim VI); that he was denied access to competent mental health assistance (Claim VII); that his death sentence is an arbitrary application of the death penalty (Claim XII); and that the cumulative effect of these errors entitles him to habeas relief (Claim XIV).

### A. **Claim I**: Ineffective Assistance of Counsel for Failure To Adequately Investigate and Present Mitigating Evidence

Raulerson contends that his trial counsel rendered ineffective assistance of counsel by failing to adequately investigate and present a case for the jury to return a verdict of life as opposed to death. Raulerson takes issue with the paucity of testimony in the mitigation phase. Raulerson complains that trial counsel failed to investigate and present

11

evidence regarding the abuse Raulerson suffered during childhood, Mr. Raulerson's love for his wife and child, and Raulerson's mental state and condition at the time of the murders. Additionally, Raulerson contends that trial counsel failed to investigate and challenge the State's aggravating evidence. See doc. no. 1 at 9.

### 1. Ineffective Assistance of Counsel Standard

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland v. Washington, 466 U.S. 668, 686 (1984). Strickland established the familiar two-pronged analysis under which a criminal defendant's Sixth Amendment rights are denied when (1) a defense attorney's performance falls below an objective standard of reasonableness and (2) thereby prejudices the defense. Yarborough v. Gentry, 540 U.S. 1, 5 (2003); see also Wiggins v. Smith, 539 U.S. 510, 520 (2003). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Strickland, 466 U.S. at 700.

To establish deficient performance, a petitioner must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney

conduct." _Wiggins_, 539 U.S. at 521. Instead, "[t]here are countless ways to provide effective assistance in any given case." _Strickland_, 466 U.S. at 689. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." _Id._ at 688. In reviewing ineffectiveness claims, "judicial scrutiny of counsel's performance must be highly deferential." _Id._ at 689. Furthermore, courts afford counsel a "strong presumption of competence," _Cullen v. Pinholster_, 131 S. Ct. 1388, 1407 (2011); _see also Premo v. Moore_, 131 S. Ct. 733, 742 (2011) ("[S]ubstantial deference must be accorded to counsel's judgment."); _Rompilla v. Beard_, 545 U.S. 374, 381 (2005) (recognizing the "heavy measure of deference to counsel's judgments").

Even when the record fails to explain all of trial counsel's decision-making, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." _Bell v. Cone_, 535 U.S. 685, 698 (2002) (quotation omitted); _see also Yarborough_, 540 U.S. at 8 ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect."). When courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger. _See Provenzano v. Singletary_, 148 F.3d 1327,

1332 (11th Cir. 1998) (stating that the "strong reluctance to second guess strategic decisions is even greater where those decisions were made by experienced criminal defense counsel" and that "[t]he more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting a defense" is reasonable); see also Burger v. Kemp, 483 U.S. 776, 779-780 (1987) (reciting counsel's impressive credentials in opinion finding that counsel rendered effective assistance).

To establish actual prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694; see also Wiggins, 539 U.S. at 534. A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. See Strickland, 466 U.S. at 689; Wiggins, 539 U.S. at 534. The court does not consider prejudice in a vacuum. "In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." Strickland, 466 U.S. at 695.

### 2. State Habeas Court's Determination Regarding Ineffective Assistance of Counsel

In addressing Raulerson's complaints of ineffectiveness of counsel, the state habeas court concluded that counsel was not ineffective in its investigation and presentation of potential

mitigating evidence at trial. See generally Resp't Ex. 94. Specifically, the state habeas court determined that counsel presented mitigating evidence in the guilt-innocence phase of the trial demonstrating the following: that Raulerson was physically and verbally abused by his parents; that Raulerson grew up in an extremely dysfunctional environment; that Raulerson's family had a history of substance abuse; that Raulerson began abusing drugs and alcohol at a very young age; that Raulerson showed signs of brain damage; that Raulerson had a lifelong history of depression; that Raulerson was diagnosed with attention deficit disorder and explosive disorder; that Raulerson had difficulty in controlling his impulses; that Raulerson's alleged mental retardation resulted in increased aggressive behavior due to his increased level of frustration; that Raulerson attempted suicide and was hospitalized; that Raulerson experienced marital difficulties resulting in divorce; that Raulerson often experienced blackouts after using alcohol and drugs; and that Raulerson engaged in binge drinking and drug use in the days preceding the crimes in question. Id. at 50-51.

Additionally, the state habeas court found that counsel's failure to present testimony of Raulerson's family members and acquaintances during sentencing was not deficient. Id. at 51. The state habeas court determined that the testimony of these people could have adduced additional harmful information that was not otherwise before the jury. Id. at 52. Specifically,

counsel did not elicit testimony regarding Raulerson's daughter because the prosecution could have responded to such evidence with testimony from Raulerson's ex-wife, Stacey Cox. Id. At the time of the crimes, Ms. Cox made statements to law enforcement that she suffered beatings from Raulerson and that Raulerson threatened her life, as well as the lives of her family members. Id. The state habeas court also determined that counsel's failure to interview all of Raulerson's family members and acquaintances and to call these people as potential mitigation witnesses was not deficient. Specifically, the state habeas court determined that the testimony presented during the state habeas proceeding by these potential witnesses was cumulative of the evidence presented at the guilt-innocence phase of the trial. Id. at 53. The only evidence that was not cumulative were a few instances of Raulerson's isolated good deeds, and the state habeas court found there was no reasonable probability that presenting this evidence would have resulted in a sentence less than death. Id. at 53-54. The state habeas court also concluded that the trial court instructed the jury regarding sentencing that they were "authorized to consider all of the evidence received" in court "in both stages of this proceeding, presented by the State and the defendant throughout the trial." Id. at 51. Thus, the state habeas court concluded that trial counsel did not perform deficiently in mitigation under Strickland. Id.

### 3. *Application of Strickland*

Here, as in Strickland, Raulerson contends that his trial counsel – Mr. Leon Wilson and Mr. Mark Hatfield - were deficient for failing to perform a proper investigation into potential mitigating evidence. Raulerson argues that the state habeas court's conclusion to the contrary is an unreasonable application of Strickland as announced in the following cases: Williams v. Taylor, 529 U.S. 362, 395-96 (2000) (finding that defense counsel's failure to investigate and present any mitigating evidence at sentencing in a capital murder case was deficient performance, where counsel failed to present record evidence of the defendant's substantial alcohol and drug consumption and lack of sleep before the murder, favorable expert testimony regarding the defendant's cognitive ability to conform his conduct to the law, evidence of the defendant's history of drug and alcohol abuse, and evidence of his dysfunctional upbringing); and Wiggins, 539 U.S. at 519-38 (finding that counsel's failure to investigate the petitioner's life history for mitigating evidence for the penalty phase of his murder trial, beyond reviewing a presentence investigation report and department of social services records, fell short of prevailing professional standards).

#### a) Investigation of Mitigation Evidence

The issue before this Court now is whether the state habeas court unreasonably applied the Strickland standard in

consideration of Petitioner's claim that his counsel was ineffective during the mitigation phase. That is to say, because of the added layer of deference that AEDPA requires of this Court, Petitioner "must do more than satisfy the Strickland standard. He must also show that in rejecting his ineffective assistance of counsel claim the state court 'applied Strickland to the facts of his case in an objectively unreasonable manner.'" Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004) (quoting Bell v. Cone, 535 U.S. 685, 699 (2002)).

The Eleventh Circuit has explained that in addressing a habeas claim that trial counsel should have done something more, a court should first look at what the attorney actually did. See Grayson v. Thompson, 257 F.3d 1194, 1218-19 (11th Cir. 2001). This is not a case where trial counsel did little or nothing in preparation for Petitioner's mitigation case before the jury. Indeed, a review of the record shows that trial counsel conducted an adequate investigation into Petitioner's past. Trial counsel knew from the start that the case would revolve around Petitioner's mental retardation. To assist in this endeavor, Mr. Wilson acquired the services of a licensed social worker, Audrey Sumner; a psychologist, Dr. Daniel Grant; a psychiatrist board certified in neuropsychology and forensic psychology, Dr. John Savino; a neurologist, Dr. Michael Baker;

and a neuropsychologist, Dr. Manuel Chaknis.[1] Resp. Ex. 94 at 12-13; Ex. 25 at 11, 12, 17; Ex. 81 at 7756. Trial counsel also interviewed Raulerson's mother, father, brother, and uncle regarding his childhood and family life. Resp't Ex. 94 at 14; Resp't Ex. 81 at 7915-7937.

Although Raulerson now claims that trial counsel should have interviewed his school teachers, their affidavits for the state habeas proceeding are largely contradicted by Petitioner's school records. Indeed, Dr. Grant's report indicates that Raulerson's school experience was marked with extreme difficulties. In his school records, Raulerson's teachers described him as having difficulty in controlling his mood and behaviors, lacking self-control, exhibiting cruelty to others, lacking any friends, and failing to ever adapt to the school environment. Resp't Ex. 81 at 7624-25.

