[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-14038

_____

D.C. Docket No. 5:05-cv-00057-JRH

BILLY DANIEL RAULERSON, JR.,

                                                    Petitioner-Appellant,

versus

WARDEN,

                                                    Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(June 28, 2019)

Before WILLIAM PRYOR, JORDAN, and HULL, Circuit Judges.

WILLIAM PRYOR, Circuit Judge:

    Billy Raulerson Jr., a Georgia prisoner under three death sentences for

murdering two teenagers, one of whom he sodomized after killing her, and for

murdering a woman he robbed the next day, appeals the denial of his petition for a writ of habeas corpus, 28 U.S.C. § 2254. At trial, Raulerson's counsel argued that he was "guilty but mentally retarded" beyond a reasonable doubt and so ineligible for the death penalty. The jury disagreed and sentenced Raulerson to death. After unsuccessfully pursuing postconviction relief in Georgia courts, Raulerson filed a federal petition, which the district court denied. Raulerson contends that his counsel were ineffective by failing to investigate mitigating evidence and present it during the penalty phase; that the Georgia requirement that a criminal defendant prove his intellectual disability beyond a reasonable doubt violates the Due Process Clause of the Fourteenth Amendment; and that he is actually innocent of the death penalty because he is intellectually disabled. Because the Georgia superior court reasonably determined that the first two claims fail and because Raulerson fails to establish his intellectual disability, we affirm.

## I.  BACKGROUND

We divide the background of this appeal in three parts. First, we discuss the facts of Raulerson's crime. Next, we describe Raulerson's trial and sentencing. Then, we provide an overview of his state and federal habeas proceedings.

### A.  The Crime

In a two-day span, Billy Raulerson, Jr. killed three people in Ware County, Georgia. On May 30, 1993, Raulerson parked his car by a pickup truck occupied

by two teenagers, Jason Hampton and Charlye Dixon, on a lakeside lovers' lane. *Raulerson v. State*, 491 S.E.2d 791, 795–96 (Ga. 1997). Raulerson stood on the bed of the truck and shot Hampton several times. *Id.* at 796. As Dixon tried to flee, he shot her. *Id.* He then "dragged Hampton's body from the truck and shot him several more times." *Id.* Raulerson went on to take two fishing rods from the truck and put the rods and Dixon in his car. *Id.* He drove to a wooded area several miles away where he shot Dixon again and sodomized her. *Id.*

When he tried to return to Dixon's body the next day, people were at the site, so he "drove to a rural section of the county looking for a house to burglarize." *Id.* He stopped at a home that had no vehicle in the carport. After no one responded to his knock at the door, Raulerson broke into a shed and stole meat from the freezer. *Id.* When he was loading the meat into his car, he heard someone in the house. *Id.* Raulerson went inside and encountered Gail Taylor, who was armed with a knife. *Id.* A struggle ensued, and Raulerson shot Taylor multiple times. *Id.* He then stole her purse and left. *Id.* Later that day, the bodies of Hampton, Dixon, and Taylor were discovered in separate locations. *Id.* at 795.

Several months later, the police arrested Raulerson on unrelated charges. He gave the police a blood sample, which matched the semen recovered from Dixon's body. *Id.* When the police questioned Raulerson about the murders, he confessed to killing all three people. *Id.* The police searched Raulerson's home and found the

fishing rods taken from Hampton's truck and a gun that matched the shell casings recovered from the crime scenes. *Id.* A grand jury charged Raulerson with the murders of Dixon, Hampton, and Taylor; burglary; kidnapping; aggravated sodomy; necrophilia; two counts of possession of a firearm during the commission of a felony; and possession of a firearm by a convicted felon. *Id.* at 795 n.1.

### B. The Trial and Sentencing

Leon Wilson and Mark Hatfield represented Raulerson. Wilson, who served as lead counsel, had tried several capital cases in his 46 years as an attorney, although he had not done so in 20 years when he represented Raulerson. Hatfield, a new attorney, assisted Wilson with the case.

Before trial, Raulerson's counsel conducted an investigation of Raulerson's background. They hired five experts, including a licensed clinical social worker, Audrey Sumner; a psychologist, Dr. Daniel Grant; a psychiatrist, Dr. John Savino; a neurologist, Dr. Michael Baker; and a neuropsychologist, Dr. Manual Chaknis. The experts interviewed Raulerson and his family and reviewed Raulerson's medical, school, and criminal records. Among other things, Raulerson's counsel learned that Raulerson had a tumultuous childhood, abusive parents, substance-abuse issues, and several emotional and intellectual problems.

During the guilt phase of trial, Raulerson's counsel presented the defense that Raulerson was "guilty but mentally retarded." In Georgia, a criminal defendant

who proves beyond a reasonable doubt that he is intellectually disabled is ineligible for the death penalty. *See* O.C.G.A. § 17-7-131(c)(3). In July 2017, Georgia amended section 17-7-131 to substitute the term "mentally retarded" for "intellectual disability." *See id.* § 17-7-131; *see also* 2017 Ga. Laws 189 § 1. We will use the term "intellectual disability" unless we are quoting directly from the record. *See Brumfield v. Cain*, 135 S. Ct. 2269, 2274 n.1 (2015) ("While this Court formerly employed the phrase 'mentally retarded,' we now use the term 'intellectual disability' to describe the identical phenomenon." (alteration adopted) (citation and internal quotation marks omitted)). To prove intellectual disability, Raulerson needed the jury to determine, beyond a reasonable doubt, that he had "significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior which manifested during the developmental period." O.C.G.A. § 17-7-131.

To support his claim of intellectual disability, Raulerson's counsel presented the expert testimony of their psychologist, Dr. Grant. He testified that he had spent about 15 hours with Raulerson, administered about 25 different tests, interviewed his parents, and reviewed extensive records. Although Raulerson had received IQ scores of 78 and 83 as a child, which are above the range of intellectual disability, Grant testified that his tests determined Raulerson had an IQ around 69 and was "functioning at about a 12-year level." And he testified that Raulerson's deficits

onset before age 18 because Raulerson had abused drugs and alcohol at a young age, suffered head injuries, and had memory and attention problems. Grant concluded that Raulerson was intellectually disabled.

Dr. Grant also testified about Raulerson's background. He testified that Raulerson always had trouble in school and never had any friends. He explained that Raulerson had suffered multiple head injuries, including being hit by a car at age three. And Grant described Raulerson's home life. He testified that Raulerson's father was abusive; by age ten, "he and his father would actually get in the yard and fist-fight like two adults." Grant explained that Raulerson's environment made him "predisposed" for substance abuse. After Raulerson began using drugs and alcohol around age ten, Grant testified that Raulerson spent "his leisure time . . . drinking or using drugs" and sitting outside his parents' house "just staring out." Grant also discussed Raulerson's failed marriage and his child. He explained that Raulerson had been married at age 18 and had a tumultuous relationship with his then-wife. When she was five months pregnant, Raulerson shot himself in the chest.

The state presented its own expert, Dr. Gerald Lower, who disagreed with some of Dr. Grant's conclusions that led to his diagnosis that Raulerson had an intellectual disability. Dr. Lower's test also determined that Raulerson had an IQ of 69, but he testified that he found signs of malingering. Lower testified that he did

not have enough information to make a diagnosis about Raulerson's adaptive functioning. When asked whether there was "any convincing demonstration" that Raulerson had an intellectual disability onset before age 18, he testified, "Absolutely none whatever."

The jury rejected that Raulerson was "guilty but mentally retarded" beyond a reasonable doubt. It convicted him on three counts of capital murder, in addition to burglary, kidnapping, necrophilia, and two counts of possession of a firearm during the commission of a felony.

The penalty phase began the next morning. The state called six witnesses and presented several victim-impact statements. Raulerson's counsel presented no additional witnesses in mitigation and instead relied on the testimony presented during the guilt phase. During Wilson's closing argument, he maintained that although the jury had found that Raulerson was "not . . . legally retarded," Raulerson's actions were of a "sick mind" and "not entirely his fault." Wilson urged the jury to consider Raulerson's background and not to impose the death penalty. The court instructed the jury that it could rely on all testimony received in both stages of the proceedings. The jury returned a verdict of death for all three counts of capital murder for which Raulerson was convicted and found the existence of seven statutory aggravating circumstances beyond a reasonable doubt.

Raulerson appealed his convictions and sentences to the Supreme Court of Georgia. He argued, among other things, that section 17-7-131(c)(3), which requires the accused to prove his intellectual disability beyond a reasonable doubt, violated his *state* right not to be executed if intellectually disabled. In support, Raulerson cited *Cooper v. Oklahoma*, 517 U.S. 348 (1996), which held that an Oklahoma requirement that the accused prove his incompetence to be tried by clear and convincing evidence violated the Due Process Clause. The Supreme Court of Georgia rejected his challenge to section 17-7-131(c)(3), and it affirmed Raulerson's convictions and sentences. *See Raulerson*, 491 S.E.2d at 801 (citing *Burgess v. State*, 450 S.E.2d 680 (Ga. 1994)). The Supreme Court of the United States denied Raulerson's petition for a writ of certiorari. *See Raulerson v. Georgia*, 523 U.S. 1127 (1998).

## C. The State and Federal Habeas Proceedings

After his direct appeal, Raulerson filed a petition for a writ of habeas corpus in a Georgia superior court. He alleged that his counsel rendered ineffective assistance at the penalty phase of his trial by failing to investigate and present mitigating evidence about his mental health. In the light of *Atkins v. Virginia*, 536 U.S. 304 (2002), he also argued that Georgia's burden of proof to establish intellectual disability violated his *federal* right not to be executed if intellectually disabled. That is, he argued that section 17-7-131(c)(3) violates the Due Process

8

Clause of the Fourteenth Amendment by failing to protect his right under the Eighth Amendment not to be executed if intellectually disabled. And Raulerson asserted that he is intellectually disabled and cannot be executed under the Eighth Amendment.

The superior court held an evidentiary hearing on these issues. Raulerson presented over 30 affidavits from family, friends, teachers, and mental-health professionals stating that they would have provided testimony on Raulerson's behalf if they had been asked. The affidavits provided details about Raulerson's substance abuse, physical abuse, troubled childhood, and his relationship with his daughter. Raulerson also presented an affidavit and testimony from Dr. Lower, the state's expert at his trial. Lower explained that, after reviewing additional records and testimony, he "would have testified that Mr. Raulerson's I.Q. . . . and his deficits in adaptive functioning apparent prior to age 18 support[] a diagnosis of Mental Retardation." But Dr. Lower still questioned whether Raulerson's intellectual disability onset before age 18. So even with the additional information, he could not diagnose Raulerson as intellectually disabled.