Petitioner argues that the state habeas court's determination is contrary to, or an unreasonable application of, several Supreme Court cases involving the effectiveness of counsel during the mitigation phase of a death penalty trial including Williams, Wiggins, and Rompilla. Importantly, however,

---

[1] Raulerson claims that the state habeas court's determination that Dr. Grant did not request additional materials from Mr. Wilson is an unreasonable determination of the facts. Indeed, there does appear to be sworn testimony by Dr. Grant that he requested additional materials from Mr. Wilson. See Resp't Ex. 59 at 536. However, even if the state habeas court's determination was unreasonable, Raulerson has failed to explain how he was prejudiced by Dr. Grant's failure to obtain additional evidence. Dr. Grant testified for a day at the trial that Raulerson was mentally retarded. Raulerson failed to argue or present evidence that this additional information would have changed the outcome of the trial.

the instant case does not present the type of circumstances encountered by the habeas courts in the cited Supreme Court cases. For instance, in Williams the Supreme Court found that the defendant's counsel had not begun to prepare for sentencing until a week before the trial, failed to present any evidence of the defendant's borderline mental retardation, and failed to uncover juvenile and social services records depicting the defendant's nightmarish childhood. See 529 U.S. at 391-98. Similarly, in Wiggins, the Supreme Court faulted Wiggins's trial counsel for their failure to obtain any information about his background despite a report that Wiggins had a miserable childhood spent in foster care. Further investigation would have revealed that Wiggins had an abusive and alcoholic mother and suffered physical and sexual abuse in more than one foster home. See 539 U.S. at 534-38. And finally, in Rompilla, the Supreme Court granted habeas relief based upon Rompilla's attorney's failure to uncover evidence of a miserable and abusive childhood, psychological tests that pointed to schizophrenia and other disorders, and Rompilla's organic brain damage and impaired cognitive function. See 545 U.S. at 390-91.

In this case, despite a claim that counsel "failed to investigate," Raulerson has not argued that his trial counsel failed to uncover some relevant critical evidence about his background. For instance, trial counsel were aware that Raulerson suffered physical and mental abuse as a child and was

20

a life-long abuser of drugs and alcohol. Further, counsel actively investigated and pursued mental retardation. These issues were explored at trial during the guilt-innocence phase. Indeed, all the relevant information about Raulerson came out during the trial of the case in one form or another. Consequently, the state habeas court's determination that trial counsel was not ineffective for a failure to investigate is not unreasonable.

b) <u>Presentation of Mitigation Evidence</u>

Raulerson also contends that trial counsel were ineffective for failure to present mitigating evidence in this case. First, Raulerson argues that the failure to present any mitigation witnesses rendered his counsel ineffective. <u>See</u> Doc. no. 1 at 12-16. Next, Raulerson argues that his trial counsel failed to present evidence of his childhood abuse and deprivation; his love for his wife and child; his mental state at the time of the crimes; and further evidence of mental retardation. <u>Id.</u> Finally, Raulerson argues that trial counsel failed to investigate and challenge the State's aggravation witnesses, Wayne Reeves and Chris Raulerson. <u>Id.</u> at 29.

**i.   No Mitigation Witnesses at Sentencing Phase**

First, the state habeas court's determination that trial counsel were not ineffective for failure to present mitigation witnesses during the sentencing phase of the trial is not an

unreasonable application of the law or determination of the facts. No absolute duty exists to introduce mitigating or character evidence. See Tarver v. Hopper, 169 F.3d 710, 715 (11th Cir. 1999) (noting that counsel is not "required to investigate and present all available mitigating evidence to be reasonable") (citing Burger, 483 U.S. at 794-95; Stanley v. Zant, 697 F.2d 955, 961 (11th Cir. 1983) (no duty to present general character evidence)); see also Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995) (en banc) (noting that both the Eleventh Circuit and the Supreme Court have held counsel's performance to be constitutionally sufficient when no mitigation evidence was produced even though it was available). See, e.g., Burger, 483 U.S. at 794-95 (finding counsel effective even though counsel presented no mitigation evidence at all); Darden v. Wainwright, 477 U.S. 168, 186 (same).

Furthermore, a lawyer reasonably could have determined that character evidence would not be compelling in this case. See Chandler v. U.S., 218 F.3d 1305, 1319 (11th Cir. 2000). And a lawyer reasonably could also fear that character evidence might, in fact, be counterproductive: it might provoke harmful cross-examination and rebuttal witnesses. Misgivings about damaging cross-examination and rebuttal witnesses have been decisive to the Supreme Court when it determined that counsel was effective. See, e.g., Burger, 483 U.S. at 792 (concluding that failure to introduce character evidence was effective performance because

22

witnesses could have been subjected to harmful cross-examination or invited other damaging evidence); Darden, 477 U.S. at 186 (1986) (same); Strickland, 466 U.S. at 673 & 699 (same). Trial counsel in this case has testified that he had these same misgivings and concerns.

For instance, Mr. Hatfield testified that trial counsel did not call any family members during the mitigation phase for fear that they would offer negative information that would be damaging to Raulerson's case. See Resp't Ex. 57 at 204. Trial counsel were concerned that calling Raulerson's mother and sister might lead to introduction of, or elaboration on, incidents of violence where Raulerson was the aggressor against his mother and sister. Id. at 206, 208, 261, 290. Additionally, calling Raulerson's ex-wife, Stacey Cox, to testify regarding Raulerson's relationship with his daughter would have likely led to testimony that Raulerson regularly beat Ms. Cox. See Resp't Ex. 94 at 52. Likewise, Mr. Hatfield testified that they chose not to call Raulerson's uncle, Donald Pittman, because he exhibited very bizarre behavior and was not "the sort of guy you would want to put on the stand in front of a jury." Resp't Ex. 57 at 174.

Moreover, a plausible explanation exists for the failure to present mitigation witnesses. Under Georgia law, the sentencing jury may consider evidence placed before it during both phases of the trial. See O.C.G.A § 17-10-30(b) (formerly codified at §

27-2534.1(b) of the 1933 Code). Thus, while Raulerson's trial counsel elected not to offer additional evidence during the sentencing phase, Raulerson is "incorrect to say that counsel offered no mitigating evidence" at all. See Stanley, 697 F.2d at 969.

The record belies the assertion that trial counsel made no effort to place before the jury information that might have tended to mitigate the jury's view of what his punishment should be. Dr. Grant testified that after extensive testing Raulerson was in fact mentally retarded. This testimony spanned nearly 200 pages of the trial transcript. See Resp't Ex. 25 at 10-189. Additionally, during closing arguments in the sentencing phase of the trial, Mr. Wilson argued for Raulerson's life, citing to the mitigation evidence introduced in the guilt-innocence phase. He implored the jury to consider "the way [Raulerson] was raised, this dysfunctional family, parents that fought like animals with each other; an alcoholic father who taught him to mind with blows of his fists to his head, who taught him how to drink alcohol when he was 10 years old, who taught him to steal for food for them to live on." Resp't Ex. 28 at 117-18. Consequently, although trial counsel failed to present any mitigation witnesses during sentencing, this Court cannot say that the state habeas court's determination was an unreasonable application of the law or determination of the facts.

### ii. Failure to Present Evidence of Intoxication During Crimes

Likewise, the state habeas court's determination that trial counsel were not deficient for failure to present further evidence regarding his state of intoxication and substance abuse is not an unreasonable determination. It is well-accepted that many lawyers fear introducing evidence of alcohol and drug use. See Clisby v. Alabama, 26 F.3d 1054, 1056 (11th Cir. 1994). It is not unreasonable for trial counsel to decide not to dwell on intoxication due to the general disdain which jurors hold drunkenness as an excuse for violent behavior. White v. Singletary, 972 F.2d 1218, 1226 (11th Cir. 1992). Indeed, emphasizing intoxication at the time of the murders, or a history of drinking in general, could have damaged Raulerson's case for life before the jury. See Grayson v. Thompson, 257 F.3d 1194, 1227 (11th Cir. 2001) ("[W]e note that emphasizing [the petitioner's] alcoholic youth and intoxication may also have been damaging to [the petitioner] in the eyes of the jury."); Tompkins v. Moore, 193 F.3d 1327, 1338 (11th Cir. 1999) ("[A] showing of alcohol and drug abuse is a two-edged sword which can harm a capital defendant as easily as it can help him at sentencing.") (citing Waldrop v. Jones, 77 F.3d 1308, 1313 (11th Cir. 1996)); Rogers v. Zant, 13 F.3d 384, 388 (11th Cir. 1994) (noting reasonableness of lawyer's fear that defendant's

voluntary drug and alcohol use could be "perceived by the jury as *aggravating* instead of mitigating") (emphasis in original).

As to evidence of drug and alcohol abuse during the time of the incidents, Mr. Hatfield testified that he did not believe introducing additional evidence of Raulerson's intoxication would have benefited Raulerson. Specifically, he testified that "we are in the Bible belt, and people sitting on juries just don't really think very much of, you know, saying I was drunk or drugged out of my mind and didn't know what I was doing." Resp't Ex. 57 at 264. Mr. Hatfield testified further that people "are very unforgiving, you know, when it comes to that sort of drug and alcohol use." Id. at 265. Additionally, trial counsel did not want to divert attention away from what they considered the best defense: mental retardation. Id. at 266. Raulerson has not presented any Supreme Court precedent that renders the habeas court's decision unreasonable. Accordingly, the state habeas court's determination that trial counsel were not deficient for failing to introduce more evidence of intoxication and drug abuse is not an unreasonable determination.

### iii. Failure to Present Evidence of Mental Illness

Raulerson also argues that the state habeas court should have determined that trial counsel should have presented evidence of mental illness. However, the Eleventh Circuit has stated that "[t]o avoid being branded ineffective, defense

lawyers need not assert every nonfrivolous defense." Rogers, 13 F.3d at 388 (11th Cir. 1994). A "multiplicity of arguments or defenses hints at the lack of confidence in any one." Id. (citing Jones v. Barnes, 463 U.S. 745, 751-53 (1983).)

Here, Mr. Hatfield testified that trial counsel chose not to present mental illness to the jury because it would compete with the mental retardation defense. Resp't Ex. 57 at 195, 242. Significantly, at the time of Raulerson's trial, a defense of mental illness – unlike mental retardation – would not have saved him from the death penalty.[2] Thus, trial counsel decided that pursuing only mental retardation was the most likely strategy to save Raulerson. Id. Trial counsel's determination that presenting a mental illness defense would have detracted from the mental retardation defense was not an unreasonable trial strategy. Accordingly, the state habeas court's determination as such is not an unreasonable application of federal law or an unreasonable determination of the facts.