The superior court denied Raulerson's petition. It denied Raulerson's claim of ineffective assistance of counsel on the merits. It ruled that his due-process claim was barred by res judicata. And relying on precedent from the Supreme Court of Georgia, it also explained that Raulerson's due-process claim failed

9

because Georgia's burden of proof to establish intellectual disability was not
unconstitutional under *Atkins*. The superior court also determined that Raulerson's
claim that he is intellectually disabled and so ineligible for the death penalty was
barred by res judicata because the jury had rejected that claim. And it determined
that Raulerson "failed to present evidence to satisfy the extremely stringent
miscarriage of justice standard" because the evidence presented at trial and in
habeas proceedings did not "warrant eradication [of] the jury's verdict."

The Supreme Court of Georgia summarily denied Raulerson's application
for a certificate of probable cause to appeal. Raulerson then filed a federal petition
for a writ of habeas corpus in the district court. Following an evidentiary hearing,
the district court denied Raulerson's petition.

## II. STANDARDS OF REVIEW

We review *de novo* the denial of a petition for a writ of habeas corpus.
*Morrow v. Warden*, 886 F.3d 1138, 1146 (11th Cir. 2018). The Antiterrorism and
Effective Death Penalty Act, which governs Raulerson's petition, provides "[a]
general framework of substantial deference [for] our review of every issue that the
state courts have decided." *Diaz v. Sec'y for the Dep't of Corr.*, 402 F.3d 1136,
1141 (11th Cir. 2005). Under that Act, a federal court shall not grant habeas relief
on any claim "adjudicated on the merits" in state court unless, as relevant here, the
state court's decision denying relief was either "contrary to, or involved an

unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The phrase "clearly established federal law" refers only "to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000)). The decision of a state court is "contrary to" clearly established federal law when the state court "applied a rule in contradiction to governing Supreme Court case law" or "arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts." *Dill v. Allen*, 488 F.3d 1344, 1353 (11th Cir. 2007). And a state court's application of federal law is unreasonable "only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)); *see also Harrington*, 562 U.S. at 101 ("[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law."). Section 2254(d)(1) sets "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citation and internal quotation marks omitted).

### III. DISCUSSION

Raulerson raises three issues for our review. First, he argues that the superior court unreasonably determined that his attorneys were not deficient for failing to investigate mitigating evidence and to present it during the penalty phase and that he suffered no prejudice. Second, he argues that the superior court unreasonably applied clearly established law when it ruled that the Georgia requirement that he prove his intellectual disability beyond a reasonable doubt did not violate the Due Process Clause of the Fourteenth Amendment. Third, he argues that he is intellectually disabled and so actually innocent of the death penalty.

As an initial matter, our discussion focuses on the reasonableness of the superior court's decision even though it is not the last state-court "adjudicat[ion] on the merits," 28 U.S.C. § 2254(d). The Supreme Court of Georgia's summary denial of Raulerson's application for a certificate of probable cause to appeal was the last state-court adjudication on the merits. *Hittson v. GDCP Warden*, 759 F.3d 1210, 1231–32 (11th Cir. 2014). But we "presume" that the summary denial adopted the superior court's reasoning unless the state "rebut[s] the presumption by showing that the [summary denial] relied or most likely did rely on different grounds," which the state has not tried to do in this appeal. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). So we "'look through' the unexplained decision" of the

Supreme Court of Georgia to review the superior court's decision as if it were the last state-court adjudication on the merits. *See id.*

   A. *The Superior Court Reasonably Determined that Trial Counsel Were Not Ineffective for Failing to Investigate Mitigating Evidence and to Present It During the Penalty Phase.*

To obtain relief on his claim of ineffective assistance of counsel, Raulerson must establish two elements. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). First, he must prove that "his counsel's performance was deficient, which means that it 'fell below an objective standard of reasonableness' and was 'outside the wide range of professionally competent assistance.'" *Johnson v. Sec'y, Dep't of Corr.*, 643 F.3d 907, 928 (11th Cir. 2011) (quoting *Strickland*, 466 U.S. at 688, 690). When considering whether counsel's performance was deficient, we "review counsel's actions in a 'highly deferential' manner" and apply "a strong presumption . . . of reasonable professional assistance." *Id.* (quoting *Strickland*, 466 U.S. at 689). Second, Raulerson must establish prejudice, which means that "but for his counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694). Because *Strickland* provides a "most deferential" standard for assessing the performance of counsel, "[w]hen [we] combine[] [it] with the extra layer of deference that § 2254 provides, the result is double deference." *Id.* at 910–11. So "the question becomes whether there is any reasonable argument that

counsel satisfied *Strickland*'s deferential standard." *Id.* (citation and internal quotation marks omitted).

Raulerson first argues that his trial counsel were ineffective by failing to investigate mitigating evidence about his troubled childhood, his love for his child, and his mental illness. During the state habeas proceedings, Raulerson presented affidavits from over 30 family members, teachers, acquaintances, and mental-health professionals that he contends his counsel should have interviewed. Raulerson argues that these witnesses could have presented a more sympathetic portrait of him.

Counsel representing a capital defendant must conduct an adequate background investigation, but it need not be exhaustive. *See Berryman v. Morton*, 100 F.3d 1089, 1101 (3d Cir. 1996) ("The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued."). When our review is governed by section 2254, "the question is not just if counsel's investigative decisions were reasonable, but whether fairminded jurists could [reasonably] disagree." *Johnson*, 643 F.3d at 932.

To determine whether "trial counsel should have done something more" in their investigation, "we first look at what the lawyer[s] did in fact." *Grayson v. Thompson*, 257 F.3d 1194, 1219 (11th Cir. 2001) (citation and internal quotation marks omitted omitted). Raulerson's counsel hired five experts to assist in their

14

investigation: a licensed clinical social worker, a psychologist, a psychiatrist, a neurologist, and a neuropsychologist. The social worker, Audrey Sumner, interviewed Raulerson, his mother, his father, and two uncles. Her report crafted an extensive social history of Raulerson's life that described the physical and verbal abuse he suffered at the hands of both of his parents, his struggles with depression and substance abuse, his suicide attempt, and various incidents displaying his rage. The psychologist, Dr. Grant, also met with Raulerson, for at least fifteen hours, and interviewed his parents. And Dr. Grant examined extensive medical, school, and criminal records. Dr. Grant's report included background information about Raulerson and diagnoses of intellectual disability and several mental illnesses. The psychiatrist, Dr. Savino, met with Raulerson on at least eight separate occasions and reviewed Raulerson's records. Dr. Savino diagnosed Raulerson as mentally ill and intellectually disabled, and he suggested that Raulerson might have organic brain damage. To investigate potential brain damage, Raulerson's counsel hired Drs. Baker and Chaknis, a neurologist and neuropsychologist respectively. Several of the experts also reviewed Raulerson's case together. In addition to the work of these five experts, Raulerson's counsel performed their own interviews of Raulerson's mother, father, brother, and an uncle. Counsel also had Raulerson write out his life history.

The superior court reasonably concluded that trial counsel conducted an adequate investigation. Raulerson's counsel gleaned a portrait of his life from the expert reports, family interviews, and medical, school, and criminal records. Although Raulerson has presented additional affidavits from extended family members, teachers, and acquaintances that counsel could have interviewed, that more investigation *could* have been performed does not mean his counsel's investigation was inadequate. *Grayson*, 257 F.3d at 1225 ("[C]ounsel is not required to investigate and present *all* mitigating evidence in order to be reasonable." (emphasis added)). From their investigation, counsel learned much of the information contained in the affidavits, including details on Raulerson's troubled childhood, abusive parents, difficulties in school, and intellectual deficiencies. And because Raulerson has pointed to no "known evidence [that] would lead a reasonable attorney to investigate further," *Wiggins v. Smith*, 539 U.S. 510, 527 (2003), he has provided no argument that his counsel acted unreasonably when they decided to end the investigation when they did. Because the superior court reasonably determined that Raulerson's counsel conducted an adequate investigation, we need not consider whether Raulerson suffered prejudice.

Raulerson next argues that his counsel were ineffective because they decided not to present additional mitigating evidence during his penalty phase, but again,

the superior court reasonably rejected this claim. "No absolute duty exists to introduce mitigating or character evidence." *Chandler v. United States*, 218 F.3d 1305, 1319 (11th Cir. 2000) (en banc) (collecting cases). And we have held, in a capital case, that counsel's performance was not deficient when he chose to rely on the mitigating evidence presented in the guilt phase instead of presenting additional evidence during the penalty phase. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc). We explained that "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." *Id.*

The superior court reasonably determined that Raulerson's counsel were not deficient when they presented no additional mitigating evidence during the penalty phase. As counsel in *Waters* had done, Raulerson's counsel chose to rely on the mitigating evidence presented in the guilt phase instead of presenting it again in the penalty phase. *See id.* at 1512–13. During the guilt phase, his counsel presented mitigating evidence that included descriptions of Raulerson's intellectual deficiencies and life history. Dr. Grant testified about Raulerson's trouble in school, his emotional and intellectual problems, his marriage, his relationship with his child, and his tumultuous home life, including his abusive father.

After the jury returned a guilty verdict, Raulerson's counsel chose to rely on this evidence for the penalty phase. Raulerson's counsel presented a closing

argument urging the jury to consider Raulerson's background and spare him.
Counsel reminded the jury to "[g]o back and look at the circumstances of Billy
Raulerson's life, the way he was raised, this dysfunctional family, parents that
fought like animals with each other; an alcoholic father who taught him to mind
with blows of his fists to his head . . . . What chance did he have? Isn't he a victim,
too?" And the court instructed the jury that it could rely on all testimony received
in both stages of the proceedings. The superior court reasonably chose not to
second guess counsel's strategic decision to rely on the mitigating evidence
presented in the guilt phase, so neither can we.

Raulerson presents a plethora of additional character evidence that he
contends his counsel should have presented, but "[c]onsidering the realities of the
courtroom, more is not always better." *Chandler*, 218 F.3d at 1319; *see also
Waters*, 46 F.3d at 1512 ("There is much wisdom for trial lawyers in the adage
about leaving well enough alone."). "The type of 'more-evidence-is-
better' approach advocated by [Raulerson] might seem appealing—after all, what
is there to lose?" *Wong v. Belmontes*, 558 U.S. 15, 25 (2009). But there can be a lot
to lose. *Id.* By presenting a "heavyhanded case" of mitigation evidence, counsel
"would have invited the strongest possible evidence in rebuttal." *Id.* A lawyer can
reasonably "fear that character evidence might, in fact, be counterproductive."
*Chandler*, 218 F.3d at 1321. Particularly right before the jury decides a defendant's

penalty, counsel can reasonably limit the mitigating evidence he presents to avoid exposure "to a new string of [g]overnment witnesses who could testify to Petitioner's bad acts." *Id.* at 1323.