### iv. Failure to Cross-Examine Aggravation Witnesses

Raulerson further contends that his trial counsel were deficient for failure to thoroughly cross examine aggravation witnesses that painted Raulerson as a continuous threat to society. Specifically, Raulerson argues that his trial counsel

---

[2]    According to the 1988 version of O.C.G.A. § 7-7-131, defendants found guilty but mentally ill are entitled to psychological evaluation and treatment, but the explicit terms of the statute provide that the death penalty is only prohibited for those who are found guilty but mentally retarded.

should have cross-examined Wayne Reeves. At trial, Mr. Reeves testified about an alleged incident in which Raulerson shot at individuals in a boat. Raulerson argues that defense counsel should have presented evidence that Mr. Reeves had a long criminal history and made inconsistent statements to police regarding whether Raulerson actually shot at individuals in a boat.

At the state habeas hearing, Mr. Hatfield testified that he did not cross-examine Mr. Reeves because Mr. Reeves could also testify that Raulerson had made some racial remarks that trial counsel did not want to come out to the jury. See Resp't Ex. 57 at 232. Mr. Hatfield also testified that the reason for not bringing out Mr. Reeves' prior convictions was a desire to avoid "point[ing] the finger at Wayne Reeves for having had the same prior record that our client did." Id. at 273.

Likewise, Raulerson argues that trial counsel should have cross-examined his brother, Chris Raulerson, who testified about an incident in which Raulerson allegedly pushed his mother, punched his sister, and used a gun to threaten his brother. Specifically, Raulerson contends that testimony from his sister and another witness would have established that it was a fight between brothers that escalated. See Doc. no. 66 at 41. However, there is no evidence that Petitioner did not threaten his brother with a gun, push his mother to the ground, and punch his sister during the altercation in question. Accordingly, the

state habeas court's determination that trial counsel reasonably handled these aggravation witnesses is not an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

### v. Failure to Present Full Extent of Mitigation Evidence

Raulerson also takes issue with the depth at which certain aspects of his background were explored and detailed before the jury. In this Court's estimation, however, Raulerson's ineffectiveness claim focuses upon the strategic choices his counsel made after a thorough investigation into any mitigating evidence. Mr. Hatfield testified that introducing all the information into the record during mitigation that Raulerson now seeks to argue was pertinent would be like "throw[ing] 100 things against the wall and see[ing] what sticks" and that it "is not [his] approach to the trial of a case." Resp't Ex. 57 at 213. Indeed, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. Considering the realities of the courtroom, more is not always better. The Eleventh Circuit explained that stacking defenses can hurt a case. Good advocacy requires "winnowing out" some arguments, witnesses, evidence, and so on, to stress others. See Rogers, 13 F.3d at 388 (citing Jones v. Barnes, 463 U.S. 745, 751 (1983)); see also Waters, 46 F.3d at 1512 (en banc) ("There

is much wisdom for trial lawyers in the adage about leaving well enough alone.").

Ultimately, counsel is not required to present every nonfrivolous defense; nor is counsel required to present all mitigation evidence, even if the additional mitigation evidence would have been compatible with counsel's strategy. See Waters, 46 F.3d at 1511 (en banc) ("Our decisions are inconsistent with any notion that counsel must present all available mitigating circumstance evidence."). Consequently, the state habeas court's denial of Raulerson's ineffective assistance claim on this ground is not an unreasonable application of clearly established federal law or an unreasonable determination of the facts.

### c) Prejudice

Under the second prong of Strickland, counsel's alleged failures must have prejudiced the defense to constitute ineffective assistance. Strickland, 466 U.S. at 692. "When a defendant challenges a death sentence . . . the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695. In assessing a claim of prejudice, the Court must re-weigh the aggravating evidence against all of the mitigating evidence adduced at trial and during the state habeas proceedings. Wiggins, 539 U.S. at 534.

Here, Raulerson made a full confession to the police, his DNA was recovered from Mrs. Dixon's rectum, and property taken from the three murder victims was recovered at Raulerson's home at the time of his arrest. As stated by Raulerson in his brief on the merits, "[t]here was virtually no chance that Mr. Raulerson would be found innocent of these crimes." See Doc. no. 66 at 20. Raulerson does not deny that the evidence clearly establishes that the murder of Dixon was committed while Raulerson was engaged in the commission of murdering Hampton; that the murder of Hampton occurred while Raulerson was kidnapping Dixon; that the murders of Hampton, Dixon, and Taylor were all outrageously or wantonly vile, horrible, or inhuman in that the acts involved torture, depravity of mind, or aggravated battery; that the murder of Taylor was committed while Raulerson was in the commission of a burglary; or that Raulerson committed murder to obtain money or other things of value.

Rather, as evidence that he was prejudiced by trial counsel's alleged failures, Raulerson presents three juror affidavits claiming that if they had been presented with additional mitigation evidence, they would have given Raulerson life in prison without parole rather than a death sentence. See doc. no. 66 at 52. However, on collateral appeal the state habeas court declined to consider these affidavits because O.C.G.A. § 17-9-41 provides that jurors' affidavits "may be taken to sustain but not to impeach their verdict." See

_Gardiner v. State_, 264 Ga. 329, 332 (1994).[3] Georgia's rule against the use of juror affidavits to impeach the verdict is similar to Federal Rule of Evidence 606, which prohibits jurors from testifying about "the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters." Fed. R. Evid. 606(b).[4] Accordingly, the juror affidavits do not offer any competent evidence that more evidence in mitigation would have changed the outcome of the proceedings. As a result, the state habeas court's finding that Raulerson was not prejudiced by the alleged errors of trial counsel is not unreasonable under Section 2254(d).

### 4. Conclusion

In conclusion, although Raulerson asserts that his trial counsel completely failed to investigate or present mitigation evidence, the reality is that trial counsel's mitigation strategy was unsuccessful. The jury rejected Raulerson's mitigating evidence in favor of the death penalty. In now reweighing the evidence, this Court finds that none of the additional mitigation evidence proffered here would have altered

---

[3] The exception to the rule is when affidavits would show that "extrajudicial and prejudicial information has been brought to the jury's attention improperly, or where non-jurors have interfered with the jury's deliberations." _Id._ (internal citations omitted).

[4] The exceptions — extraneous prejudicial information or outside influences — are not at issue with respect to Raulerson's claim that more mitigation evidence would have changed the jurors' vote.

the jury's finding that the murders were especially heinous or atrocious. The notion that the result would have been different had counsel presented more detailed evidence of Raulerson's mental retardation, mental health issues, history of abuse, and "love" for his family is unattainable in light of the aggravating evidence before the jury. The jury heard about Raulerson's mental retardation and dysfunctional childhood in the days prior to its verdict of death. The additional evidence proffered by habeas counsel would not have changed the prosecution's portrayal of Raulerson as a dangerous, cold-blooded killer. Indeed, it was not objectively unreasonable for trial counsel to believe that providing more detailed information about Raulerson's substance abuse issues, family, or his mental state at the time of the crime may have been counterproductive and harmful to his mitigation case.

Raulerson has simply not shown a reasonable probability that additional, more detailed evidence of his mental health problems, substance abuse issues, familial relationships, and history of childhood abuse would have changed the balance of aggravating and mitigating circumstances. The Eleventh Circuit has noted that "some death penalty cases almost certainly cannot be won by defendants because sometimes the *best* lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder – or, even a less-brutal murder – for which there is strong evidence of guilt in fact."

Lawhorn, 519 F.3d at 1295 (citing Clisby, 26 F.3d at 1057 (quotations omitted)). Accordingly, habeas relief based upon counsel's performance at the mitigation phase must be **DENIED**.[5] Consequently, in accordance with the July 24, 2009, Order of this Court, (doc. no. 63) Raulerson has not demonstrated cause and prejudice to excuse his procedural default as to the following claims: Claim VIII (bomb threat claim); Claim IX (juror misconduct claim); Claim X (same jury claim); and Claim XIII (unified appeal procedure claim).

**B. Claim III: Whether Georgia's Beyond a Reasonable Doubt Standard for Mental Retardation Is Unconstitutional**

**1. State Habeas Court Did Not Determine that Claim III Was Res Judicata**

In addressing Petitioner's Claim III, whether Georgia's statutory burden of proof regarding mental retardation is constitutional, the Court begins with its previous Orders dated June 9 and December 15, 2008. (Doc. nos. 33, 44.) In these Orders, Judge Alaimo determined that "the state habeas court did not reach the merits of Raulerson's claim, or interpret the import of the intervening precedent in Atkins, but simply

---

[5]    Raulerson argues that if this Court were to deny relief on the basis of the record, he is entitled to an evidentiary hearing to develop additional evidence. In this case, an evidentiary hearing on Claim I is not precluded under § 2254(e)(2) because Raulerson was diligent in seeking to develop the factual bases of his claims in state court, see Williams v. Taylor, 529 U.S. 420, 432, 120 S.Ct. 1479, 1488, 146 L.Ed.2d 435 (2000). However, an evidentiary hearing in this case is not mandatory under Townsend v. Sain, 372 U.S. 293 (1963). There is no indication from the state records that Raulerson was deprived of developing evidence necessary to adjudicate his claims. Accordingly, the Court will exercise its discretionary authority to not hold a hearing, finding the record to be fully developed with respect to the claims presented. See Williams v. Allen, 542 F.3d 1326, 1347-48 (11th Cir. 2008).

explained that it was bound by the state supreme court's interpretation" regarding Georgia's burden of proof for mental retardation. (See Doc. no. 44 at 6; see also doc. no. 33 at 8.) However, a careful review of the state court's habeas order leads this Judge to a different conclusion.