As the superior court highlighted, a reasonable lawyer could fear that additional evidence of Raulerson's character during the penalty phase would be counterproductive, which is exactly what Raulerson's counsel explained had motivated their decision to not present additional mitigating evidence. Hatfield testified that they decided not to call Grant or Savino back to the stand for fear of "opening the flood gates" for "bad stuff." And they decided not to call Raulerson's family members to testify out of concern that "they would be able to offer other negative information that might have hurt" Raulerson's case. Hatfield was concerned about testimony that Raulerson was an aggressor because "those sorts of things don't play well in front of a jury." Counsel knew from their investigation that Raulerson had frequently picked fights, bullied other children, and had abused his younger brother, mother, and ex-wife. And Raulerson, "who bears the burden in this case, never presented evidence that the fears of trial counsel about hurtful . . . witnesses were imaginary and baseless." *Chandler*, 218 F.3d at 1323 n.36.

We also disagree with Raulerson that, because the jury had already heard harmful information about him, presenting mitigating evidence would not be

counterproductive. We cannot overlook that Raulerson's counsel faced an uphill battle in the light of the brutality of the three murders Raulerson confessed he had committed. And his counsel reasonably feared that presenting additional mitigating evidence would have invited testimony about Raulerson's violent behavior and bad acts—aggravating evidence that far outweighed any mitigation value of the additional evidence Raulerson contends should have been presented. For example, had counsel called Raulerson's mother, she might have also testified about how her son beat her and how she had called the police on him. Because Raulerson has failed to prove that "no competent counsel would have taken the action that his counsel did take," *id.* at 1315, the superior court reasonably determined that counsel's performance was not deficient.

Even if counsel's performance in the penalty phase were deficient, the superior court also reasonably determined that Raulerson was not prejudiced by the failure to introduce the additional mitigating evidence. A petitioner cannot establish that the outcome of the proceeding would have been different when "[t]he 'new' evidence largely duplicated the mitigation evidence at trial." *Cullen*, 563 U.S. at 200; *see also Holsey*, 694 F.3d at 1260–61. And "[t]o the extent the state habeas record includes new . . . evidence," that evidence cannot prove prejudice when it is of "questionable mitigating value." *Cullen*, 563 U.S. at 201.

The superior court reasonably determined that Raulerson's additional

evidence would not have changed the jury's verdict. The superior court reasonably

determined that much of the "new" evidence in the affidavits that Raulerson

presented was cumulative. That is, the evidence Raulerson presented "tells a more

detailed version of the same story told at trial," which covered Raulerson's limited

intelligence and troubled childhood. *Holsey*, 694 F.3d at 1260. And the evidence

was of questionable mitigating value because it could have led to a damaging

rebuttal. *See Cullen*, 563 U.S. at 201. If counsel had introduced additional

testimony about Raulerson's relationship with his daughter to make him seem

more sympathetic, such testimony could have opened the door to testimony about

how Raulerson abused his ex-wife. And additional evidence about Raulerson's

family and his own substance abuse might have led the jury to conclude that he

"was simply beyond rehabilitation," so that evidence is "by no means clearly

mitigating." *Id.* The superior court reasonably discounted this evidence as

cumulative and of questionable value.

> ### B. The Superior Court's Determination that the Georgia Burden of Proof
> ### for Intellectual Disability Does Not Violate the Due Process Clause Was
> ### Not an Unreasonable Application of Clearly Established Federal Law.

We divide in two parts our discussion of Raulerson's argument that the

Georgia requirement that he prove his intellectual disability beyond a reasonable

doubt violates the Due Process Clause of the Fourteenth Amendment. First, we

explain that the superior court adjudicated his due-process claim on the merits, so we apply the deferential framework imposed by section 2254(d)(1). Second, we explain that the superior court's rejection of his due-process claim was not an unreasonable application of clearly established federal law.

1.  The Superior Court Rejected Raulerson's Due-Process Claim on the Merits, so We Apply the Deferential Framework of Section 2254(d)(1).

Raulerson argues that we should review *de novo* his due-process claim because the superior court never adjudicated it on the merits. According to Raulerson, the superior court concluded that the Supreme Court of Georgia had rejected the claim on direct appeal and so dismissed his due-process claim based only on res judicata. Raulerson argues that the court erred in applying res judicata because the due-process claim he now brings on collateral review is based on federal law but his claim on direct appeal—which the Supreme Court of Georgia rejected—was based on Georgia law. Based on that asserted error, Raulerson argues that no state court adjudicated his federal due-process claim on the merits, which would, if correct, subject his claim to *de novo* review. *See Cone v. Bell*, 556 U.S. 449, 466, 472 (2009).

When we consider the superior court's order denying Raulerson's petition in full, we have no trouble concluding that it rejected his federal due-process claim on the merits. "[A] decision that does not rest on procedural grounds alone is an adjudication on the merits regardless of the form in which it is expressed." *Wright*

*v. Sec'y for Dep't of Corr.*, 278 F.3d 1245, 1255–56 (11th Cir. 2002). To be sure, the court addressed Raulerson's due-process claim within a section of its opinion titled "Claims that are Res Judicata." And it referenced the Supreme Court of Georgia's denial of that claim on direct appeal. So we agree with Raulerson that the superior court dismissed his claim in part because of res judicata. But it did not dismiss the claim *only* because of res judicata.

The court alternatively decided the merits of Raulerson's claim. It rejected Raulerson's argument that the Supreme Court's decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), established that Georgia's burden of proof for intellectual disability was unconstitutional. And it found *Head v. Hill*, 587 S.E.2d 613, 621 (Ga. 2003)—in which the Supreme Court of Georgia held that its burden of proof did not violate "federal constitutional law"—"controlling." Both of these decisions postdate the rejection of Raulerson's due-process claim on direct appeal, so the superior court's reference to them establishes that it alternatively rejected Raulerson's federal due-process claim on the merits. Under Georgia law, this alternative holding is binding. *See World Harvest Church, Inc. v. GuideOne Mut. Ins. Co.*, 586 F.3d 950, 958 (11th Cir. 2009) (explaining that Georgia courts consider alternative holdings binding); *QOS Networks Ltd. v. Warburg, Pincus & Co.*, 669 S.E.2d 536, 541 (Ga. Ct. App. 2008) ("Where a case presents two or more points, any one of which is sufficient to determine the ultimate issue, but the court

actually decides all such points, the case is an authoritative precedent as to every point decided, and none of such points can be regarded as having merely the status of a dictum." (citation omitted)).

We join our sister circuits in holding that a state court's alternative holding is an adjudication on the merits. *See Rolan v. Coleman*, 680 F.3d 311, 319–21 (3d Cir. 2012) ("[W]here a state court has considered the merits of the claim, and its consideration provides an alternative and sufficient basis for the decision, such consideration warrants deference."); *Sharpe v. Bell*, 593 F.3d 372, 382 (4th Cir. 2010) ("[A] state court's alternative holding on the merits of a constitutional claim qualifies for deference under Section 2254(d)."); *Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008) (same). Because the superior court adjudicated the merits of Raulerson's due-process claim, we must review the denial of that claim under the deferential framework set forth in section 2254(d)(1).

2. The Superior Court's Rejection of Raulerson's Due-Process Claim Was Not an Unreasonable Application of Clearly Established Federal Law.

Raulerson argues that, even under the deferential framework of section 2254(d)(1), the superior court's rejection of his due-process claim was an unreasonable application of clearly established federal law. According to Raulerson, the Supreme Court's holdings in *Atkins* and *Cooper* clearly establish that the application of Georgia's beyond-a-reasonable-doubt standard to his claim of intellectual disability violated his right to due process under the Fourteenth

24

Amendment by failing to protect his Eighth Amendment right not to be executed if intellectually disabled. Because neither *Atkins* nor *Cooper* so held, this argument fails.

Raulerson first relies on *Atkins*, but that decision did not address the burden of proof to prove intellectual disability, much less clearly establish that a state may not require a defendant to prove his intellectual disability beyond a reasonable doubt. In *Atkins*, the Supreme Court held that the execution of the intellectually disabled violates the Eighth Amendment. *See* 536 U.S. at 321. But as we have explained, "the Supreme Court in *Atkins* made no reference to, much less reached a holding on, the burden of proof." *See Hill v. Humphrey*, 662 F.3d 1335, 1347 (11th Cir. 2011) (en banc). To the contrary, the Supreme Court expressly "le[ft] to the States the task of developing appropriate ways" to identify intellectual disability. *Atkins*, 536 U.S. at 317 (alterations adopted) (quoting *Ford v. Wainwright*, 477 U.S. 399, 405, 416–17 (1986)). So "*Atkins* established *only* a substantive Eighth Amendment right for the mentally retarded" and established no "minimum procedural due process requirements for bringing that Eighth Amendment claim." *Hill v. Humphrey*, 662 F.3d at 1360; *see also Bobby v. Bies*, 556 U.S. 825, 831 (2009) (explaining that *Atkins* "did not provide definitive procedural or substantive guides for determining when a person" is intellectually disabled). And we cannot "import a procedural burden of proof requirement" that the Supreme Court

25

declined to adopt in our review of a habeas petition. *Hill v. Humphrey*, 662 F.3d at 1360.

Raulerson contends that the Court clearly established a procedural limitation on the burden of proof "by invoking *Ford*," *see Atkins*, 536 U.S. at 317, but that argument reads too much into a lone citation to *Ford*. In *Ford*, the Supreme Court, in Justice Powell's controlling concurrence, held that prisoners who made a substantial threshold showing of incompetence to be executed were entitled to a hearing on that claim. 477 U.S. at 426 (Powell, J., concurring in part and in the judgment). "The citation in *Atkins*, however, not only was not to that portion of *Ford*, it was not even to Justice Powell's *opinion* in *Ford*." *Brumfield*, 135 S. Ct. at 2294 (Thomas, J., dissenting). And neither the plurality opinion in *Ford* nor Justice Powell's concurring opinion even mentioned the burden of proof for claims of incompetence. So *Atkins*'s citation to *Ford* cannot clearly establish a procedural limitation on the burden of proof for intellectual disabilities.