The state habeas court found the following regarding Raulerson's claim attacking Georgia's statutory burden of proof for mental retardation:

> **Claim IX, ¶56 of the amended petition**, wherein Petitioner alleged that he was denied due process of law by requiring him to bear the burden of proving his mental retardation beyond a reasonable doubt. Raulerson, 268 Ga. at 632 ("There is no merit to Raulerson's challenge to the constitutionality of O.C.G.A. § 17-7-131(3), which requires that the defense of mental retardation be proven beyond a reasonable doubt in order for a jury to return a verdict of 'guilty but mentally retarded.'").

> This Court denies Petitioner's claim that the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S. Ct. 2242 (2002), declared this burden of proof of mental retardation unconstitutional. The Georgia Supreme Court's recent decision in Head v. Hill, S03A0559 (2003) held that defendant's burden in proving the mental retardation "beyond a reasonable doubt" is controlling.

(Doc. no 31, Ex. 424 at 6.)

Petitioner continues to argue that this passage from the state habeas order was not a decision on the merits, but was a determination of res judicata. In order for res judicata to apply to a claim, it must have been raised and decided during the direct appeal. See Elrod v. Ault, 231 Ga. 750, 750 (1974); Gunter v. Hickman, 256 Ga. 315 (1986). The Eleventh Circuit,

35

however, has "repeatedly held a state court's summary rejection of a claim qualifies as an adjudication on the merits under § 2254(d) so as to warrant deference." Ferguson v. Culliver, 527 F.3d 1144, 1146 (11th Cir. 2008); Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1347 (11th Cir. 2005). In Wright v. Moore, 278 F.3d 1245, 1255-56 (11th Cir. 2002), the Eleventh Circuit stated that "a decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed."

In this case, the state habeas court went beyond a res judicata determination and actually *denied* Raulerson's claim based upon Atkins and Head v. Hill, 277 Ga. 255 (2003). Atkins and Head v. Hill were both issued after the Georgia Supreme Court determined Raulerson's direct appeal in 1997. Thus, the state habeas court's determination on Georgia's burden of proof for mental retardation could not have been a res judicata decision. Instead, the state habeas order denied the claim based upon the merits, as there is no way that the Georgia Supreme Court's determination of Raulerson's claim on direct appeal was based upon Atkins and Head v. Hill.

The Court recognizes that the state habeas court discusses this claim within the res judicata section of its order. However, to find that the state habeas court determined Raulerson's constitutional challenge to Georgia's statutory burden of proof on mental retardation was res judicata is to

36

elevate form over substance. The state habeas court denied the claim and based the denial upon cases that the Georgia Supreme Court could not have considered on direct appeal. Although the state habeas court failed to analyze the claim in depth, a summary adjudication is enough to warrant deference. Ferguson, 527 F.3d at 1146. Thus, the state habeas court's determination was on the merits and is due deference under Section 2254(d)(1).

### 2. The State Habeas Court's Finding that Georgia's Beyond a Reasonable Doubt Burden of Proof Is Not Unconstitutional Under Atkins Was Not Contrary to, or an Unreasonable Application of, Well-Established Federal Law.

In the most recent briefing to the Court, Respondent argues that Hill v. Humphrey, 662 F.3d 1335, 1360 (11th Cir. 2011), found that Georgia's burden of proof on mental retardation was not contrary to, or an unreasonable application of, clearly established federal law as established under Atkins. Accordingly, Respondent contends that Raulerson's Claim III regarding the burden of proof on mental retardation must be denied as Hill is directly on point and controlling.

In Hill, the Eleventh Circuit affirmed the denial of the petitioner's Section 2254 petition because there was no decision of the United States Supreme Court clearly establishing that Georgia's burden of proof on mental retardation was unconstitutional. Id. Specifically, Hill addressed whether Georgia's burden of proof violates the Eight Amendment right established in Atkins. Id. Thus, while Hill conclusively

37

establishes that the state habeas court's decision regarding Georgia's burden of proof was not contrary to, or an unreasonable application of, the Eight Amendment right enunciated in Atkins, Hill did not rule on the question of whether Georgia's burden of proof violates procedural due process under the Due Process Clause. Id. at 1358.

Raulerson argues that Georgia's burden of proof on mental retardation violates procedural due process. Specifically, Raulerson contends that Georgia's burden of proof on mental retardation is so high that it effectively assures that some mentally retarded persons will be executed. Essentially, Raulerson argues that the state habeas court's use of the beyond a reasonable doubt standard was an unreasonable application of the substantive right conferred in Atkins. See Doc. no. 52 at 39. Raulerson, however, has not identified any Supreme Court case clearly establishing that Georgia's beyond a reasonable doubt standard is an unreasonable application of Atkins.

Raulerson identifies several cases that he believes establish that Georgia's burden of proof on mental retardation violate procedural due process under the Due Process clause: Bailey v. Alabama, 219 U.S. 219, 239 (1911); Speiser v. Randall, 357 U.S. 513, 520 (1958); Panetti v. Quarterman, 551 U.S. 930, 949-50 (2007); Ford v. Wainwright, 477 U.S. 399, 424 (1986); Cooper v. Oklahoma, 517 U.S. 348, 355 (1996); Staub v. City of Baxley, 355 U.S. 313, 325 (1958); and Davis v. Wechsler, 263

U.S. 22, 24 (1923). However, none of these cases speak to the constitutionality of burdens of proof for mental retardation. As the Eleventh Circuit stated in Hill, AEDPA does not permit this Court to import a procedural burden of proof requirement into Atkins and find that a state's preexisting procedural standards are an unreasonable application of that imported standard. Hill, 662 F.3d at 1360. Accordingly, due to the lack of Supreme Court precedent addressing the constitutionality of the burden of proof on mental retardation claims, this Court cannot find that the state habeas court's decision was contrary to, or an unreasonable application of, clearly established federal law.

Thus, Raulerson's Claim III, that the Georgia statute requiring capital defendants to prove their mental retardation beyond a reasonable doubt violates the constitution, is **DENIED**.

### C. Claim II: Whether Raulerson Is Mentally Retarded

Raulerson claims that he is mentally retarded and therefore ineligible for the death penalty under both the United States and Georgia Constitutions. See Atkins, 536 U.S. at 304; Fleming v. Zant, 259 Ga. 687 (1989). Under Georgia law, "'[m]entally retarded' means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the development period." O.C.G.A. § 17-7-131(a)(3) (2013). Raulerson challenges the state habeas court's decision and alleges that it

39

was contrary to or an unreasonable application of federal law. The Court disagrees.

### a. Adjudication on the Merits in the State Court Proceedings

Under section 2254(d), the Court must first determine whether there was an adjudication on the merits of Raulerson's claim that he is mentally retarded. Raulerson claims there has not yet been a decision on the merits of his mental retardation claim either on direct appeal or by the state habeas court.

The Supreme Court of the United States recently explained that "[a] judgment is normally said to have been rendered 'on the merits' only if it was delivered after the court . . . heard and *evaluated* the evidence and the parties' substantive arguments.'" Johnson v. Williams, 133 S. Ct. 1088, 1097 (2013) (citing Black's Law Dictionary 1199 (9th ed. 2009) (emphasis in original). And "as used in this context, the word 'merits' is defined as '*the intrinsic rights and wrongs of a case* as determined by *matters of substance*, in distinction from matters of form.'" Id. (citing Webster's New Int'l Dictionary 1540 (2d. ed. 1954) (emphasis in original). See also Id. at 1091 (discussing that a merits decision can come "either on direct appeal or in a collateral state proceeding"). Additionally, the Eleventh Circuit has explained that "[o]ur case law also makes clear that we accord AEDPA deference not only to the adjudications of state appellate courts but also to those of

40

state trial courts that have not yet been overturned on appeal."
Loggins v. Thomas, 654 F.3d 1204, 1217 (11th Cir. 2011). See
also Shelton v. Sec'y, Dep't of Corr., 691 F.3d 1348, 1353 (11th
Cir. 2012) (stating that the state court on direct appeal did
not apply a procedural bar, and thus the Court was "compelled to
presume that the court rendered an 'adjudication on the merits'
entitled to AEDPA deference.").

Here, the jury's determination that Raulerson was not
mentally retarded was an adjudication on the merits of
Raulerson's mental retardation. Raulerson presented a defense at
trial of "guilty but mentally retarded." See O.C.G.A. § 17-7-
131(c)(3). The jury heard the evidence presented at trial and
rejected the defense. On direct appeal, the Georgia Supreme
Court summarized the evidence bearing on Raulerson's claim of
mental retardation:

> In response to expert testimony presented by
> [Raulerson] that tests administered after the crimes
> established that [Raulerson] was mentally retarded
> with an IQ of 69, the State presented expert testimony
> [Raulerson's] IQ at age 15 (9 years earlier) was 83.
> The State's psychologist opined that there was no
> indication that [Raulerson] was severely mentally ill.

268 Ga. at 624. Ultimately, the Court concluded that this
evidence was sufficient to support the jury's verdict. Id. Under
well-established Supreme Court and Eleventh Circuit precedent,
these decisions were adjudications on the merit of Raulerson's
mental retardation and are entitled to deference under section
2254(d).

Raulerson makes two arguments that this conclusion is incorrect. First, he argues that neither the jury's determination of his mental retardation nor the Georgia Supreme Court's affirmance of his conviction was an adjudication on the merits of his federal claim under Atkins. He claims that because Atkins was not decided until five years after the Georgia Supreme Court affirmed his conviction, the Georgia Supreme Court could not have adjudicated that yet-to-be-announced federal constitutional claim on direct appeal. See Doc. no. 90 at 8. However, Burgess v. Terry, is instructive:

> To the extent that [petitioner] also claims that even if that standard is not unconstitutional he is entitled to have it re-applied and the question of whether he is mentally retarded determined again in federal court, that claim has no merit. There is nothing in Atkins v. Virginia, or any other decision we are aware of, that requires a state court jury's pre-Atkins determination of mental retardation to be redone simply because the Atkins decision was issued after that determination was made in state court.