Acknowledging that *Atkins* expressly left procedural rules to the states, Raulerson next argues that considering *Atkins* in conjunction with *Cooper* yields clearly established minimum procedural requirements to prove intellectual disability, but even the combination of these decisions does not suffice. In *Cooper*, the Supreme Court addressed whether an Oklahoma law that required a defendant to prove his incompetence to stand trial by clear and convincing evidence violated

the Due Process Clause. To resolve that issue, the Court applied the general due-process standard first articulated in *Patterson v. New York*, 432 U.S. 197, 202 (1977)—whether the criminal procedural rule "offends a principle of justice that is [so] deeply rooted in the traditions and conscience of our people" as to be considered fundamental. *Cooper*, 517 U.S. at 362 (citation and internal quotation marks omitted). The Court had already held that requiring a defendant to prove his incompetence by a preponderance of the evidence did not violate this standard. *See Medina v. California*, 505 U.S. 437, 453 (1992). But contrasting the longstanding right not to be tried if incompetent with the lack of historical support for Oklahoma's clear-and-convincing standard, the Court concluded that the heightened standard offended a principle of justice deeply rooted in the traditions and conscience of our people. *Cooper*, 517 U.S. at 359–60, 362.

Raulerson's comparison between the right not to be tried if incompetent and the right not to be executed if intellectually disabled is misplaced. Unlike the right at issue in *Cooper*, which has deep roots in our common-law heritage, there is no historical right of an intellectually disabled person not to be executed. *See Hill v. Humphrey*, 662 F.3d at 1350. Indeed, as recently as 1989, the Supreme Court refused to bar the execution of the intellectually disabled. *See Penry v. Lynaugh*, 492 U.S. 302 (1989). Georgia's reasonable-doubt standard, enacted 30 years ago, was "the first state statute prohibiting such executions." *Atkins*, 536 U.S. at 313–

14; *see also Hill v. Humphrey*, 662 F.3d at 1350–51. "And since the constitutional right itself is new, there is no historical tradition regarding the burden of proof as to that right." *Hill v. Humphrey*, 662 F.3d at 1350.

In the light of these fundamental differences, *Cooper* did not clearly establish that the application of Georgia's beyond-a-reasonable-doubt standard to Raulerson's claim of intellectual disability violated his right to due process under the Fourteenth Amendment. To conclude otherwise would require us to extend the Court's rationale from incompetence to intellectual disability. That we cannot do. *See White v. Woodall*, 572 U.S. 415, 426 (2014) ("'[I]f a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'" (quoting *Yarborough*, 541 U.S. at 666)).

In the "controlling" decision the superior court applied to reject Raulerson's due-process claim on the merits, the Supreme Court of Georgia reasoned that the burden of proof required to prove the defense of insanity is "more closely analogous to the burden of proof standard in Georgia's mental retardation statute than is the mental incompetency" burden. *Hill v. Humphrey*, 662 F.3d at 1350 (glossing *Head v. Hill*, 587 S.E.2d at 621–22). And the Supreme Court has rejected a due-process challenge to a state law that required a defendant to prove his insanity beyond a reasonable doubt. *See Leland v. Oregon*, 343 U.S. 790, 798–99

(1952). We held in *Hill v. Humphrey* that it was reasonable for the Supreme Court of Georgia to conclude that the burden of proof for intellectual disability is analogous to insanity, which permits a beyond-a-reasonable-doubt standard. *See* 662 F.3d at 1350. Nothing the Supreme Court has said since then changes that conclusion.

Our dissenting colleague's contrary conclusion disregards the nature of our inquiry. This Court cannot "answer the due process question presented here" based on how we would apply federal law. Dissenting Op. at 49. We review only whether the superior court's decision was "contrary to, or involved an unreasonable application of, clearly established [f]ederal law," 28 U.S.C. § 2254(d)(1), which refers only to the holdings of the Supreme Court's decisions, *see Yarborough*, 541 U.S. at 660–61. Our dissenting colleague infers that *Cooper* and *Leland* establish different procedural standards for constitutional and nonconstitutional rights respectively, *see* Dissenting Op. at 48–49, but neither decision so holds. And the dissent's inference of an unstated rationale underlying their divergent outcomes does not amount to clearly established federal law. *See Yarborough*, 541 U.S. at 660–61. Indeed, *Leland* did not even hold that the right to present an insanity defense was not constitutionally based, so this key premise of the dissent's argument that *Head v. Hill* transgressed clearly established federal law is itself not clearly established. In any event, although *Cooper* established a procedural

standard for one constitutional right—the right not to be tried if incompetent—it does not follow that *Cooper* clearly established a procedural standard applicable to *all* constitutional rights. *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) (explaining that "due process is flexible and calls for such procedural protections as the particular situation demands"). Our dissenting colleague's extension of *Cooper* from the context of incompetency to stand trial to the distinct context of ineligibility for the death penalty because of intellectual disability is just that—an extension—and section 2254(d)(1) neither "require[s] state courts to *extend* [Supreme Court] precedent [n]or license[s] federal courts to treat the failure to do so as error." *Woodall*, 572 U.S. at 426.

No decision of the Supreme Court clearly establishes that Georgia's burden of proof for intellectual disability violates the Due Process Clause. "If the standard of proof Georgia has adopted for claims of [intellectual disability] is to be declared unconstitutional, it must be done by the Supreme Court in a direct appeal, in an appeal from the decision of a state habeas court, or in an original habeas proceeding filed in the Supreme Court." *Hill v. Humphrey*, 662 F.3d at 1361. Because the Court has not done so, the superior court's decision was not an unreasonable application of clearly established federal law.

### C. Raulerson Fails to Establish His Intellectual Disability by Clear and Convincing Evidence.

Raulerson argues that he is "actually innocent" of the death penalty because he is intellectually disabled, and under *Atkins*, the execution of an intellectually disabled person would violate the Eighth Amendment. This argument needlessly blends the distinct concepts of actual innocence and intellectual disability, but even when we sift through each, Raulerson's claim fails.

Considered as a freestanding claim of actual innocence of the death penalty, Raulerson's claim is a nonstarter. To begin with, our precedent forecloses habeas relief based on a prisoner's assertion that he is actually innocent of the crime of conviction "absent an independent constitutional violation occurring in the underlying state criminal proceeding." *See Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (citation and internal quotation marks omitted); *see also Cunningham v. Dist. Att'y's Office*, 592 F.3d 1237, 1273 (11th Cir. 2010) ("[An] assertion of actual innocence, by itself, is not enough."); *Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007). As we have explained, "[i]t is not our role to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial." *Brownlee*, 306 F.3d at 1065. And the Supreme Court has never held that a prisoner is "entitled to habeas relief based on a freestanding claim of actual innocence." *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013).

The prohibition on freestanding claims of actual innocence in a habeas petition respects the nature of our federal system: "Federal courts are not forums in which to relitigate state trials." *Herrera v. Collins*, 506 U.S. 390, 401 (1993) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)). When reviewing a habeas petition, we "sit to ensure that individuals are not imprisoned in violation of the Constitution—not to correct errors of fact." *Id.* at 400. And "[f]ew rulings would be more disruptive of our federal system than to provide for federal habeas review of freestanding claims of actual innocence." *Id.* at 401.

To be sure, a prisoner may assert actual innocence to overcome a procedural bar that would otherwise prevent a federal court from hearing his claim on the merits. *See Sawyer v. Whitley*, 505 U.S. 333, 338–39 (1992); *see also Herrera*, 506 U.S. at 404. But that way of escaping a procedural bar concerns "*factual* innocence, not mere legal insufficiency." *McKay v. United States*, 657 F.3d 1190, 1197 (11th Cir. 2011). And even when the Supreme Court has "assume[d] for the sake of argument"—but without deciding—that "a truly persuasive demonstration of 'actual innocence' [as a freestanding claim] . . . would render the execution of a defendant unconstitutional," it meant actual innocence *of the crime*. *Herrera*, 506 U.S. at 417. Raulerson neither raises actual innocence to overcome a procedural bar nor argues that he is actually innocent of the murders for which he was convicted.

Although Raulerson frames his claim as one of actual innocence, it rests on the notion that he is "actually innocent" of the death penalty because he is intellectually disabled and so his execution would violate the Eighth Amendment—that is, in essence, an *Atkins* claim. *See Atkins*, 536 U.S. at 321. A claim of a federal constitutional violation, in contrast with a freestanding claim of actual innocence, is a ground for federal habeas relief. *See Herrera*, 506 U.S. at 400 ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief *absent an independent constitutional violation* occurring in the underlying state criminal proceeding." (emphasis added)). So Raulerson may pursue his claim not because of actual innocence but because he argues that his execution would violate the Constitution. We put aside Raulerson's misplaced "actual innocence" rhetoric and consider his argument as an *Atkins* claim. But even when we give Raulerson's *Atkins* claim the benefit of every doubt, it fails.

We begin by making two assumptions that favor Raulerson. First, although the parties dispute whether Raulerson exhausted this *Atkins* claim, we will assume that he did. Second, we will assume that Raulerson's *Atkins* claim has not been "adjudicated on the merits" by any Georgia court, so we will not apply the deferential standard of section 2254(d), which would require us to deny relief unless Raulerson's *Atkins* claim was unreasonable "in the light of the evidence

presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see also Cullen*, 563 U.S. at 181 ("[R]eview under § 2254(d)(1) [also] is limited to the record that was before the state court that adjudicated the claim on the merits.").

The superior court rejected Raulerson's *Atkins* claim on the ground of res judicata, which is not an adjudication on the merits for our purposes. *See Cone*, 556 U.S. at 466, 472. And the Supreme Court of Georgia's denial of a certificate of probable cause presumably rested on the same ground. *See Wilson*, 138 S. Ct. at 1192. So, if Raulerson's *Atkins* claim was ever adjudicated on the merits, it must have been when the jury rejected his defense of intellectual disability or when the Supreme Court of Georgia affirmed the jury verdict. That Raulerson's *Atkins* claim was adjudicated by the jury and on direct appeal is a plausible interpretation but is in some tension with the longstanding principle that a "claim" in habeas consists of a "*particular* legal basis" wedded to a "*specific* factual foundation." *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005) (emphases added) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). In the context of exhaustion, "it is not at all clear that a petitioner can exhaust a federal claim by raising an analogous state claim," even if the federal and state rights are identical in content. *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 460 (11th Cir. 2015).