478 Fed. Appx. 597, 599 (11th Cir. 2012) (internal citations omitted). This conclusion is reinforced by the reality that Atkins merely established a federal right that was coextensive with Raulerson's pre-existing right under Georgia law. Prior to Atkins, the Georgia legislature amended O.C.G.A. § 17-7-131 to prohibit the execution of mentally retarded criminals. While Atkins did not establish the analogous federal right until the pendency of Raulerson's state collateral proceedings, Atkins did not provide more rights than those given in O.C.G.A. § 17-7-131.

Consequently, the state habeas court, contrary to Raulerson's allegations, did not have a new claim to rule upon following the issuance of Atkins.

Second, Raulerson contends that the Georgia Supreme Court decision cannot properly be considered an adjudication on the merits of his mental retardation because the Supreme Court did not make any express findings of fact on that issue. See Doc. no. 90 at 3-4. However, the United States Supreme Court recently explained that AEDPA deference applies to summary dispositions of a state court. See Richter, 131 S. Ct. at 785 ("[Section] 2254 does not require a state court to give reasons before its decision can be deemed to have been adjudicated on the merits."). The Eleventh Circuit, significantly, has held that "[s]tate court findings of fact can be inferred from its opinion and the record. Moreover, implicit findings of fact are entitled to deference under § 2254(d) to the same extent as explicit findings of fact." Blankenship v. Hall, 542 F.3d 1253, 1272 (11th Cir. 2008). While Raulerson is correct that the Georgia Supreme Court did not make an explicit finding of fact that Raulerson was indeed mentally retarded, it was not required to do so to establish AEDPA deference.

It is evident from its opinion that the Georgia Supreme Court weighed the evidence presented at trial regarding Raulerson's mental retardation. Under Supreme Court and Eleventh Circuit precedent, this is sufficient to render the decision on

43

Raulerson's mental retardation on direct appeal an adjudication on the merits for purposes of Section 2254 review.[6] Consequently, the jury's determination of Raulerson's mental retardation on the merits is entitled to deference under AEDPA. Thus, according to section 2254(d), the Court must deny Raulerson's claim unless the adjudication on the merits resulted in either a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or a decision that was based on an unreasonable determination of the facts.

### b. Application of Section 2254(d)

Raulerson argues that the Georgia Supreme Court's affirmance of his convictions was both an unreasonable determination of the facts, and an unreasonable application of federal law in violation of section 2254(d). He points to extensive evidence introduced at the state habeas court's evidentiary hearing that, he argues, shows that he is mentally retarded.

The Supreme Court recently held in Cullen v. Pinholster that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 131 S. Ct. 1388, 1398 (2011). The State argues that a

---

[6]   This conclusion is further supported by the Supreme Court's discussion in Cone, 556 U.S. at 466-67 ("When a state court refuses to readjudicate a claim on the ground that it has been previously determined, the court's decision does not indicate that the claim has been procedurally defaulted. To the contrary, it provides strong evidence that the claim has already been given full consideration by the state courts and thus is *ripe* for federal adjudication.").

straightforward application of Pinholster dismisses any evidence presented by Raulerson at the state habeas proceeding. Raulerson, on the other hand, attempts to distinguish Pinholster on the basis that Pinholster involved a habeas petitioner that introduced new, additional evidence at the federal (rather than the state) habeas proceeding. Raulerson argues that Pinholster merely limits the record under review to the record before the state habeas court. The Court need not make a determination on this point. Whether the review is restricted to the record which was before the Georgia Supreme Court or includes the supplemented record from the state habeas hearing does not affect the outcome of the Court's analysis. Under either record, it was not unreasonable under Section 2254(d) for the court to find that Raulerson was not mentally retarded.

Georgia defines "mentally retarded" as "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." O.C.G.A. § 17-7-131(a)(3). Further:

> "significantly subaverage functioning" is generally defined as an IQ of 70 or below. However, an IQ test score of 70 or below is not conclusive. At best, an IQ score is only accurate within a range of several points, and for a variety of reasons, a particular score may be less accurate. Moreover, persons "with an IQ somewhat lower than 70" are not diagnosed as being mentally retarded if there "are no significant deficits or impairment in adaptive functioning."

*Stripling v. State*, 261 Ga. 1, 4 (1991). At trial, the jury heard testimony from two psychologists (Dr. Daniel Grant and Dr. Gerald Lower) who had examined Raulerson and opined as to mental retardation. Dr. Grant testified that Raulerson was mentally retarded and based this testimony, in part, on the following test results: a score of 69 on the Kaufman Adolescent and Adult Intelligence Test, a score of 69 on the Stanford-Binet Test (4th ed.), a score of 73 on the Test of Nonverbal Intelligence, a score of 60 on the revised Peabody Picture Vocabulary Test, and a score of 62 on the revised Slosson Intelligence Test. See Doc. no. 90 at 7. Dr. Grant testified that these scores all placed Raulerson within the range of mild mental retardation, thus having significant subaverage intellectual functioning. Id.

Dr. Grant also testified that Raulerson suffered deficits in adaptive functioning during the developmental period. Resp't Ex. 25 at 51-86. He based this testimony on his interview of Raulerson's parents and review of Raulerson's school, medical, and criminal records. Specifically, he testified that Raulerson suffered from major psychological problems from an early age; including major depressive disorder; that his family was marked by aggression and physical abuse; that he began using drugs and alcohol when he was ten years old; and that he dropped out of school during the ninth grade. Id. at 63-72. Thus, he concluded that Raulerson was, to a reasonable degree of medical certainty, mentally retarded under Georgia law. Id. at 96.

46

The State rebutted this with evidence of two IQ test scores obtained by Raulerson prior to the age of eighteen and the testimony of Dr. Lower. First, the State presented evidence that when Raulerson was twelve years old he obtained a score of 78 and at age fourteen he obtained a score of 83. Resp't Ex. 26 at 7, 23. Second, Dr. Lower testified that he administered the Revised Wechsler Adult Intelligence Scale and that Raulerson obtained a score of 69. However, he opined that this score was likely due to malingering.[7] Id. at 36. When asked whether there was any convincing evidence demonstrating that Raulerson was diagnosed as mentally retarded before the age of eighteen, Dr. Lower testified there was "[a]bsolutely none whatever." Id. at 37. However, Dr. Lower testified that he did not conduct any evaluation of Raulerson's adaptive functioning.

Considering this evidence the jury convicted Raulerson and rejected his "guilty but mentally retarded" defense. On direct appeal, the Georgia Supreme Court held:

> In response to expert testimony presented by appellant that tests administered after the crimes established that appellant was mentally retarded with an IQ of 69, the State presented expert testimony [that] appellant's IQ at age 14 (9 years earlier) was 83. The State's psychologist opined that there was no indication that appellant was severely mentally ill.
>
> The evidence summarized above was sufficient to authorize a rational trier of fact to find appellant guilty beyond a reasonable doubt of two malice murders and felony murder, burglary, necrophilia, and

---

[7] "Malingering" means to "pretend incapacity." See Webster's New Collegiate Dictionary 690 (1979).

possession of a firearm during the commission of a crime and during the commission of a felony.

268 Ga. at 624. Raulerson has not shown by clear and convincing evidence that this determination was objectively unreasonable. See Wiggins v. Smith, 539 U.S. 510, 521 (2003); 28 U.S.C. § 2254(e)(1). Raulerson failed to prove the first and last prong of the mental retardation standard – that he had subaverage intellectual functioning during the developmental period - as he had two scores prior to age eighteen well above 70. And, importantly, he could not present any evidence of any IQ scores before age eighteen in the 70 or below range. Thus, although there was evidence before the jury and the Georgia Supreme Court indicating that Raulerson may be mentally impaired or mentally ill, the jury found that Raulerson had not shown beyond a reasonable doubt that he was mentally retarded. He has not met his burden in showing that upon the record on direct appeal this determination was unreasonable.

However, even assuming the record before the Court properly included the additional testimony produced at the state habeas hearing, Raulerson, nevertheless, is unable to show that the determination of either the Georgia Supreme Court or the state habeas court was unreasonable in law or fact. Raulerson argues that the state habeas court's denial of relief was unreasonable in light of the additional evidence of mental retardation presented at the state habeas evidentiary hearing for three

48

reasons. First, Raulerson argues that the state's expert, Dr. Lower, did an "about-face" and has "changed his conclusion" about Raulerson's retardation. Doc. no. 90 at 11. Second, Raulerson argues that the additional evidence presented "strongly confirmed Dr. Grant's original diagnosis" and "would have had a bearing on Dr. Grant's findings and testimony." Id. And third, Raulerson argues that with the supplemented evidence both experts would have accounted for the Flynn Effect, "which would mean that Mr. Raulerson's childhood IQ test scores could not rule out a diagnosis of mental retardation." Id. at 9.

First, and most importantly, Raulerson argues that the state habeas court's denial of his Atkins claim was an unreasonable determination of facts in light of Dr. Lower's allegedly changing his conclusion that Raulerson was not mentally retarded. Citing the additional evidence, Dr. Lower stated in his affidavit that:

> "these materials provide clear evidence of deficits in Mr. Raulerson's adaptive skill functioning . . . [t]hese deficits were apparent prior to the age of 18 . . . [h]ad I been provided with this information, I would have testified that Mr. Raulerson's IQ (including the scores obtained by Dr. Grant) and his deficits in adaptive functioning apparent prior to age 18 supports a diagnosis of Mental Retardation."