34

By the same token, it is not immediately obvious that Raulerson's jury or the Supreme Court of Georgia decided Raulerson's *Atkins* claim—which is based on his right not to be executed if intellectually disabled under the federal Constitution—when they rejected his state-law defense of intellectual disability. When Raulerson was tried, he had a right not to be executed if intellectually disabled under Georgia law, but the Supreme Court had not yet decided *Atkins*, which acknowledged a corresponding federal right. So we will give Raulerson the benefit of this doubt and assume without deciding that his *Atkins* claim has never been adjudicated on the merits.

Even if Raulerson escapes the gauntlet of section 2254(d) because no state court adjudicated his *claim* based on *Atkins*, there was a determination of the factual *issue* of his intellectual disability, and we must presume correct "a determination of a factual issue made by a State court." 28 U.S.C. § 2254(e)(1). Whether a person is intellectually disabled is a factual issue. *Fults v. GDCP Warden*, 764 F.3d 1311, 1319 (11th Cir. 2014). The jury determined that issue against Raulerson when it rejected his defense of intellectual disability. *See* Restatement (Second) of Judgments § 27 cmt. d (Am. Law Inst. 1982) ("A determination may be based on a failure of . . . proof as well as on the sustaining of the burden of proof."). And the Supreme Court of Georgia held that the jury verdict was rational. *Raulerson*, 491 S.E.2d at 796. Because the state courts

determined that Raulerson is not intellectually disabled and that determination is

entitled to be presumed correct, he bears "the burden of rebutting the presumption

of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The precise scope of the "determination of [the] factual issue" which

Raulerson must rebut is not immediately obvious. The most generous interpretation

of section 2254(e)(1) is that it provides the primary standard of proof whenever a

state prisoner desires to prove a factual issue that was determined against him in

state court. If so, then a state prisoner may establish that a state court's factual

determination was incorrect by proving the contrary proposition—in Raulerson's

case, that he is intellectually disabled—by clear and convincing evidence as if in

the first instance.

But section 2254(e)(1) could also be understood to establish, not a primary

standard of proof, but a secondary standard of persuasion that operates in tandem

with the original standard of proof applied by the state court. If so, then a state

prisoner must prove by clear and convincing evidence that a state court's factual

determination was incorrect in the light of the standard of proof that state law

applies to that issue. *See Maldonado v. Thaler*, 625 F.3d 229, 236, 241 (5th Cir.

2010) (applying section 2254(e)(1) to a claim of intellectual disability, explaining

that the petitioner "bears the burden of establishing by a preponderance of the

evidence that he is mentally retarded"—the Texas burden of proof for intellectual

disability—and finding that the petitioner "did not rebut the [section 2254(e)(1) presumption of correctness that attaches to the state habeas court's conclusion that [he] did not meet his [state-law] burden"); *cf. Tharpe v. Warden*, 834 F.3d 1323, 1344–47 (11th Cir. 2016). In other words, it may be that the state's burden of proof is incorporated into the determination that the prisoner must rebut by clear and convincing evidence. On this interpretation, Raulerson must rebut—by clear and convincing evidence—the determination that it is not beyond a reasonable doubt that he is intellectually disabled.

Such compound standards are far from unusual in federal habeas review of state-court proceedings. *See, e.g.*, 28 U.S.C. § 2254(e)(2)(B) (To obtain an evidentiary hearing in federal court, the petitioner must show that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."); *Sawyer*, 505 U.S. at 336 ("[T]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law."); *Tharpe*, 834 F.3d at 1345 (When section 2254(d) applies to a Georgia court's rejection of an *Atkins* claim, "the heart of the matter" is "whether [the state court] *unreasonably* concluded that [the petitioner] had failed to prove *beyond a*

*reasonable doubt* that" he is intellectually disabled. (emphases added)). By contrast, the more lenient interpretation *would* be unusual; even with a demanding standard of proof, permission for state prisoners to relitigate already-decided factual issues as if in the first instance would be a surprising departure from the structure and objectives of the Antiterrorism and Effective Death Penalty Act. But, because the outcome of this appeal does not depend on the answer, we assume without deciding that the more lenient interpretation is correct.

To recap, we have now made three important assumptions in Raulerson's favor. We have assumed his *Atkins* claim is exhausted. We have also assumed that it was not adjudicated on the merits, so the rigorous standards of section 2254(d) do not apply. And we have assumed that section 2254(e)(1) permits him to prove that he is intellectually disabled—and ineligible for the death penalty—by providing clear and convincing evidence to a federal court in the first instance. In practice, this amounts to the assumption that a state prisoner may prove the factual predicate of an *Atkins* claim in federal court with clear and convincing evidence even when the state in which he was convicted and sentenced imposes a more demanding burden of proof for precisely the same factual issue—a particularly generous assumption in the light of the *Atkins* Court's express decision to "leave to the States the task of developing appropriate ways to enforce [*Atkins*'s]

constitutional restriction." *Atkins*, 536 U.S. at 317 (alteration adopted) (quoting *Ford*, 477 U.S. at 416).

Even with these assumptions in his favor, Raulerson is not entitled to relief based on his *Atkins* claim because the record does not clearly and convincingly prove that he is intellectually disabled. The clear-and-convincing-evidence standard, although not "insatiable," is still "demanding." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). We have explained that it "calls for proof that a claim is 'highly probable.'" *Fults*, 764 F.3d at 1314 (alterations adopted) (quoting *United States v. Owens*, 854 F.2d 432, 436 (11th Cir. 1988)). To succeed on his claim, Raulerson must provide clear and convincing evidence of the three components of Georgia's definition of "intellectual disability": "significantly subaverage general intellectual functioning"; "resulting in or associated with impairments in adaptive behavior"; "which manifested during the developmental period." O.C.G.A. § 17-7-131(a)(2); *see also Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017) (explaining the "generally accepted, uncontroversial intellectual-disability diagnostic definition," which Georgia's definition matches). Considering the evidence presented at trial and in the habeas proceedings, Raulerson failed to prove that it is "highly probable" that he is intellectually disabled.

Raulerson's IQ scores that he received as a child undermine that he had "significantly subaverage general intellectual functioning," which is generally

defined as an IQ between 70 and 75 or below. *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 633 (11th Cir. 2016). At trial, the evidence proved that Raulerson had received two IQ scores as a child that were above the range of intellectual disability. When Raulerson was eleven years old, he received an IQ score of 78. And when he was fourteen years old, he received an IQ score of 83. Both scores refute that Raulerson had subaverage intellectual functioning.

By applying two adjustments, the Flynn effect and the standard error of measurement, Dr. Grant testified that Raulerson's IQ scores could be as low as 70 and 74. But neither adjustment provides clear and convincing evidence of his subaverage intellectual functioning. No adjustment for the Flynn effect is required in this Circuit. *Id.* at 635–37. Because "IQ tests are scored on a scale that is relative to the population" when the test is developed, the Flynn effect adjusts for the empirical observation that IQ scores are rising over time. *McManus v. Neal*, 779 F.3d 634, 652 (7th Cir. 2015). But as we have acknowledged, there is no consensus about the Flynn effect among experts or among the courts. *Ledford*, 818 F.3d at 635–37 (explaining the divergent approaches to the Flynn effect taken by our sister circuits); *Thomas v. Allen*, 607 F.3d 749, 758 (11th Cir. 2010) ("[T]here is no uniform consensus regarding the application of the Flynn effect in determining a capital offender's intellectual functioning . . . ."). Although Dr. Grant testified that the Flynn effect should be applied to lower Raulerson's IQ scores, the two

psychologists who had administered Raulerson's IQ tests disagreed and testified that they would not apply the Flynn effect to the scores.

Adjusting Raulerson's scores for the standard error of measurement puts him closer to the range of intellectual disability, but that standard is a "bi-directional concept." *Ledford*, 818 F.3d at 641. "The standard error of measurement accounts for a margin of error both below *and* above the IQ test-taker's score." *Id.* at 640 (emphasis added). While Dr. Grant applied a standard error of measurement of five or six points to *lower* Raulerson's IQ scores, the standard also raises his range of scores. For example, while a six-point standard error of measurement might mean Raulerson's score of 83 could reflect an IQ as low as 77, it could also reflect one as high as 89. With Dr. Grant's standard error of measurement, Raulerson had IQ ranges of 77–89 and 73–83, which both fall above and dip into the threshold of intellectual disability. And the standard error of measurement "does not carry with it a presumption that an individual's IQ falls to the bottom of his IQ range." *Id.* at 641. Even adjusting Raulerson's scores *both* for the Flynn effect and the standard error of measurement does not make it highly probable that he had subaverage intellectual functioning. As Dr. Lower testified in state habeas proceedings, although Raulerson's adjusted scores *could* put him in the intellectually disabled range, it "is a very small likelihood" because his scores are "pretty, pretty well above the range."

To be sure, Raulerson received an IQ score within the range of intellectual disability when he was tested after committing the murders. Both Dr. Grant and Dr. Lower tested him and scored him at an IQ of 69. But Dr. Lower also explained several reasons why he felt that Raulerson "was not probably motivated to do his best on [the tests]," including that "it was not to his advantage to do too well" because he stood charged of three capital offenses. In the light of two IQ scores comfortably above the range of intellectual disability that Raulerson received as a child, his later IQ score below the range does not clearly and convincingly prove he has "*significantly* subaverage general intellectual functioning."

Raulerson also has not established that it is highly probable he had an intellectual disability "which manifested during the developmental period." The "developmental period" refers to a disability that originated before the age of 18. *Ledford*, 818 F.3d at 635. Raulerson's claim of intellectual disability rests on Dr. Lower reevaluating his testimony about whether Raulerson was intellectually disabled, but Lower never changed his mind as to whether Raulerson had an intellectual disability that onset during the developmental period. At trial, when asked whether there was any "convincing demonstration" that Raulerson was diagnosed with an intellectual disability before age 18, Lower answered, "Absolutely none whatever." At the hearing before the superior court on collateral review, Lower still questioned whether Raulerson had an intellectual disability

onset before age 18, stating that the evidence of onset was "not real strong." And Lower explained that there was "no way to determine" when Raulerson "sunk" into the range for intellectual disability. Considering the IQ scores that Raulerson received as a child, Lower also testified that Raulerson's scores were "pretty well above the range" for intellectual disability. Ultimately, Lower still could not conclude that Raulerson was intellectually disabled. In the light of Lower's testimony, Raulerson has not established by clear and convincing evidence that he had an intellectual disability that onset during the developmental period.