Resp't Ex. 58 at 376. Raulerson contends this admission renders the state habeas court's determination unreasonable because "based on the evidence presented at the hearing, no examining

expert would have testified that Mr. Raulerson was not mentally retarded." Doc. no. 90 at 12. However, this is misleading.

At the hearing, Dr. Lower was asked "[n]ow, after looking at all the materials that were provided to you by Mr. Raulerson's attorneys, you still can't rule out mental retardation, can you?" He responded, "No, I can't." Resp't Ex. 58 at 365. When asked again "[s]o you still can't affirmatively diagnose him as being mentally retarded," Dr. Lower responded flatly "no" and that he would need more information still. Id. Ultimately, Dr. Lower testified that he "would still agree . . . . that the evidence supports a diagnosis of mental retardation." Id. at 380. So despite acknowledging that the adaptive functioning analysis likely supports a diagnosis of mental retardation (in light of the additional evidence), he remained steadfast in his opinion as it related to his testimony concerning the intellectual functioning and age of onset inquiries. Consequently, Raulerson has not shown by clear and convincing evidence that the decision by either the Georgia Supreme Court or the state habeas court was unreasonable under Section 2254(d).

Similarly, Raulerson's argument that the additional evidence confirmed Dr. Grant's diagnosis and would have had a bearing on his findings and testimony is unpersuasive. Raulerson argues that the additional information presented at the hearing "would have had a bearing on Dr. Grant's findings and testimony"

and "strongly confirmed Dr. Grant's original diagnosis." Doc. no. at 10-11. However, this is insufficient for this Court to find that either the Georgia Supreme Court's or the state habeas court's determination was unreasonable. The additional evidence presented focused on supplementing the adaptive functioning evidence that was presented to the trial jury. However, the Georgia Supreme Court's brief analysis focused on the intellectual functioning inquiry and the two IQ scores above the mental retardation range. Despite supplementing the evidence on the adaptive functioning prong, Raulerson has not shown by clear and convincing evidence that either the Georgia Supreme Court's or the state habeas court's determination was unreasonable.

Finally, Raulerson argues that under the supplemented record his childhood IQ scores of 78 and 83 could not rule out a diagnosis of mental retardation because all experts, including Dr. Lower, now agree that they should have accounted for the Flynn Effect. However, this argument fails. First, Raulerson has failed to show any Supreme Court case requiring an accounting for the Flynn Effect or any other manipulative scoring tool to lower Raulerson's IQ scores of 78 and 83 to the mental retardation range of 70. Moreover, the Eleventh Circuit has held that there is "no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning." Thomas v. Allen, 607 F.3d 749, 758

(11th Cir. 2010).[8] The Court also notes that no medical association recognizes its validity. See id. at 757. Thus, it was not an unreasonable determination by either the Georgia Supreme Court or the state habeas court to not apply the Flynn effect in determining whether Raulerson suffered from subaverage intellectual functioning.

Accordingly, considering either the record under review by the Georgia Supreme Court or the supplemented record before the state habeas proceeding, Raulerson has failed to show by clear and convincing evidence that the adjudication on the merits of his mental retardation claim was unreasonable.[9]

---

[8] The Eleventh Circuit noted that "[n]umerous courts recognize the Flynn effect." Thomas, 607 F.3d at 757-58 (11th Cir. 2010). See e.g., Walker v. True, 399 F.3d 315, 322-23 (4th Cir.2005) (stating that on remand, the district court should consider the Flynn effect evidence to determine if petitioner's IQ score is overstated); United States v. Davis, 611 F.Supp.2d 472, 486-88 (D. Md. 2009) (considering Flynn effect in evaluation of defendant's intellectual functioning); People v. Superior Court, 28 Cal. Rptr. 3d 529, 558-59 (Cal. Ct. App. 2005), overruled on other grounds by 40 Cal. 4th 999, 56 Cal. Rptr. 3d 851, 155 P.3d 259 (2007) (recognizing that Flynn effect must be considered); State v. Burke, No. 04AP-1234, 2005 WL 3557641, at *13 (Ohio Ct. App. Dec. 30, 2005) (stating that court must consider evidence on Flynn effect, but it is within court's discretion whether to include it as a factor in the IQ score). There are also courts that do not recognize the Flynn effect. See In re Mathis, 483 F.3d 395, 398 n. 1 (5th Cir. 2007) (noting that circuit has not recognized Flynn effect as scientifically valid); Berry v. Epps, No. 1:04-CV-328-D-D, 2006 WL 2865064, at *35 (N.D. Miss. Oct. 5, 2006) (refusing to consider Flynn effect); Bowling v. Commonwealth, 163 S.W.3d 361, 374-75 (Ky. 2005) (noting that because Kentucky statute unambiguously sets IQ score of 70 as cutoff, courts cannot consider Flynn effect or SEM).

[9] Raulerson claims that if the Court limits the record under review to that which was before the Georgia Supreme Court, that he is then entitled to an evidentiary hearing in federal court to present "the compelling evidence of actual mental retardation" that he presented to the state habeas court. Doc. no. 90 at 5-6. While an evidentiary hearing would not be precluded by § 2254(e)(2) because Raulerson was diligent in seeking to develop the factual bases of this claim in state court, the Court finds that an additional hearing is unnecessary. See Schriro, 550 U.S. at 474 ("[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing . . .

### c. Miscarriage of justice exception

In addition to the arguments above, Raulerson also argues that he is "actually innocent" of the death sentence because he is mentally retarded, and thus, the state habeas court's denial of this claim under the miscarriage of justice standard was unreasonable under section 2254(d). The Supreme Court of the United States recently explained that under the stringent miscarriage of justice standard "a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." McQuiggin v. Perkins, 133 S. Ct. 1924, 1928 (2013) (quoting Schlup v. Delo, 513 U.S. 298, 329 (1995)). The Schlup standard, the Court noted, is "demanding" and "seldom met." Id.

Here, the state habeas court adjudicated the merits of Raulerson's claim under the miscarriage of justice standard. In its final Order, the court held:

> that Petitioner failed to satisfy by sufficient new and reliable evidence the stringent miscarriage of justice standard as to warrant the eradication of the jury's verdict on the issue of Petitioner's alleged mental retardation.

---

[Additionally] an evidentiary hearing is not required on issues that can be resolved by reference to the state court record.").

Here, the Court reiterates that even considering the evidence presented to the state habeas court, Raulerson has not shown by clear and convincing evidence that the state habeas court's determination was unreasonable as a matter of clearly established federal law. Accordingly, the Court will exercise its discretionary authority to not hold a hearing because the exhaustive state court record is fully developed with respect to this claim.

Resp't Ex. 94 at 5. Raulerson even concedes that the court "noted, based on the evidence presented at the habeas hearing, that Petitioner had not satisfied the miscarriage of justice standard." Doc. no. 90 at 6. From its Order, it is apparent that the court heard the new testimony, evaluated the evidence, applied the appropriate standard and cited to relevant federal and state law. This, undoubtedly, was an adjudication on the merits of Raulerson's claim under the miscarriage of justice standard. Consequently, its determination is not to be upset unless it is unreasonable in light of clearly established federal law or in light of the facts presented at the hearing.

Raulerson does not cite to any Supreme Court case under which the state habeas court's decision could be determined to be an unreasonable application of clearly established federal law. Rather, Raulerson claims that the decision was an unreasonable determination of the facts "in light of the evidence . . . in which all experts qualified to diagnose mental retardation agreed that the evidence supported a diagnosis of mental retardation." Id. As explained above, the court's determination was not unreasonable.

The new evidence produced at the habeas hearing focused primarily on testimony concerning the adaptive functioning prong of the mental retardation standard. With respect to that specific prong, Dr. Lower testified that the evidence "support[ed] a diagnosis of mental retardation." Resp't Ex. 58

at 380. However, he also testified that even considering this new evidence of significant deficits in Raulerson's adaptive functioning, he still could not "affirmatively diagnose him as being mentally retarded." Id. at 365. He explained, under oath, that doubts persisted with respect to the first and third prongs of the mental retardation analysis. Because Raulerson's only IQ scores before the age of eighteen were 78 and 83, which are "pretty well above the range" and "there [was] no way to determine" when Raulerson sunk below the range, he still could not diagnose Raulerson as mentally retarded. Id. at 380.

Considering this evidence, the state habeas court's denial of Raulerson's claim under the miscarriage of justice standard was not an unreasonable determination of the facts. Where the testifying expert could not confirm a diagnosis of mental retardation despite the new evidence, surely, a reasonable juror could find Raulerson was not mentally retarded. Accordingly, the state habeas court's denial of Raulerson's claim under the miscarriage of justice standard was not unreasonable, and therefore, this claim is **DENIED**.

D. **Claim IV: Whether the Sentencing Phase Instructions Permitted the Jury to Consider Raulerson's Mental Retardation in Mitigation**

Raulerson asserts that the trial court's sentencing instructions "failed to inform the jury that the extremely high standard of 'beyond a reasonable doubt' no longer applied to the issue of mental retardation" and "failed to inform the jury that

55

it could reconsider the issue of mental retardation after it already had made a determination on that issue under a different standard at the guilt-innocence phase." Doc. no. 66 at 60. Specifically, Raulerson argues that the instruction that the jury could consider all of the evidence presented at trial was insufficient to inform the jurors that they could reconsider an issue they had already decided and that they could apply a different standard to evidence relevant to that issue. Id. Raulerson argues that the state habeas court's rejection of this jury instruction claim was contrary to, or an unreasonable application of, clearly established federal law. Id. at 59.

In reviewing a challenge to a trial court's jury instructions, a court must first focus on how a reasonable juror would understand the specific language challenged. Devier v. Zant, 3 F.3d 1445, 1463 (11th Cir. 2013). If the specific charge is found to be unconstitutional, then the instructions, as a whole, must be examined to determine whether the entire charge reflected a correct statement of the law. Id.; see also California v. Brown, 479 U.S. 538, 541 (1987); Peek v. Kemp, 784 F.2d 1479, 1489 (11th Cir. 1986).