The record does not prove that Raulerson's claim of intellectual disability is "highly probable." So he has not rebutted the presumption that the state courts' contrary determination was correct, and he is not entitled to federal habeas relief based on *Atkins*.

## V. CONCLUSION

We **AFFIRM** the denial of Raulerson's petition for a writ of habeas corpus.

JORDAN, Circuit Judge, concurring in part and dissenting in part:

"[B]urdens of proof can be outcome-determinative in the face of ignorance[.]"*

The Eighth Amendment prohibits a state from executing a defendant who is intellectually disabled. *See Atkins v. Virginia*, 536 U.S. 304, 321 (2002). In my view, the Georgia statute requiring capital defendants to prove intellectual disability beyond a reasonable doubt, *see* O.C.G.A. § 17-7-131(c)(3), violates the Due Process Clause of the Fourteenth Amendment. That burden of proof creates an intolerable risk that intellectually disabled defendants will be put to death. Indeed, in the last 30 years not a single capital defendant in Georgia has been able to establish intellectual disability when the matter has been disputed. With respect, I dissent from the majority's contrary holding.[1]

# I

Where a criminal proceeding does not implicate an underlying constitutional right, the Due Process Clause generally allows a state to decide the appropriate allocation and burden of proof. Take, for example, the affirmative defense of insanity. When a defendant invokes insanity as a defense to criminal liability, a state

---

* Ronald J. Allen, *How Presumptions Should Be Allocated—Burdens of Proof, Uncertainty, and Ambiguity in Modern Legal Discourse*, 17 Harv. J. L. & Pub. Pol'y 627, 639 (1994).

[1] I concur in Parts I, II, and III.A. of the majority opinion. Because I believe that Georgia's beyond-a-reasonable-doubt standard is unconstitutional, I would remand Mr. Raulerson's substantive intellectual disability claim to the district court for an evidentiary hearing under the preponderance-of-the-evidence standard.

may require him to prove that he was insane beyond a reasonable doubt. *See Leland v. Oregon*, 343 U.S. 790, 799–800 (1952). But that is because insanity is not a defense born of the Constitution. Indeed, the Supreme Court has never held that the Constitution requires states "to recognize the insanity defense." *Medina v. California*, 505 U.S. 437, 449 (1992). *See also* Alex Stein, *Constitutional Evidence Law*, 61 Vand. L. Rev. 65, 80 (2008) ("Because states and Congress may choose not to recognize [certain affirmative] defenses, they are allowed to condition the availability of any such defense on its proof by the defendant. Consequently, lawmakers can require defendants to establish any affirmative defense by preponderance of the evidence, by clear and convincing proof, or even beyond a reasonable doubt.").

Constitutionally-based rights stand on a different footing. Competency, for example, provides a good contrast to the affirmative defense of insanity. A state cannot constitutionally try and convict a defendant who is incompetent. *See, e.g.*, *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975); *Pate v. Robinson*, 383 U.S. 375, 378 (1966). Accordingly, the Supreme Court has held that although a state can require a defendant to prove lack of competency by preponderance of the evidence, it cannot, based on "traditional and modern practice and the importance of the constitutional interest at stake," demand clear and convincing evidence. *Compare Medina*, 505 U.S. at 453 (allowing the use of the preponderance-of-the-evidence

standard), *with Cooper v. Oklahoma*, 517 U.S. 348, 356, 369 (1996) (prohibiting the use of the clear-and-convincing standard).

Intellectual disability, as noted, presents a constitutionally-based restriction on a state's ability to carry out the death penalty. *See Atkins*, 536 U.S. at 321. Georgia's placing of a beyond-a-reasonable-doubt burden on capital defendants asserting intellectual disability therefore violates the Due Process Clause, and the decisions of the state superior court and the Georgia Supreme Court holding otherwise are contrary to *Cooper*, which constitutes clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

## A

In *Hill v. Humphrey*, 662 F.3d 1335, 1338 (11th Cir. 2011) (en banc), a habeas corpus case decided under the deferential AEDPA framework, we held by a 7-4 vote that a Georgia Supreme Court decision upholding § 17-7-131(c)(3)'s beyond-a-reasonable-doubt standard against an Eighth Amendment challenge was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. *Hill* is not controlling here because Mr. Raulerson is challenging the beyond-a-reasonable-doubt standard under the Due Process Clause, and not the Eighth Amendment. *See id.* at 1363–64 (Tjoflat, J., concurring in the judgment) (explaining that the petitioner in *Hill* should have, but did not, assert a due process claim).

Prior to our decision in *Hill*, the Georgia Supreme Court held, by a 4-3 vote, in *Head v. Hill*, 587 S.E.2d 613, 620–22 (Ga. 2003), that Georgia's beyond-a-reasonable-doubt standard did not violate the Due Process Clause.  In this case, the state superior court relied on the opinion in *Head* to reject Mr. Raulerson's due process claim.  *See* R31-423.

In *Head*, the Georgia Supreme Court identified *Leland*, 343 U.S. at 799–800 (concerning the non-constitutional affirmative defense of insanity), as the governing Supreme Court precedent, and expressly declined to apply the standard set forth in *Cooper*, 517 U.S. at 356, 369 (concerning the constitutional matter of competency). *See Head*, 587 S.E.2d at 621 ("[W]e again find the comparison between claims of insanity and of mental retardation to warrant a conclusion that the beyond-a-reasonable-doubt standard may be applied constitutionally to mental retardation claims.").  This ruling, followed by the state superior court here, is "contrary to" established Supreme Court precedent—i.e., *Cooper*—under § 2254(d)(1) and is therefore not entitled to AEDPA deference.

A state court decision comes within the "contrary to" clause of § 2254(d)(1) if it applies a "rule that contradicts the governing law set forth in [Supreme Court] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). *See also id.* at 406 (explaining that if a state court, in a case involving a claim of ineffective assistance of counsel, applies a standard different than the one set forth in *Strickland v. Washington*, 466

U.S. 668 (1984), the "contrary to" standard is satisfied); *id.* at 397–98 (holding that a state court's decision was "contrary to" clearly established precedent because it did not correctly apply the prejudice standard of *Strickland*). If, on the other hand, a state court correctly identifies the governing Supreme Court cases in the relevant area of law and applies the standard from those cases, its decision will not be "contrary to" clearly established Supreme Court law. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The Supreme Court has consistently confirmed this interpretation of the "contrary to" clause, and so have we. *See White v. Woodall*, 572 U.S. 415, 420 (2014); *Lafler v. Cooper*, 566 U.S. 156, 173 (2012); *Trepal v. Sec'y, Fla. Dep't of Corr.*, 684 F.3d 1088, 1109 (11th Cir. 2012). *Accord* Randy Hertz & James S. Liebman, Federal Habeas Corpus Practice and Procedure § 32.3 at 1908–10 (7th ed. 2018).

Contrary to what *Head* concluded, *Leland* is not the governing Supreme Court precedent for addressing the limits on determining and allocating the burden of proof when a constitutional right is at stake. Insanity, the affirmative defense at issue in *Leland*, is not and has never been constitutionally based. *See Medina*, 505 U.S. at 449. So the deference given to the states in *Leland* to determine and allocate the burden of proof for an insanity defense to criminal liability is not appropriate in a case involving a constitutionally-protected right. Indeed, the Supreme Court noted in *Leland* that the defendant there did not "s[eek] to enforce against the states a right

48

which we have held to be secured to defendants in federal courts by the Bill of Rights." *Leland*, 343 U.S. at 798. *See also Hill*, 662 F.3d at 1383 (Martin, J., dissenting) ("There is a critical distinction between the Due Process required to protect substantive rights derived from the United States Constitution on the one hand [in *Cooper*] and state created rights on the other [in *Leland*.]") (citation omitted).

Where a fundamental constitutional right is involved—and the Eighth Amendment right of an intellectually-disabled defendant not to be executed is such a right—*Cooper* provides the governing precedent under the Due Process Clause. The Supreme Court in *Cooper* in fact distinguished cases, like *Patterson v. New York*, 432 U.S. 197, 201–02 (1977), involving the determination and allocation of the burden of proof for state-created defenses. *See Cooper*, 517 U.S. at 367–68 ("[U]nlike *Patterson*, which concerned procedures for proving a statutory defense [i.e., extreme emotional disturbance], we consider here whether a State's procedures for guaranteeing a fundamental constitutional right are sufficiently protective of that right.").

To answer the due process question presented here, *Cooper* requires a court to examine the relevant common-law traditions of England and the United States, contemporary practices, and the risks inherent in Georgia's practice of requiring capital defendants to prove intellectual disability beyond a reasonable doubt. *See id.*

at 356–69.  This is why several states have relied on *Cooper* to analyze their states'
procedures for determining intellectual disability.   *See, e.g.*, *Pennsylvania v.
Sanchez*, 36 A.3d 24, 70 (Pa. 2011); *Pruitt v. State*, 834 N.E.2d 90, 103 (Ind. 2005);
*State v. Williams*, 831 So. 2d 835, 859 (La. 2002); *Murphy v. State*, 54 P.3d 556, 573
(Okla. Crim. App. 2002); *Morrow v. State*, 928 So. 2d 315, 324 n.10 (Ala. Crim.
App. 2004).   The Indiana Supreme Court, for example, overturned its precedent
requiring defendants to prove intellectual disability by clear and convincing
evidence.  *See Pruitt*, 834 N.E.2d at 103.  That precedent had disregarded *Cooper*
because "execution of the [intellectually disabled] had not yet been held to violate
the Federal Constitution."  *Id.* at 101.  Once *Atkins* established the constitutional
nature of the right, however, *Cooper* applied and barred the state from requiring the
defendant to prove his disability by clear and convincing evidence.  *Id.*  at 101–03
("The reasoning of *Cooper* in finding a clear and convincing standard
unconstitutional as to incompetency is directly applicable to the issue of mental
retardation . . . .  [T]he implication of *Atkins* and *Cooper* is that the defendant's right
not to be executed if mentally retarded outweighs the state's interest as a matter of
federal constitutional law.").

Because the Georgia Supreme Court in *Head* did not conduct the due process
analysis required by *Cooper*, its decision in that case (followed by the superior court
here) is not entitled to AEDPA deference.  *See Williams*, 529 U.S. at 406 (explaining

that if a state court applies an incorrect legal standard, "a federal court will be unconstrained by § 2254(d)(1) because the state court decision falls within that provision's 'contrary to' clause").