The state habeas court reviewed the trial court's sentencing charges. Specifically, the state habeas court looked to the following instructions:

> In arriving at this determination, you are authorized to consider all of the evidence received here in court in both stages of this proceeding,

presented by the State and the defendant throughout the trial before you.

[Y]ou shall also consider the facts and circumstances, if any, in extenuation, mitigation, and aggravation of punishment. Mitigating or extenuating facts or circumstances are those which you the jury find do not constitute a justification or excuse for the offense in question, but which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame.

Members of the jury, under the laws of this state, a person found guilty of murder shall be punished by death, or life imprisonment without parole or life imprisonment. Under our law, a sentence of death or life imprisonment without parole shall not be imposed unless the jury finds, in writing, at least one or more statutory aggravating circumstances, and next sixes [sic] the sentence of death or life without parole in its verdict.

It is not required and it is not necessary that you find any extenuating or mitigating facts or circumstances in order for you to return a verdict setting the penalty to be imposed at life imprisonment . . . Whether or not you find any extenuating or mitigating facts or circumstances, you are authorized to fix the penalty at life imprisonment.

If you find from the evidence, beyond a reasonable doubt, the existence in this case of one or more aggravation circumstances as given to you in charge by the Court, then you would be authorized to recommend the imposition of a sentence of death, but you would not be required to do so. If you should find from the evidence in this case, beyond a reasonable doubt, the existence of one or more aggravating circumstances as given to you in charge by the Court, you would also be authorized to sentence the defendant to life in prison. You may fix the penalty at life imprisonment, if you see fit to do so, for any reason satisfactory to you, or without any reason.

Resp't Ex. 94 at 61-62. After reviewing these jury instructions, the state habeas court found that "the jury was not misled into believing that the beyond a reasonable doubt standard applicable to a finding of mental retardation in the guilt phase applied to its consideration of alleged mental retardation as evidence in

57

mitigating circumstances was sufficient." Id. at 62. The state habeas court based this finding on the trial court's instruction to the jury that they could consider anything in mitigation of punishment and that they would vote for a sentence less than death for any reason or for no reason at all. Id.

Raulerson argues that the state habeas court's determination is an unreasonable application of Penry v. Lynaugh, 492 U.S. 302 (1989). In the subsequent Supreme Court case, Penry v. Johnson, the Court held that once a state habeas petitioner establishes "a reasonable likelihood that the jury believed that it was not permitted to consider" some mitigating evidence, he has shown that the error was not harmless and therefore is grounds for reversal. 532 U.S. 782, 786-88 (2001) (citing Boyde v. California, 494 U.S. 370 (1990)). In more recent years, the Supreme Court has repeatedly emphasized that a Penry violation exists whenever a statute, or a judicial gloss on a statute, prevents a jury from giving meaningful effect to mitigating evidence that may justify the imposition of a life sentence rather than a death sentence. Brewer v. Quarterman, 550 U.S. 286, 289 (2007).

However, the Supreme Court has "never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, [Supreme Court] decisions suggest that complete jury

discretion is constitutionally permissible." Buchanan v. Angelone, 522 U.S. 269, 276 (1998).

Here, the jury instructions did not violate these constitutional principles. The instruction did not foreclose the jury's consideration of any mitigating evidence. By directing the jury to base its decision on "all the evidence," the instruction afforded jurors an opportunity to consider mitigating evidence. The instructions inform the jury that the death penalty shall not be imposed unless one of the aggravating factors are found, but instructed that even if the jury finds one of those aggravating factors, the jury "would also be authorized to sentence the defendant to life in prison." The jury was further instructed that they "may fix the penalty at life imprisonment, if you see fit to do so, for any reason satisfactory to you, or without any reason." The jury was thus allowed to impose a life sentence even if it found the aggravating factor proved. Moreover, in contrast to the Texas special issues scheme in question in Penry, the instructions here did not constrain the manner in which the jury was able to give effect to mitigation.

Accordingly, the state habeas court's rejection of this claim was not contrary to, or an unreasonable application of, clearly established federal law. This claim is **DENIED**.

**E. Claim VI: Whether Raulerson Is Severely Mentally Ill and Therefore Ineligible for the Death Penalty under the Eighth Amendment**

In his petition, Raulerson argues that because he "suffers from severe mental illness, he may not be executed under the Eighth Amendment." Doc. no. 1 at 50. However, there appears to be confusion over the status of this claim. In his Brief in Support of his Petition, Raulerson acknowledges that he "is not presently seeking habeas corpus relief from this Court on the basis of [this claim]." Doc. no. 66 at 6. Yet, he later states this claim is ripe for determination as "previously briefed." Doc. no. 86 at 12 (referencing doc. no. 1 at 50-52). Regardless, the Court will address the claim out of an abundance of caution.

The state habeas court held that this claim was "non-cognizable" because "[c]ontrary to Petitioner's argument, there is no constitutional prohibition against executing the mentally ill." Resp't Ex. 94 at 4 (citing Colwell v. State, 273 Ga. 634 (2001)). Raulerson does not argue this determination was contrary to, or an unreasonable application of, clearly established federal law. In fact, Raulerson fails to cite to any Supreme Court case supporting his contention that the Eighth Amendment prohibits the execution of mentally ill criminals. Rather, Raulerson argues that the "Eighth Amendment's prohibition on cruel and unusual punishment is measured by evolving standards of decency that mark the progress of a maturing society." Doc. no. 86 at 32 (citing Furman v. Georgia,

60

408 U.S. 238, 242 (1972)). He contends that "numerous court cases and state legislation evidence a growing consensus that those with severe mental illness do not warrant the death penalty." Id. at 32-33.

Section 2254(d), however, does not permit the Court to entertain such an argument. Raulerson has not challenged, or even referenced, the state habeas court's adjudication of this claim. Moreover, Raulerson has failed to point to any Supreme Court case supporting his contention. Whether there is a growing consensus of state courts and legislatures recognizing this claim is irrelevant under AEDPA review. Consequently, the state habeas court's decision was not unreasonable and the Court must deny this claim under Section 2254(d). See Richter, 131 S. Ct. at 786 ("It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."). Thus, this claim is **DENIED**.

### F. Claim VII: Whether Raulerson Was Denied Access to Competent Mental Health Assistance

Raulerson claims that he is "entitled to a new trial and sentencing proceeding" because he was denied access to competent mental assistance in violation of his Sixth, Eighth, and Fourteenth Amendment rights. Doc. no. 1 at 53. Specifically, Raulerson argues that "the defense experts were hindered in their ability to perform a competent evaluation by defense

counsel's failure to provide them with adequate background information." Doc. no. 66 at 68. He speculates that "[h]ad this information been presented to the experts and the jury, there is a reasonable probability that the outcome of either phase of trial would have been different." Id. The state habeas court found that Raulerson's claim was non-cognizable. Resp't Ex. 94 at 4. Raulerson contends this finding was contrary to, or an unreasonable application of, federal law.

The United States Supreme Court has recognized that when the defendant has demonstrated his sanity will be a significant factor at trial, the state must "assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Ake v. Oklahoma, 470 U.S. 68, 83 (1985). The Court explained further that "[o]ur concern is that the indigent defendant have access to a competent psychiatrist." Id. The Eleventh Circuit further clarified that Ake protects against the denial of due process due to trial court error. Blanco v. Sec'y, Fla. Dept. of Corr., 688 F.3d 1211, 1228 (11th Cir. 2012) ("[I]t must be the trial judge, not the mental health expert, who denies the defendant due process by taking some action that renders the proceeding fundamentally unfair . . . the defendant must point to an error of the trial court that deprived him of due process of law to make out an Ake claim.").

In Blanco, the defendant complained that his due process rights were violated in two ways: first, by the initial appointment of his expert and, second, by his expert's incompetent review, preparation, and performance testifying. Id. at 1227. The Court found the trial court did not violate the defendant's due process in the appointment of his expert, citing the expert's impressive credentials as well as the trial court's appointment of a psychologist, a neuropsychologist, a neurologist, and a sociologist to assist in the defense. The Court also found that "[t]here is nothing in United States Supreme Court precedent that would support [the defendant's second claim.]" Id. at 1230.

Here, Raulerson's claim similarly fails. He alleges:

> Mr. Raulerson's mental health experts were unable to provide effective assistance because they generally lacked a complete record upon which to base their conclusions. As discussed in Petitioner's opening brief, and above, *trial counsel failed* to provide defense experts with pertinent background information and documents indicating the full extent of Mr. Raulerson's mental health limitations. During state habeas proceedings, Mr. Raulerson produced affidavits indicating that the testimony of both Mr. Raulerson's and the State's expert witnesses would have been substantially more favorable to Mr. Raulerson had those experts had access to his complete mental health record. Without a full and appropriate evaluation of his mental health, Mr. Raulerson was denied "a fair opportunity to present his defense."

Doc. no. 72 at 60-61 (emphasis added). Crucially, Raulerson fails to allege – either in his petition, his brief in support of his petition, or his reply brief in support of his petition –

a single action by the trial court that violated his due process rights. Rather, he repeatedly asserts that it was his trial counsel's failure to provide a complete record to his experts that deprived him of a fundamentally fair proceeding. See Doc no. 1 at 52-54; doc no. 66 at 66-69; doc. no. 72 at 59-61. Ake does not go this far. And Raulerson has not pointed to any other Supreme Court precedent supporting such a claim.