## B

*Atkins* tasked the states with "developing appropriate ways to enforce the constitutional restriction" on executing the intellectually disabled.  *See Atkins*, 536 U.S. at 317.  That task includes establishing a standard of proof and determining who bears the burden.  But states do not have unfettered authority to establish such procedures.  As in other areas of the law, "the state procedures must be adequate to protect" the Eighth Amendment prohibition against the execution of the intellectually disabled.  *See Pate*, 383 U.S. at 378.  *See also Twining v. New Jersey*, 211 U.S. 78, 102 (1908) ("The limit of the full control which the state has in the proceedings of its courts, both in civil and criminal cases, is subject only to the qualification that such procedure must not work a denial of fundamental rights."); *Bailey v. Alabama*, 219 U.S. 219, 239 (1911) ("It is apparent that a constitutional prohibition cannot be transgressed indirectly by the creation of a [procedural rule] any more than it can be violated by direct enactment.").

The burden of proof plays a critical role in our adversarial system because it often drives the result.  "In all kinds of litigation it is plain that where the burden of proof lies may be decisive of the outcome . . . . There is always in litigation a margin

of error, representing error in factfinding, which both parties must take into account." *Speiser v. Randall*, 357 U.S. 513, 525 (1958). The burden of proof "allocate[s] the risk of error between the litigants" and, in so doing, "indicate[s] the relative importance attached to the ultimate decision." *Addington v. Texas*, 441 U.S. 418, 423 (1979). This is why we generally use the preponderance-of-the-evidence standard in civil disputes, but demand that the state prove the guilt of an accused defendant beyond a reasonable doubt. *See Grogan v. Garner*, 498 U.S. 279, 286 (1991) ("Because the preponderance-of-the-evidence standard results in a roughly equal allocation of the risk of error between litigants, we presume that this standard is applicable in civil actions between private litigants unless 'particularly important individual interests or rights are at stake.'"). Our society recognizes the "magnitude" of the defendant's interests in a criminal case and places a high burden of proving guilt on the government "to exclude as nearly as possible the likelihood of an erroneous judgment." *Id.* at 423–24. *See also Cruzan v. Dir., Mo. Dep't. of Health*, 497 U.S. 261, 283 (1990) (noting that the "more stringent the burden of proof a party must bear, the more that party bears the risk of an erroneous decision").

In *Cooper*, 517 U.S. at 363, the Supreme Court reiterated that where a constitutional right is at issue, a state may not place a heightened burden on the defendant if doing so "imposes a significant risk of an erroneous determination." *See also Lockett v. Ohio*, 438 U.S. 586, 604–05 (1978) (plurality opinion) ("[The]

52

qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed . . . . When the choice is between life and death, [a heightened risk of wrongful execution created by a state statute] is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments.").  The Court in *Cooper* reversed the conviction of a capital defendant because Oklahoma required him to prove his lack of competency to stand trial by clear and convincing evidence.  *See id.* at 350.  This burden "allocat[ed] to the criminal defendant the large share of the risk which accompanies a clear and convincing evidence standard" and thus created an unconstitutional risk that the state would "put to trial a defendant who is more likely than not incompetent." *Id.* at 365, 369.  Oklahoma used this burden even though "the vast majority of jurisdictions" thought the heightened standard was "not necessary to vindicate the[ir] interest in prompt and orderly disposition of criminal cases." *Id.* at 362.  Because the "consequences of an erroneous determination of competence are dire," the Court held Oklahoma's procedural rule to be "incompatible with the dictates of due process." *Id.* at 364, 369.

Here the stakes are just as high, and the burden Georgia places on capital defendants to prove intellectual disability is even higher than the clear-and-convincing standard found unconstitutional in *Cooper*.  Georgia, I note, is also the only state to impose such a burden of proof. *See Head*, 587 S.E.2d at 630 (Sears, J.,

dissenting) ("[Georgia] is now the only state that requires condemned defendants to prove their retardation beyond a reasonable doubt.").  Of the 25 states that retain and currently enforce the death penalty, 19 apply a preponderance-of-the-evidence standard and only two apply a clear-and-convincing standard.  *See generally* Lauren S. Lucas, *An Empirical Assessment of Georgia's Beyond a Reasonable Doubt Standard to Determine Intellectual Disability in Capital Cases*, 33 Ga. St. U. L. Rev. 553, 560–61 (2017).[2]  "Not one state has followed Georgia's statutory scheme in implementing the *Atkins* decision."  *Id.*

Moreover, several states have rejected a clear and convincing standard because no state interest justified the higher burden.  *See, e.g.*, *Sanchez*, 36 A.3d at 70 ("[W]e are persuaded that a different allocation or standard of proof [than preponderance] are not necessary to vindicate the constitutional right of mentally retarded capital defendants recognized in *Atkins*, or to secure Pennsylvania's 'interest in prompt and orderly disposition of criminal cases.'"); *Pruitt*, 834 N.E.2d at 103 ("We do not deny that the state has an important interest in seeking justice, but we think the implication of *Atkins* and *Cooper* is that the defendant's right not to be executed if mentally retarded outweighs the state's interest as a matter of

---

[2] Arizona and Florida currently apply a clear and convincing standard.  *See* Ariz. Rev. Stat. § 13-753 (2011); Fla. Stat. § 921.137 (2013).  Although Colorado, Delaware, and Indiana passed statutes requiring clear and convincing evidence for *Atkins* claims, Delaware's death penalty statute was struck down, Colorado no longer enforces the death penalty, and the Indiana Supreme Court has held that a clear-and-convincing standard was unconstitutional under *Atkins* and *Cooper*.  *See Pruitt*, 834 N.E.2d at 103.  The remaining states that retain and enforce the death penalty (Kansas, Montana, and Wyoming) have not adopted a specific standard of proof for *Atkins* claims.

federal constitutional law. We therefore hold that the state may not require proof of mental retardation by clear and convincing evidence."); *Howell v. State*, 151 S.W.3d 450, 465 (Tenn. 2004) ("[W]ere we to apply the statute's 'clear and convincing' standard in light of the newly declared constitutional right against the execution of the mentally retarded, the statute would be unconstitutional. . . . [Because] the risk to the petitioner of an erroneous outcome is dire, as he would face the death penalty, while the risk to the State is comparatively modest. . . . The balance, under these circumstances, weighs in favor of the petitioner and justifies applying a preponderance of evidence standard at the hearing."); *Williams*, 831 So. 2d at 859–60 ("Clearly, in the *Atkins* context, the State may bear the consequences of an erroneous determination that the defendant is mentally retarded (life imprisonment at hard labor) far more readily than the defendant of an erroneous determination that he is not mentally retarded."). Despite being the only state to apply the beyond-a-reasonable-doubt standard, Georgia has never explained how its uniquely high standard furthers a legitimate state interest.[3]

---

[3] In *Head*, the Georgia Supreme Court stated that the "higher standard of proof serves to enforce the General Assembly's chosen definition of what degree of impairment qualifies as mentally retarded under Georgia law for the purpose of fixing the appropriate criminal penalty that persons of varying mental impairment should bear for their capital crimes, in light of their individual diminished personal culpabilities and the varying degrees of deterrence possible." 587 S.E.2d at 622 (quotations omitted and alterations adopted). Georgia has not asserted such an interest in its briefs, but even if it had, the explanation amounts to no justification at all. The Georgia Supreme Court's reasoning—that the standard of proof is high because the General Assembly defined intellectual disability to require a high standard of proof—is tautological and fails to identify a state interest that the burden of proof actually serves.

## C

Mr. Raulerson asserts that Georgia's beyond-a-reasonable-doubt standard effectively permits the state to do what the Eighth Amendment forbids—execute a prisoner who is intellectually disabled. Concurring in the judgment in *Hill*, Judge Tjoflat summarized the due process argument against imposing the beyond-a-reasonable-doubt standard. I think he was prescient, and got it exactly right:

> Claims of mental retardation are incredibly fact-intensive and could devolve into a swearing match between conflicting, and equally qualified, experts. This swearing match could easily—if not always—create reasonable doubt that the defendant is not mentally retarded. By erecting this higher burden, the State effectively put its thumb on the scale against a defendant's mental-retardation defense . . . . [T]he State's unfair thumb—the beyond-a-reasonable-doubt standard—deprive[s a defendant] of full and fair post-conviction hearing, and he would be entitled to an evidentiary hearing in federal court.

*Hill*, 662 F.3d at 1364 (Tjoflat, J., concurring in the judgment).

Intellectual disability is an inherently imprecise and partially subjective diagnosis. The generally accepted definition of intellectual disability, which Georgia follows, requires three core elements: (1) an intellectual-functioning deficit; (2) an impairment of adaptive behavior (the "inability to learn basic skills and adjust behavior to changing circumstances," *Hall v. Florida*, 572 U.S. 701, 710 (2014)); and (3) the onset of these deficits at an early age. *See* O.C.G.A. § 17-7-131(a)(2). *See also Moore v. Texas*, 137 S. Ct. 1039, 1045 (2017). Experts must therefore sift

through a lifetime's worth of data and draw impressions about whether certain facts or data points satisfy several subjective elements.

Each element presents its own challenges. Experts may measure intellectual functioning through IQ tests, but a person's score can only provide a possible range. As the Supreme Court explained in *Hall*, where it struck down Florida's use of a strict 70-or-below IQ requirement for *Atkins* claims, "[a]n individual's IQ test score on any given exam may fluctuate for a variety of reasons" including "a test-taker's health; practice from earlier tests; the environment or location of the test; the examiner's demeanor; the subjective judgment involved in scoring certain questions on the exam; and simple lucky guessing." *Hall*, 572 U.S. at 713. And "the test itself may be flawed, or administered in a consistently flawed manner," so that "even a consistent score is not conclusive evidence of intellectual functioning." *Id.* at 714. And the age-of-onset element requires an expert to conduct a retrospective analysis to piece together the prisoner's intellectual capacity as a child—often without the benefit of childhood IQ tests, trained child psychologists, or witnesses of the prisoner's childhood behavior. The difficulty of drawing a clear-cut conclusion is compounded by the always-existing phenomenon of dueling experts, who often differ only in terms of degrees.

The intellectual disability analysis, with its inherent difficulties, renders *Atkins* claims highly susceptible to uncertainty. That uncertainty is magnified by the

way Georgia defines the concept of reasonable doubt.  In Georgia, the "true question in criminal cases" is "whether there is sufficient evidence to satisfy the mind and conscience beyond a reasonable doubt."  O.C.G.A. § 24-14-15.  The Georgia pattern jury instructions state that a reasonable doubt can arise from "consideration of the evidence, a lack of evidence, or a *conflict in the evidence*."  Georgia Suggested Pattern Jury Instruction—Criminal 1.20.10 (2019) (emphasis added).  *See also Ward v. State*, 515 S.E.2d 392, 393 (Ga. 1999) (approving this portion of the pattern jury instruction).  Given that intellectual disability disputes will always involve conflicting expert testimony, there will always be a basis for rejecting an intellectual disability claim.  Placing a beyond-a-reasonable-doubt burden on a defendant therefore creates an unacceptable risk of error that those with intellectual disabilities will be put to death.  If *Cooper* held that a clear-and-convincing burden cannot be placed on defendants asserting incompetency, I do not see how Georgia can place a beyond-a-reasonable-doubt burden on capital defendants asserting intellectual disability.

The majority says that Georgia's burden of proof cannot transgress the Due Process Clause because *Atkins* left to the states the ability to craft procedures for intellectual disability claims.  But this reasoning disregards how the Supreme Court has interpreted its mandate for the states to create "*appropriate*" procedures to enforce the constitutional restriction.  *See Atkins*, 536 U.S. at 317 (emphasis added).

*See also Moore*, 137 S. Ct. at 1053 ("'If the States were to have complete autonomy to define intellectual disability as they wished,' we have observed, '*Atkins* could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality.'") (quoting *Hall*, 572 U.S. at 1999).  Would it be permissible for a state to require a capital defendant asserting an *Atkins* claim to prove intellectual disability "beyond all doubt whatsoever" or with "100% certainty" just because *Atkins* tasked the states with establishing procedures?  The question answers itself—of course not.

In *Hall*, the Supreme Court recognized that "*Atkins* did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation falls within the protection of the Eighth Amendment," but it also reiterated that "*Atkins* did not give the States unfettered discretion to define the full scope of the constitutional protection."  572 U.S. at 718–19 (quotations omitted).  Florida exceeded its permissible discretion by using a strict IQ score because it "ignore[d] the inherent imprecision of these tests [and] risk[ed] executing a person who suffers from intellectual disability."  *Id.* at 723.  So too in *Moore*,  137 S. Ct. at 1052–53.  There, the Supreme Court repeated that "[s]tates have some flexibility, but not unfettered discretion in enforcing *Atkins*' holding."  *Id.* (quotations omitted).  The Court then held that Texas had overstepped its *Atkins* authority by disregarding the consensus of the medical community and applying an outdated set of factors to

determine intellectual disability—a practice that "create[d] an unacceptable risk that persons with intellectual disability will be executed." *Id*. at 1044.

Georgia's beyond-a-reasonable-doubt standard is one more manifestation of the same problem. *Hall* and *Moore* teach that states violate their discretion under *Atkins* by establishing procedures that create an unacceptable risk that intellectually disabled prisoners will be executed. Not only has Georgia failed to recognize the practical impediments to proving an intellectual disability claim, but has imposed on capital defendants the heaviest burden in our legal system. Doing so effectively denies those defendants a "fair opportunity to show that the Constitution prohibits their execution." *Hall*, 572 U.S. at 724.

## III

Sometimes "a page of history is worth a volume of logic." *N.Y. Trust Co. v. Eisner*, 256 U.S. 345, 349 (1921) (Holmes, J.). Should any proof be needed that Georgia's beyond-a-reasonable-doubt standard imposes an insurmountable and unconstitutional demand on capital defendants, we need look no further than how that burden has operated in practice. In the 30 years since § 17-7-131(c)(3) was enacted, not a single capital defendant has succeeded in proving to a factfinder that he or she is intellectually disabled beyond a reasonable doubt.

In *Hill*, 662 F.3d at 1380—where we rejected, under AEDPA deference, an Eighth Amendment challenge to Georgia's beyond-a-reasonable-doubt standard—

the majority asserted that there was no data "to support the proposition that the reasonable doubt standard triggers an unacceptably high error rate for mental retardation claims." *See also id.* at 1356 ("*There is no data on this question in this record.*") (emphasis in original). That is no longer the case.

Here, the district court held an evidentiary hearing to consider, among other things, whether any Georgia capital defendants had successfully proven their intellectual disability to a judge or jury beyond a reasonable doubt. Prior to that hearing, the district court allowed discovery and required Georgia to respond to interrogatories concerning whether, since 1988, any capital defendants had established intellectual disability beyond a reasonable doubt. Georgia, tellingly, did not provide *any* cases where a defendant met that standard. *See* D.E. 38; R1123–33.[4]

The record shows that since 1988 at least 27 Georgia defendants have asserted intellectually disability in cases where the death penalty was sought. *See* D.E. 38 at 6–8; D.E. 52 at 29–32. In 13 of those cases, the intellectual disability issue went to

---

[4] Some of this evidence was not available in 2005, when the Georgia Supreme Court denied Mr. Raulerson's appeal. Under AEDPA, our review is normally constrained to the record as established before the state habeas court. *See Cullen v. Pinholster*, 563 U.S. 170, 181–82 (2011). But because the state habeas court's decision here was contrary to established Supreme Court precedent under § 2254(d)(1), *de novo* review is appropriate. *See Daniel v. Comm'r*, 822 F.3d 1248, 1280 (11th Cir. 2016). We therefore can, and should, consider the evidence developed in the district court. *See Landers v. Warden*, 776 F.3d 1288, 1295 (11th Cir. 2015); *Maddison v. Comm'r*, 761 F.3d 1240, 1249–50 (11th Cir. 2014).

a factfinder.  And not a single one of those 13 defendants was able to satisfy the
beyond-a-reasonable-doubt standard.  In this context, 13 defendants is a reasonable
sample size and a success rate of zero is constitutionally unacceptable.[5]

Other Georgia cases and recent scholarship on this issue confirm this reality.
"From an empirical perspective, we can now say with confidence that not one
defendant in Georgia has proven successfully to a jury post-*Atkins* that he is exempt
from the death penalty due to intellectual disability."  Lucas, *Empirical Assessment*,
at 605.  *See also id.* at 582 ("The final results of the study [reviewing records from
379 capital cases tried after § 17-7-131(c)(3) was enacted] confirmed what was
thought anecdotally to be true about the impact of Georgia's beyond a reasonable
doubt standard . . . : not one capital defendant in Georgia has successfully obtained
a jury verdict of [intellectual disability] in a case of intentional murder.").[6]

By comparison, a national study found that, from 2002 to 2013, 55% of capital
defendants succeeded in proving their *Atkins* intellectual disability claims.  *See* John

---

[5] The intellectual disability claims of 13 defendants are still pending, and one defendant passed
away before the state court could determine his intellectual disability claim.

[6] In my own research, I have been able to find one Georgia non-capital defendant who proved to a
jury that she was intellectually disabled beyond a reasonable doubt.  In 2003—prior to the Supreme
Court's decision in *Atkins*—a jury found Vanessa Marshall guilty but intellectually disabled of
*felony murder* for the unintentional death of her son.  *See Marshall v. State*, 583 S.E.2d 884, 886
(Ga. 2003).  In 2009, a state court found that Christopher Lewis—a capital defendant—was
intellectually disabled beyond a reasonable doubt on habeas review.  *See Hall v. Lewis*, 692 S.E.2d
580, 584, 592 (Ga. 2010).  In that case, however, Georgia did not credibly challenge Mr. Lewis'
claim that he was intellectually disabled and did not appeal the habeas court's determination.  So,
there was no real dispute.  *See Hill*, 662 F.3d at 1376 n.19 (Barkett, J., dissenting).

H. Blume, Sheri L. Johnson, Paul Marcus, & Emily C. Paavola, *A Tale of Two (and Possibly Three) Atkins: Intellectual Disability and Capital Punishment Twelve Years After the Supreme Court's Creation of a Categorical Bar*, 23 Wm. & Mary Bill Rts. J. 393, 397 (2014) (reviewing cases from 29 states).  Not surprisingly, this disparity has raised the attention of experts in the areas of capital punishment and disability policy.  *See id.*; Lucas, *Empirical Assessment*, at 553; Lauren A. Ricciardelli & Kristina Jaskyte, *A Value-Critical Policy Analysis of Georgia's Beyond a Reasonable Doubt Standard of Proof of Intellectual Disability*, 30 J. Disability Pol'y Stud. 56, 58–59 (2019).

Part of the problem is that Georgia's beyond-a-reasonable-doubt standard requires a level of certainty that mental health experts simply cannot provide.  Mr. Raulerson's expert witness—a distinguished professor specializing in intellectual disabilities—analyzed cases where Georgia defendants attempted to prove intellectual disability and testified at the district court evidentiary hearing.  When asked about the burden imposed by Georgia, she said the following:

> [W]hat I know is that the burden in the state of Georgia is beyond a reasonable doubt[,] and what I can say is that it would be very rare for a clinician, especially in the so-called mild mental retardation range, to testify to that high level, to be able to testify to that high level.

D.E. 51 at 71–72.  *See also* Lauren A. Ricciardelli & Kevin M. Ayres, *The Standard of Proof of Intellectual Disability in Georgia: The Execution of Warren Lee Hill*, 27 J. Disability Pol'y Stud. 158, 165 (2016) (criticizing Georgia's procedures because

the "standard of proof for diagnosis requires something other than what a qualified expert in that field can provide").

We now have solid data confirming that Georgia's standard does not afford capital defendants a meaningful opportunity to prove intellectual disability. Must we continue to bury our heads in the sand?

## IV

"Rules about presumptions and burdens of proof reflect one's views about where the risk of loss ought to be placed . . . . It is not a novel proposition that judgments inflicting the penalty of death should be hedged about with greater safeguards." *Stanley v. Zant*, 697 F.2d 955, 974 (11th Cir. 1983) (Arnold, J., dissenting). In my view, § 17-7-131(c)(3) violates the Due Process Clause because a state cannot constitutionally place on a defendant the burden of proving intellectual disability beyond a reasonable doubt. That standard creates an intolerable risk that intellectually disabled defendants will be put to death, and the evidence from the last three decades in Georgia conclusively demonstrates that the standard is in fact insurmountable in litigated capital cases.

"[T]he procedures by which the facts of a case are determined assume an importance fully as great as the validity of the substantive rule of law to be applied. And the more important the rights at stake the more important must be the procedural safeguards surrounding the rights." *Speiser*, 357 U.S. at 520–21. Mr. Raulerson

64

should be allowed to prove to the district court, by a preponderance of the evidence, that he is intellectually disabled.