Even putting aside Raulerson's failure to identify any error by the trial court, Dr. Grant, despite the alleged shortcomings of counsel, testified that Raulerson was, indeed, mentally retarded. Additionally, he testified that he arrived at this conclusion after conducting "approximately 25 different tests plus interviews with Mr. Raulerson and both his parents" as well as reviewing "schools records, medical records, [and] some criminal records." Resp't Ex. 25 at 19. Through the course of these examinations, Dr. Grant testified that he spent somewhere between twelve and fifteen hours with Raulerson. Id. Plainly, the record demonstrates that Raulerson's mental health assistance was, at a minimum, competent, if not exhaustive. Furthermore, the trial court provided funds for the defense to hire not only Dr. Grant, but also a neurologist, a psychiatrist, and a neuropsychologist. See Resp't Ex. 81, at 7757; Resp't Ex. 79, at 2000; Resp't Ex. 81, at 7753.

Stripped of its conclusory allegations, Raulerson's Ake claim fails to allege facts bringing it within the ambit of Ake.

Despite his attempt to distinguish this claim from his ineffective assistance of counsel claim, Raulerson does not raise any alleged error committed by the trial court. Rather, he focuses exclusively on the alleged errors by his trial counsel in preparing his complete team of state-provided experts. Accordingly, Raulerson failed to present any Supreme Court precedent that supports such a claim. As a result, the state habeas court did not act contrary to clearly established federal law, and its decision was not based on an unreasonable determination of the facts in light of the evidence presented. Raulerson's claim, consequently, is **DENIED**.

### G. Claim XII: Whether Raulerson's Death Sentence Is a Disproportionate and Arbitrary Application of the Death Penalty

Raulerson asks the Court to vacate his death sentence, claiming it was imposed "arbitrarily and capriciously, and pursuant to a pattern and practice of discrimination in the administration of the death penalty in Georgia, thereby rendering [his] sentence of death unlawful and in violation of [his] rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution." Doc. no. 1 at 59-60. On direct appeal, the Supreme Court of Georgia held:

> We do not find that Raulerson's death sentence was imposed under the influence of passion, prejudice, or other arbitrary factor. The death sentence is not excessive or disproportionate to penalties imposed in similar cases, considering both the crime and the defendant. The similar cases listed in the Appendix

support the imposition of the death sentence in this case.

Raulerson, 268 Ga. at 633. The Court listed ten cases in its Appendix. Id. The state habeas court found that Raulerson's claim that his death sentence was imposed arbitrarily, capriciously, and discriminatorily was not reviewable based on res judicata principles.

Raulerson claims that the Georgia Supreme Court's proportionality review was cursory and "wholly lacking" in violation of clearly established federal law. Doc. no. 66 at 69. He argues that the United States Supreme Court's approval of Georgia's capital punishment statute in Gregg v. Georgia was premised in significant part on the proportionality review conducted by the Georgia Supreme Court. Id. (citing Walker v. Georgia, 129 S. Ct. 453, 454 (2008) (Stevens, J., respecting the denial of certiorari)). Justice Stevens explained that meaningful proportionality review must include a comparison to cases where similarly situated defendants had not been put to death. Walker, 129 S. Ct. at 454. In the absence of this safeguard, he expressed concern that "the likely results of such a truncated review . . . is the arbitrary or discriminatory imposition of death sentences." Id. at 457. Raulerson argues that none of the ten comparative cases include a defendant that presented evidence of mental retardation, and consequently, his

death sentence should be vacated as it fails the constitutional test imposed by Walker.

The question before the Court is whether the Georgia Supreme Court's decision on this issue was "contrary to, or an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254. "Clearly established federal law" consists of the "holdings . . . of the [United States Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). First, the Court notes that there is no constitutional right to proportionality review. Neither Gregg v. Georgia nor any subsequent cases have held that Georgia courts must conduct any proportionality review. The United States Supreme Court, in fact, has held that it would be error to conclude "that Gregg required proportionality review." Pulley v. Harris, 465 U.S. 37, 46 (1984). Second, Walker is not binding because Justice Stevens's statement respecting the denial of the petition for writ of certiorari is not "clearly established federal law."[10] And even assuming it was Supreme Court precedent, it was not decided until eleven years after the Georgia Supreme Court rendered the decision at issue here. Thus, Raulerson has failed to show that

---

[10]    Moreover, Justice Thomas responded to Justice Stevens in his concurrence of the denial of the petition for certiorari: "Justice Stevens acknowledged in his Pulley concurrence that his interpretation of Gregg and Zant differed from the Court's. He continues to adhere to his distinctive interpretation of Gregg and Zant today . . . . But, under this Court's precedents, Georgia is not required to provide any proportionality review at all." Walker v. Georgia, 129 S Ct. at 481 (2008).

the Georgia Supreme Court's review was contrary to, or an unreasonable application of Supreme Court precedent. Further, Raulerson has not shown that the Georgia Supreme Court's determination was based on any unreasonable determinations of facts.

Additionally, the Court refuses Raulerson's invitation to conduct its own, independent, assessment of the Georgia Supreme Court's proportionality review in light of Eleventh Circuit precedent. The Eleventh Circuit has cautioned:

> A federal habeas court should not undertake a review of the state supreme court's proportionality review and, in effect, "get out the record" to see if the state court's findings of fact, their conclusion based on a review of similar cases, was supported by the "evidence" in similar cases. To do so would thrust the federal judiciary into the substantive policy making area of the state. It is the state's responsibility to determine the procedure to be used, if any, in sentencing a criminal to death.

Moore v. Balkcom, 716 F.2d 1511, 1518 (11th Cir. 1983) (internal citations omitted). More specifically, the Eleventh Circuit has rejected the very claim Raulerson raises here:

> We also reject [the] claim that the [state] . . . courts violated his constitutional rights by not conducting a detailed determination of the proportionality and appropriateness of his death sentence in comparison with other capital murders. The Constitution does not require a proportionality review. And we refuse to mandate as a matter of federal constitutional law that where, as here, state law requires such review, courts must make an explicit, detailed account of their comparisons. Based on their own past experience in reviewing capital punishment cases, state appellate courts "can rationally distinguish between those individuals for

whom the death penalty is an appropriate sanction and those for whom it is not," without listing in their opinions the facts that did or did not justify the imposition of the death penalty in prior cases.

Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987) (internal citations omitted). Consequently, relief on this claim is **DENIED**.

### H. Claim XIV: Whether Raulerson Is Entitled to Relief Due to Errors Considered in the Aggregate

In his final prayer for relief, Raulerson contends that the cumulative effect of "numerous and varied constitutional" errors entitle him to habeas relief. See Doc. no. 1 at 65. He raised this claim in his state habeas petition and the state habeas court held the claim to be non-cognizable because Georgia courts do not recognize the cumulative error rule. State Habeas Order, at 5 (citing Head v. Taylor, 273 Ga. 69 (2000)).

The Supreme Court of the United States has not recognized a "cumulative error" doctrine in habeas proceedings. See Forrest v. Florida Dep't of Corr., 342 Fed. Appx. 560, 564-65 (11th Cir. 2009) ("The Supreme Court has not directly addressed the applicability of the cumulative error doctrine in the context of an ineffective assistance of counsel claim.").[11] Likewise, the Eleventh Circuit has yet to recognize a "cumulative error"

---

[11] However, "[t]he Supreme Court has held, in the context of an ineffective assistance claim, that 'there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.'" Forrest, 342 Fed. Appx. at 565 (citing United States v. Cronic, 466 U.S. 648, 659 n.26 (1984)).

doctrine in federal habeas proceedings.[12] Furthermore, as the state habeas court noted, Georgia courts do not recognize the cumulative error doctrine. Thus, Raulerson has not shown the decision by the state habeas court was contrary to, or an unreasonable application of, clearly established federal law.

In any event, cumulative error analysis is implicated only where there are multiple, harmful errors. See United States v. Waldon, 363 F.3d 1103, 1110 (11th Cir. 2004) (where no individual errors have been demonstrated, no cumulative errors can exist); United States v. Barshov, 733 F.2d 842, 852 (11th Cir. 1984) ("Without harmful errors, there can be no cumulative effect compelling reversal."); see also Sneed v. Fla. Dep't of Corrs., 496 F. App'x 20, 28 (11th Cir. 2012) ("There are no errors to accumulate, and the state court's rejection of [a cumulative error] claim [is] not contrary to or an unreasonable application of Supreme Court law."). Thus Raulerson must show error with respect to at least two of his individual claims. He has not.

As discussed above, the Court finds no merit to any of Raulerson's individual alleged errors. Considered in the aggregate, their cumulative effect also falls short of depriving

---

[12]    However, the Eleventh Circuit has held, on direct appeal of a federal conviction, that the cumulative effect of several errors that are harmless by themselves could so prejudice the defendant's right to a fair trial that a new trial may be necessary. See United States v. Ramirez, 426 F.3d 1344, 1353 (11th Cir. 2005) ("[T]he 'cumulative effect' of multiple errors may so prejudice a defendant's right to a fair trial that a new trial is required, even if the errors considered individually are non-reversible.") (quoting United States v. Thomas, 62 F.3d 1332, 1343 (11th Cir. 1995)).

Raulerson a fundamentally fair trial. See Bronstein v. Wainwright, 646 F.2d 1048 (11th Cir. 1981) ("[A] state trial must be so 'fundamentally unfair' as to amount to a denial of due process before federal habeas relief can be appropriately applied.") (internal quotation and citation omitted). Therefore, Raulerson is not entitled to federal relief on his "cumulative effect" argument.

## IV. Conclusion

For the reasons set forth above, Petitioner has failed to show that he is entitled to habeas corpus relief under 28 U.S.C. § 2254. Accordingly, the Court **DENIES** the Petitioner's Petition for Writ of Habeas Corpus (doc. no. 1). The Clerk is directed to **ENTER JUDGMENT** in favor of Respondent and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 30th day of September, 2013.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA